## Case No. 24-1209

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

---

NATIONAL ASSOCIATION FOR GUN RIGHTS;
CHRISTOPHER JAMES HIESTAND RICHARDSON;
MAX EDWIN SCHLOSSER; JOHN MARK HOWARD;
ROCKY MOUNTAIN GUN OWNERS,
*Plaintiffs-Appellants,*

v.

JARED S. POLIS,
in his official capacity as Governor of the State of Colorado,
*Defendant-Appellee.*

---

*On Appeal from the United States District Court for the District of Colorado (Denver)*
*Case No. 1:24-CV-00001-GPG-STV · The Honorable Gordon P. Gallagher, U.S. District Judge*

**BRIEF FOR BRADY CENTER TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY SUPPORT FUND, AND GIFFORDS
LAW CENTER TO PREVENT GUN VIOLENCE AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

KATHLEEN R. HARTNETT
   *Counsel of Record*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
khartnett@cooley.com

ADAM M. KATZ
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736
Telephone: (617) 937-2300
akatz@cooley.com

*Counsel for Amici*

September 13, 2024

 

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 10th Cir. R. 26.1, Brady Center to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Support Fund ("Everytown"), and Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), certify they are all not-for-profit corporations with no parent corporations, and, because none of these entities issues any stock, no publicly held company owns 10% or more of their stock.

## TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ............................................................... viii

INTRODUCTION .............................................................................. 1

ARGUMENT ................................................................................... 4

    I.    The Second Amendment In No Way Preserves Any
           Supposed Right to Sell or Possess Guns Designed to
           Thwart Law Enforcement ..................................................... 4

    II.    There Is No Legitimate Reason to Oppose Serialization .... 14

CONCLUSION ................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Boyd v. Nott an LLC d/b/a JSD Supply, et al.,*
24-000304-NP (Mich. 22d Jud. Circuit Mar. 11, 2024) ....................... 3

*Defense Distributed v. Bonta,*
2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) .................................... 12

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................................ 4, 5, 7, 9

*McDonald v. Chicago,*
561 U.S. 742 (2010) ...................................................................... 4, 5, 7

*McRorey v. Garland,*
99 F.4th 831 (5th Cir. 2024) ............................................................... 10

*Montgomery v. Rosenblum,*
2024 WL 3887248 (D. Or. Aug. 20, 2024) .......................................... 8

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ...................................................... 4, 5, 6, 10, 12, 25

*New York v. Arm or Ally, LLC,*
--- F. Supp. 3d ---, 2024 WL 756474 (S.D.N.Y. 2024) ...................... 12

*Rigby v. Jennings,*
630 F. Supp. 3d 602 (D. Del. 2022) .............................................. 12, 13

*Thomas v. United States,*
2023 WL 8827216 (D. Del. Dec. 21, 2023) ........................................ 16

*United States v. Avila,*
672 F. Supp. 3d 1137 (D. Colo. 2023) .......................................... 11, 16

*United States v. Holton,*
639 F. Supp. 3d 704 (N.D. Tex. 2022) ............................................... 11

## TABLE OF AUTHORITIES
### continued

Page(s)

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010) ............................................................. 7, 15

*United States v. Price,*
111 F.4th 392 (4th Cir. 2024) (en banc) ............................ 7, 10 ,16, 29

*United States v. Rahimi,*
144 S. Ct. 1889 (2024).................................................................... 4, 5, 6

*United States v. Reyna,*
2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) .................................... 10

*United States v. Serrano,*
651 F. Supp. 3d 1192 (S.D. Cal. 2023)................................................. 16

*United States v. Taconi,*
1:23-cr-00058-CNS (July 3, 2024) ....................................................... 23

*United States v. Trujillo,*
670 F. Supp. 3d 1235 (D.N.M. 2023) .................................................. 16

*VanDerStok v. Garland,*
86 F.4th 179 (5th Cir. 2023) ............................................................... 24

**Statutes**

18 U.S.C. § 922(k)........................................................................... 7, 10

Colo. Rev. Stat.
§ 18-12-111.5 ......................................................................................... 1
§ 18-12-111.5(5)................................................................................... 13
§ 18-12-111.5(5)(b)(I)........................................................................... 13

**Other Authorities**

27 C.F.R.
§ 478.42(a)(2)....................................................................................... 27
§ 478.49 ............................................................................................... 27

# TABLE OF AUTHORITIES
## continued

**Page(s)**

80% Arms, *Gun Build Kits* (last visited Aug. 12, 2024) .......................... 28

ATF, *Fact Sheet - NTC* (Apr. 2023),
  https://www.atf.gov/resource-center/fact-sheet/fact-sheet-
  national-tracing-center ..................................................................... 15

ATF, *How to Become a Federal Firearms Licensee in 10 Easy
  Steps* (Apr. 6, 2020), https://tinyurl.com/3xft395j ............................. 27

ATF, National Firearms Commerce and Trafficking
  Assessment, Crime Guns, Vol. II (Nov. 7, 2023) .................................. 17

ATF, National Firearms Commerce and Trafficking
  Assessment (NFCTA): Crime Guns - Volume Two, Part
  III, at 6 (last updated Nov. 7, 2023),
  https://www.atf.gov/firearms/national-firearms-commerce-
  and-trafficking-assessment-nfcta-crime-guns-volume-two .............. 18

Brian DeLay, *The Myth of Continuity in American Gun
  Culture*, 113 Calif. L. Rev. (forthcoming 2025), available
  at https://tinyurl.com/2wxbnmj5 ....................................................... 25

10th Cir. R.
  25.5 ...................................................................................................... 31
  26.1 ......................................................................................................... i
  32 ......................................................................................................... 30

Colorado Gun Writes, *https://coloradogunwrites.com* (last
  visited Sept. 10, 2024) ........................................................................ 13

*Definition of "Frame or Receiver" and Identification of
  Firearms*, 87 Fed. Reg. 24,652, 24,659 (Apr. 26, 2022) ...................... 21

Denver7, *Undercover ATF Agents Bust Alleged 'Ghost Gun
  Ring Dealing in AK-47s, Homemade Silencers* (Dec. 4,
  2018), https://perma.cc/Y24A-VJTL ................................................... 22

v

# TABLE OF AUTHORITIES
## continued

**Page(s)**

DOJ, *Aurora Man Sentenced for Dealing Firearms Without a License* (July 25, 2024), https://perma.cc/KHE3-GMMD ................. 22

Everytown Research & Policy, *Untraceable: The Rising Specter of Ghost Guns* 13 (May 14, 2020), https://bit.ly/3OcBb1W .......................................................... 29

Fed. R. App. P.
26.1 ..................................................................................... ii
29(a)(5) ............................................................................ 30
32(a) ................................................................................. 30
32(f) ................................................................................. 30

*Ghost Gun Recoveries and Shootings*, Everytown Research & Policy (July 31, 2023), https://tinyurl.com/3ywjk9b5 ............. 16, 17, 23

Giffords, Ghost Guns:  How Untraceable Firearms Threaten Public Safety (May 2020), https://giffords.org/lawcenter/report/ghost-guns-how-untraceable-firearms-threaten-public-safety/ ................................. 21

Grace Hauck, *What Is a Ghost Gun? A Soaring Number Are Being Used in Crimes*, USA Today (Feb. 3, 2023), https://bit.ly/3YbZT7k .......................................................... 18

Graham Ambrose, Note, *Gunmaking at the Founding*, 77 Stan. L. Rev. (forthcoming 2025) .......................................... 9

Jaclyn Allen, *Untraceable, Unregulated and Easy to Build: Colorado and the Increasing Popularity of "Ghost Guns,"* ABC Denver7 (Feb. 22, 2019), https://tinyurl.com/46pwj7j7 ............................................... 19

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35 (2023) ...................................... 24

## TABLE OF AUTHORITIES
### continued

**Page(s)**

Michelle P. Fulcher, *Gov. Jared Polis Says He Supports a Ban on Ghost Guns and Expanding the State's "Red Flag" Law*, CPR News (Jan. 18, 2023), https://tinyurl.com/3zh9an7u ...........................................................24

*The One Complete Pistol & Frame Kit,* Zrodelta, https://perma.cc/U9F8-XEVF (last visited Sept. 11, 2024) ...............14

*Polymer80 - PF45 Serialized Pistol Frame Kit*, Arm or Ally, https://perma.cc/S4PA-XEAZ (last visited Sept. 6, 2024) ..................14

Rob Low, *Club Q Suspect Used "Ghost Gun," Sources Say*, Fox 31 (Nov. 22, 2022), https://kdvr.com/news/local/colorado-club-q-shooting-suspect-ghost-gun/ ?ipid=promo-link-block3......................................20

Rob Low, *East High Shooting Suspect Killed Himself with Ghost Gun, Failed Prior Diversion Program*, Denver KDVR (Mar. 23, 2023), https://tinyurl.com/4pz8a8u7 ......................20

Tom Jackman, *Philadelphia Becomes Fourth City to Ban Largest Ghost Gun Parts Dealer*, Wash. Post (Apr. 14, 2024), https://perma.cc/HXA7-LKCC .................................................21

U.S. DOJ, *Former Colorado Resident Sentenced to Life in Prison for Federal Hate Crimes and Firearm Offenses Related to Mass Shooting at Club Q* (June 18, 2024), https://perma.cc/253W-9XA6 ..............................................................20

*USAO District of Colorado: Ghost Gun Public Service Announcement*, YouTube (Dec. 18, 2022), https://www.youtube.com/watch?v=-HLM973uF2g.....................26, 27

## STATEMENT OF INTEREST

Brady is the nation's longest-standing non-partisan, non-profit organization dedicated to counteracting gun violence through education, research, legal advocacy, and political action. Everytown is the education, research, and litigation arm of Everytown for Gun Safety, the largest gun violence prevention organization in the nation, with millions of supporters across the country. Giffords Law Center is a law and policy organization serving lawmakers, advocates, gun violence survivors and others who seek to reduce gun violence and guard the safety of their communities. Drawing on their expertise, *Amici* have filed dozens of amicus briefs in Second Amendment and other firearms-related cases, offering historical, doctrinal, technical, and policy research that might not be presented otherwise. *Amici* also have extensively studied ghost guns, fought for measures to curtail the rise of ghost guns and ensure public safety, and filed briefs specifically addressing the dangers of unserialized firearms.[1]

---

[1] This brief is filed with the consent of all parties. No party or party's counsel authored this brief in whole or part; no party or party's counsel contributed money to fund this brief's preparation or submission; and no person—besides Brady, Everytown, and Giffords Law Center—contributed money to fund this brief's preparation or submission.

## INTRODUCTION

A ghost gun is a deadly, unserialized, and untraceable weapon that can be assembled at home in twenty minutes or less from unregulated components freely available for purchase online—with no background check and no questions asked. In recent years, ghost guns have fueled a nationwide public-safety epidemic. It is not difficult to see why. For individuals who are prohibited from legally purchasing a firearm or are interested in evading law enforcement detection—such as those who have been convicted of felonies, or are minors, or are would-be criminals—a ghost gun is the natural choice. These guns are just as powerful and deadly as serialized guns, but impossible to trace.

In 2023, Colorado fought back against this threat to public safety. In adopting Senate Bill 23-279 ("SB-279"), Colorado joined the federal government and multiple states that now subject ghost guns to many of the commonsense regulations that govern any other firearm. Under SB 23-279, individuals are free to continue keeping and bearing arms. *See* Colo. Rev. Stat. § 18-12-111.5. Hobbyists interested in assembling firearms from prefabricated parts are likewise free to continue doing so, as long as the frame or receiver is serialized. *See id.* Hobbyists who wish

1

to 3D-print a firearm are free to do so, as long as they obtain a federal license to manufacture firearms.  *See id.*  SB 23-279 does not discourage gun ownership.  It is simply an effort to close a dangerous loophole.

For the reasons set forth by Colorado, the district court's decision should be affirmed.  *Amici* write to highlight several of the many reasons why Plaintiffs'[2] challenge here is misguided and dangerous.  As Colorado explains, the district court correctly held that SB 23-279 does not regulate conduct protected by the Second Amendment's plain text.  *See* Gov't Br. 34–38.  The statute allows Plaintiffs to "keep and bear Arms" that they acknowledge are "functionally identical in all relevant respects" to the ghost guns they wish to own.  Pl. Br. 44.  Thus, SB 23-297 enshrines an important law enforcement tool while preserving Plaintiffs' Second Amendment rights in full.

Plaintiffs have not identified—and cannot identify—a lawful basis for preferring unserialized firearms to serialized firearms.  As court after court has concluded, the only reason to prefer an unserialized firearm

---

[2] Plaintiffs-Appellants National Association for Gun Rights, Christopher James Hiestand Richardson, Max Edwin Schlosser, John Mark Howard, and Rock Mountain Gun Owners collectively refer to themselves in their brief as "Plaintiffs."  For simplicity, this brief adopts that terminology.

such as a ghost gun to a functionally identical serialized firearm is to avoid detection by law enforcement.  And that basic conclusion is borne out by the alarming data on the proliferation of ghost guns and the commensurate rise in violence related to ghost guns—including several high-profile and disturbing incidents in Colorado.  Try as they might, Plaintiffs cannot rebrand ghost guns as the rightful heir to a long tradition of innocent gunsmithing.  As recent scholarship points out, ghost guns are a distinctly modern phenomenon.  At no point in the history of this country have amateurs had the technology to assemble a deadly weapon in a matter of minutes, all while remaining invisible to law enforcement.

It is thus no accident that ghost gun purveyors have specifically marketed their wares to those disdainful of firearms law and law enforcement.  *See*, *e.g.*, Complaint ¶ 49, *Boyd v. Nott an LLC d/b/a JSD Supply, et al.* 24-000304-NP (Mich. 22d Jud. Circuit Mar. 11, 2024) (collecting examples of ghost gun purveyor marketing that its wares were available "without the paperwork" and "off-the-books," that its ghost gun kits were sold with "[n]o serialization" and "no background check," that its kits "are used to create fully functional firearms with no registration

or serial numbers required" and "with absolutely no paperwork," that "without serialization" on the wares there was "no way to track your purchase," and that it allowed those "looking at having a handgun" to do so "without the traditional headaches of background checks, registration, and serialization."). Arguing that such deliberate evasion of basic public safety measures is protected by the U.S. Constitution is a perversion of the Second Amendment that finds no support whatsoever in the precedents of this Court or the Supreme Court.

The district court's decision should thus be affirmed.

## ARGUMENT

### I. The Second Amendment In No Way Preserves Any Supposed Right to Sell or Possess Guns Designed to Thwart Law Enforcement

**1.** The Supreme Court's decisions in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), *McDonald v. Chicago*, 561 U.S. 742 (2010), and *District of Columbia v. Heller*, 554 U.S. 570 (2008), all make clear that "the right secured by the Second Amendment is not unlimited"; it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The right "does not," for example, "protect … weapons not typically possessed by law-abiding

4

citizens for lawful purposes." *Id.* at 625.

In and after *Heller*, the Court has instructed that "prohibitions on … concealed weapons," "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms" are consistent with the "*pre-existing*" right codified by the text of the Second Amendment. *Heller*, 554 U.S. at 592 (emphasis in original), 626; *see*, *e.g.*, *id.* at 626 n.26 (cautioning that this "list" of "presumptively lawful measures" was not "exhaustive"); *McDonald*, 561 U.S. at 786 (repeating that *Heller* "did not cast doubt on … longstanding regulatory measures"); *Bruen*, 597 U.S. at 21 (confirming that the right "is not unlimited" (quotations omitted)); ; *Rahimi*, 144 S. Ct. at 1902 (reiterating that "many" prohibitions, including those mentioned in *Heller*, are "presumptively lawful").

Additionally, the Court has indicated that "shall-issue" firearm licensing requirements are compatible with the Second Amendment. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of such licensing laws, which "often

require applications to undergo a background check or pass a firearms safety course" in order to qualify. *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring) (approving of carry licensing regimes across "43 states" that include "fingerprinting, a background check, a mental health records check, and training in firearms handling," "among other possible requirements."). At bottom, the Second Amendment "codified a pre-existing right, and pre-existing limits on that right are part and parcel of it." *Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring).

Applying these principles, Colorado correctly explains that the "Second Amendment protects people's rights to keep and bear arms for self-defense" and SB 23-279 "does not affect this right at all." Gov't Br. 15. SB 23-279 requires that "serial numbers be printed on firearms," but that "regulation on commercial transactions" does not "impact anyone's right to possess or acquire any firearm." *Id.* SB-279 permits Coloradans to keep arms, bear arms, and to do so in connection with the individual self-defense at the "core" of the right. *Id.* at 36.[3]

---

[3] While the Court need not reach the second step of *Bruen*, Colorado correctly explains how and why SB 23-279 is fully consistent with this nation's history of firearm regulation. Gov't Br. 45–55.

6

In addition to being lawful for the reasons set out by Colorado, the serialization required by SB 23-279 is fully consistent with Second Amendment rights because ghost guns are not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 623; *see also McDonald*, 561 U.S. at 780 (it is a "right to keep and bear arms for *lawful purposes*" (emphasis added)).  It is self-evident—as well as borne out by practice—that *the* reason to avoid serialization is to avoid detection by law enforcement, because it is difficult to "conceive of a lawful purpose for which a person would prefer an unmarked firearm." *United States v. Marzzarella*, 614 F.3d 85, 99 (3d Cir. 2010).  In fact, as set forth below, ghost guns have left a trail of violence and crime in their wake that is fundamentally incompatible with the notion that these guns are typically in circulation among law-abiding gun owners for lawful self-defense. *Infra* Part II.

The en banc Fourth Circuit's recent decision in *United States v. Price*, 111 F.4th 392 (4th Cir. 2024) (en banc), is instructive.  There, an individual charged with possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) moved to dismiss the indictment on the grounds that Section 922(k) violates the Second Amendment.  *Id.*

at 396.  The en banc Fourth Circuit rejected the challenge, holding that "the conduct regulated by § 922(k) does not fall within the scope of the right enshrined in the Second Amendment because a firearm with a removed, obliterated, or altered serial number is not a weapon in common use for lawful purposes."  *Id.* at 397.  In reaching this conclusion, the Fourth Circuit recognized that firearms without "serial numbers are preferable to criminals because of their concealability" and could identify "no common-sense reasons for a law-abiding citizen to prefer" a firearm without a serial number "for a lawful purpose."  *Id.* at 404.  Concurring in the judgment, Judge Niemeyer echoed the majority's conclusion that "the reason people tamper with firearm serial numbers is to make it harder for law enforcement officers to trace their use in criminal activity." *Id.* at 411 (Niemeyer, J., concurring in judgment).  Of the 15 judges, nine joined the majority opinion and four more filed concurrences.

Weeks later, the District of Oregon reached a similar conclusion, upholding Oregon's ghost gun regulation because "unserialized and undetectable firearms are not in common use for lawful purposes." *Montgomery v. Rosenblum*, 2024 WL 3887248, at *5 (D. Or. Aug. 20, 2024).  That analysis applies here:  whether the serial number is

8

obliterated or was never applied to begin with, there is no common, lawful purpose for preferring unserialized firearms to serialized firearms. Tellingly, Plaintiffs never identify any such purpose.

Moreover, as Colorado's arguments reflect, *see* Gov't Br. 34, SB 23-279's modest conditions on firearm possession comport with the limited scope of the pre-existing right codified through the Second Amendment. SB 23-279 is concerned with serialization in the "commercial sale of arms," *Heller*, 554 U.S. at 626, in line with labeling and defacement prohibitions dating back to at least as early as the eighteenth century.[4] The law has one subsection requiring serialization for self-manufactured firearms. But that subsection does not even apply to Plaintiffs, who seek to *assemble* frames and receivers, not *manufacture* them. *See* District Court Op. 20 n.18. As Colorado points out, "none of the Plaintiffs testified that they had the means to manufacture their own frames or receivers," Gov't Br. 19, and SB 23-279 does not apply to the "assembly" of prefabricated "parts into a functional firearm," *id.* at 20.

---

[4] *See* Graham Ambrose, Note, *Gunmaking at the Founding*, 77 Stan. L. Rev. at 28–32 (forthcoming 2025).

9

**2.**     Plaintiffs rest their claim on a supposed right to "manufacture" unserialized arms that Plaintiffs assert is *"implie[d]"* by the Second Amendment's text.  Pl. Br. at 45 (emphasis added).  But this position fails on its face.  By definition, any right that is purportedly *implied* by the Second Amendment is not a right within the Amendment's "plain text."[5]  *Bruen*, 597 U.S. at 17.  That inescapable reality explains why courts have rejected Plaintiffs' theory and why Plaintiffs' cited cases are inapposite.

For example, in *United States v. Reyna*, the court rejected a Second Amendment challenge to a law prohibiting possession of a firearm with an obliterated serial number, finding that the law at issue regulated "possession of a firearm with an obliterated serial number"—a right with no textual home in the Second Amendment.  2022 WL 17714376, at *3–5 (N.D. Ind. Dec. 15, 2022).  As in *Price*, discussed above, *Reyna* observed that Section 922(k)'s prohibition "applie[d] to a class of guns defined

---

[5] To be sure, some courts have signaled that rights ancillary to keeping and bearing arms (*e.g.*, acquisition of arms) can come within the Second Amendment, but only when ancillary rights are restricted in a manner that impedes the core right of lawful self-defense.  Or, as the Fifth Circuit put it, when ancillary rights are regulated in a manner that shoehorns in "functional prohibitions on keeping."  *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024).  That is not this case.

solely by a nonfunctional characteristic," *i.e.*, "the serial number," which are not in common use for lawful purposes. *Id.* at *5–6; *see id.* (adding that, "[b]y using a gun without a serial number, a criminal ensures he has a greater likelihood of evading justice").

The District of Colorado reached the same conclusion in *United States v. Avila*, holding that guns with "obliterated serial numbers are not within the class of firearms typically possessed by law-abiding citizens for lawful purposes" and thus "do[] not implicate the Second Amendment." 672 F. Supp. 3d 1137, 1143 (D. Colo. 2023); *see id.* (collecting cases reaching the same result).

So too in *United States v. Holton*, where the Northern District of Texas held that the prohibition on possessing a firearm with an obliterated serial number upheld the right "to possess and carry an otherwise lawful gun *with a serial number* for self-defense," and did not "infringe[] on the right to keep and bear arms." 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022) (emphasis in original).

Likewise in a challenge to a California ghost-gun regulation, the Central District of California upheld the regulation because the claimed right to "self-manufacture" unserialized firearms was "quite-clearly" not

based upon a "plain text analysis" as "required under *Bruen*." *Defense Distributed v. Bonta*, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022).

Similarly, in *New York v. Arm or Ally, LLC*, the Southern District of New York concluded that New York's efforts to regulate ghost guns did not run afoul of the Second Amendment because "none of the … laws at issue prohibit people legally entitled to bear arms from purchasing a firearm or, for that matter, from buying unfinished frames and receivers and then making them into fully functional firearms; they must simply buy serialized parts from a licensed dealer after undergoing the same background check as any firearms purchaser." --- F. Supp. 3d ---, 2024 WL 756474, at *13 (S.D.N.Y. 2024) (quotations omitted). Just as in all of these cases, Plaintiffs' Second Amendment challenge fails because Colorado's regulation of ghost guns does not actually "infringe," *id.*, Plaintiffs' right to keep and bear arms.

Against all this, Plaintiffs rely heavily on *Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022). *See* Pl. Br. 20, 21, 43, 44, 46. As Colorado explains, that reliance is misplaced. *See* Gov't Br. 39–40. In *Rigby*, the district court found that a law barring possession, manufacture, and distribution of unserialized firearms lacked "any way for [firearm

12

owners] to keep firearms they lawfully manufactured." *Id.* at 613. *Rigby* expressly differentiated that law from California's ghost-gun regulation that "permits individuals to apply to the Department of Justice for a unique serial number," and thus afforded firearm owners an "opportunity to maintain possession of their firearms by applying for a serial number." *Id.* at 613 n.12 (quotations omitted). Like the California law distinguished in *Rigby*, SB 23-279 allows owners of unserialized firearms to bring firearms to a "federal firearms licensee" to have the firearm "imprinted with a serial number." Colo. Rev. Stat. § 18-12-111.5(5)(b)(I). *Rigby* turned on a provision that SB 23-279 simply does not have.[6]

In any event, even if Plaintiffs had standing to challenge SB 23-279's manufacturing provision, the ability to manufacture firearms is not meaningfully burdened here. Many federal firearms licensees in Colorado will engrave a serial number on a firearm for $50 or less per engraving. *See*, *e.g.*, Colorado Gun Writes, *https://coloradogunwrites.com* (last visited Sept. 10, 2024); *see also* Colo. Rev. Stat. § 18-12-111.5(5) (one can obtain a federal license to

---

[6] Plaintiffs likewise ignore that "Other courts have reached the opposite conclusion as *Rigby* and held that the Second Amendment's plain text does not cover private manufacture or assembly." Gov't Br .40.

manufacture or take a pre-SB 23-279 firearm to be imprinted with a
serial number).   And serialized firearm-assembly kits are readily
available.  *See*, *e.g.*, *The One Complete Pistol & Frame Kit,* Zrodelta,
https://perma.cc/U9F8-XEVF (last visited Sept. 11, 2024); *Polymer80 –
PF45 Serialized Pistol Frame Kit*, Arm or Ally, https://perma.cc/S4PA-
XEAZ (last visited Sept. 6, 2024).

## II.  There Is No Legitimate Reason to Oppose Serialization

As Colorado's brief explains in detail, *see* Gov't Br. 32–45, Plaintiffs
fail to show that SB 23-279 implicates conduct that falls within the plain
text of the Second Amendment.  Accordingly, their challenge fails at step
one and this Court need not undertake any further analysis.  *Amici*
nonetheless explain how the narrative that underlies Plaintiffs' brief—
that ghost guns are part of a "centuries-long tradition" of innocent
American gunsmithing, Pl. Br. 3—is wrong.  Ghost guns are a distinctly
modern threat to public safety, which has no footing in the historical
record.  As we have repeatedly emphasized in this brief—without fear of
contradiction—there is, in truth, *no* legitimate reason to prefer an
unserialized firearm to a serialized firearm.

1.    To understand the appeal of ghost guns to would-be law-

breakers, one must understand how "tracing" works. Firearms are traced by the Bureau of Alcohol, Tobacco, Firearms and Explosives's ("ATF") National Tracing Center ("NTC"), which uses serial numbers to "detect firearms trafficking and trace the movement of crime guns across police jurisdictions, state lines and national borders." ATF, *Fact Sheet – NTC* (Apr. 2023), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-tracing-center. Tracing "begins when ATF or another law enforcement agency recovers a firearm during an investigation and wants to learn where it came from." *Id.* NTC "receives the trace request and uses the gun's markings to identify its original manufacturer or importer." *Id.* That, in turn, allows NTC to "trace the firearm through the wholesale and retail distribution chain to its first retail purchaser," which can help "identify possible suspects or traffickers and link them to specific firearms found in criminal investigations." *Id.*

As noted above, numerous courts have recognized that, as a matter of simple logic and common sense, *the* reason to prefer an unserialized to a serialized firearm is to avoid tracing and detection by law enforcement.[7]

---

[7] *See, e.g., Marzzarella*, 614 F.3d at 85 ("Because a firearm with a serial number is equally as effective as a firearm without one, there would appear to be no compelling reason why a law-abiding citizen would prefer

15

That makes sense.  If, as Plaintiffs admit, unserialized and serialized arms are "functionally identical in all relevant respects," Pl. Br. 44, preferring an untraceable weapon to a traceable weapon must relate to something *other than* lawful self-defense.

**2.**    Data and real-world examples back up this logic.  For example, Everytown's research found that—particularly prior to Colorado and other jurisdictions adopting regulations to address ghost guns—law enforcement recovered "unserialized firearms from criminals at an alarming rate."  *Untraceable: The Rising Specter of Ghost Guns*,

---

an unmarked firearm," as "[t]hese weapons … have value primarily for persons seeking to use them for illicit purposes."); *Price*, 2024 WL 3665400, at *8 (firearms without "serial numbers are preferable to criminals because of their concealability"); *id.* ("criminal purposes" are "the only scenario in which we can conceive a reason to prefer such weapons"); *Avila*, 672 F. Supp. 3d at 1143 (the lack of a serial number "make[s] the identity of a person who possesses a particular firearm more difficult to determine," as is "useful for criminal activity"); *Thomas v. United States*, 2023 WL 8827216, at *3 (D. Del. Dec. 21, 2023) (finding that the lack of a serial number "suggests that the firearm[]" was "connected with [a party's] drug activities rather than sporting or other innocent use" (quotations omitted)); *United States v. Trujillo*, 670 F. Supp. 3d 1235, 1241 (D.N.M. 2023) ("Defendant has failed to identify any potential[ly] lawful purpose served by removing a firearm's serial number, and the Court cannot conceive of one."); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211 (S.D. Cal. 2023) ("A law-abiding citizen who uses a gun for self-defense has no reason to prefer a deserialized gun to a gun with serial number…." (quotations omitted)).

Everytown Research & Policy (May, 14, 2020), https://bit.ly/3OcBb1W.  In California, "[30] percent of guns recovered by ATF … are unserialized, and in Los Angeles in particular, the figure was "[f]orty-one percent."  *Id.*  In Washington, D.C., ghost gun recoveries leapt by "360 percent" from 2018 to 2019.  *Id.*  And from "Philadelphia to Syracuse to Denver, ghost gun recoveries" skyrocketed across American cities and localities, alarming local law enforcement.  *Id.*  As detailed in an *amicus* brief recently filed in the Supreme Court, cities and counties as dissimilar as Newark, Hartford, Seattle, Oakland, Columbus, Santa Clara, Rochester, and Dallas, all saw a "dramatic increase in [ghost gun] recoveries since 2019."  *Garland v. VanDerStok*, Amicus Br. of 20 Major Cities, 9 Counties, 6 Prosecutors, and Prosecutors Against Gun Violence, 23-852 (S. Ct. July 2, 2024).  Between 2017 and 2021 alone, Colorado's ATF branch recovered hundreds of privately manufactured firearms.[8]  ATF too has noted the nationwide, "exponential rise" in ghost gun recoveries:

---

[8] ATF, National Firearms Commerce and Trafficking Assessment , Crime Guns, Vol. II (Nov. 7, 2023), https://www.atf.gov/firearms/docs/report/colorado-state-report/download.



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives

Grace Hauck, *What Is a Ghost Gun? A Soaring Number Are Being Used in Crimes*, USA Today (Feb. 3, 2023), https://bit.ly/3YbZT7k; *see also* ATF, National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two, Part III, at 6 (last updated Nov. 7, 2023), https://www.atf.gov/firearms/national-firearms-commerce-and-traffickin g-assessment-nfcta-crime-guns-volume-two.

Colorado has acutely suffered from the public safety crisis caused by ghost guns. In 2019, a Denver media outlet reported that "Do-It-Yourself … weapons are on the rise here. They don't require a background check, they're completely untraceable and … they can be

bought online—almost assembled." Jaclyn Allen, *Untraceable, Unregulated and Easy to Build: Colorado and the Increasing Popularity of "Ghost Guns,"* Denver7 (Feb. 22, 2019), https://tinyurl.com/46pwj7j7.

This news report detailed the shooting of Denver police officer Travis Lloyd, who "t[ook] a bullet to the leg" and needed a "tourniquet to stop the bleeding, while an innocent bystander was also shot." *Id.* Denver prosecutors later discovered that the shooter "had a long rap sheet and would not have been able to legally buy a gun," but had been able to obtain a gun by purchasing an "unregistered 'Build Kit' … online." *Id.* Denver's District Attorney expressed alarm:

> [T]here is no way to trace a ghost gun *from any* point of sale. …. It's concerning because we cannot regulate whether people who should not have guns have guns. …. [P]rior felons, people with domestic violence convictions, open domestic violence cases, juveniles, people who are ordered by a court not to possess guns pursuant to restraining orders. …. There is no way to trace or regulate who possesses a ghost gun or who purchases the individual parts to put a ghost gun together.

*Id.*

In November 2022, a neo-Nazi who had previously had his guns seized by law enforcement carried out a mass shooting at Club Q in Colorado Springs. The shooter admitted to "murdering five people, injuring 19, and attempting to murder 26 more in a willful, deliberate,

malicious, and premeditated attack"—and further admitted to doing so with a "privately manufactured assault weapon."  U.S. DOJ, *Former Colorado Resident Sentenced to Life in Prison for Federal Hate Crimes and Firearm Offenses Related to Mass Shooting at Club Q* (June 18, 2024), https://perma.cc/253W-9XA6; *see, e.g.*, Rob Low, *Club Q Suspect Used "Ghost Gun," Sources Say*, Fox 31 (Nov. 22, 2022), https://kdvr.com/news/local/colorado-club-q-shooting-suspect-ghost-gun/?ipid=promo-link-block3 ("Sources tell FOX31 that the long gun used in the shooting was a ghost gun.  It appeared to be fully automatic, sources say, allowing the firing of at least 40 to 50 shots before good Samaritans tackled the suspect.").

And just a few months before SB 23-279 was signed, a 17-year-old student at Denver East High School shot two school administrators and died by suicide with a "ghost gun."  Rob Low, *East High Shooting Suspect Killed Himself with Ghost Gun, Failed Prior Diversion Program*, Denver KDVR (Mar. 23, 2023), https://tinyurl.com/4pz8a8u7.

In Colorado and elsewhere, the difficulty of tracing ghost guns has made them the weapon of choice for lawbreakers.  Indeed, out of 45,240 unserialized firearms recovered from crime scenes between 2016 to 2021

20

that were sent for ATF tracing, only *445* could ultimately be traced—a sub-one-percent success rate. ATF, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652, 24,659 (Apr. 26, 2022). Nor has the ghost gun industry been naïve about its client base. Just last year, a settlement between the City of Los Angeles and Polymer80—the nation's then-largest purveyor of ghost gun parts[9]—cited emails showing that Polymer80 was fully aware that its ghost guns were being purchased by minors. *See People v. Polymer80, Inc.*, 21STCV06257, Stipulated Judgment at pp. 23, 25, (Los Angeles Super. Ct. Aug. 24, 2023), https://perma.cc/JLX3-6XPJ.

It is worth pausing to underscore the utility of ghost guns to gun traffickers. In order to "buy a traditional"—that is, serialized—"gun from a licensed dealer, traffickers often use a 'straw purchasers' without a criminal record who can successfully pass a background check." Giffords, Ghost Guns: How Untraceable Firearms Threaten Public Safety 7 (May 2020), https://giffords.org/lawcenter/report/ghost-guns-how-untraceable-firearms-threaten-public-safety/. That entails risk. The straw purchaser

---

[9] Tom Jackman, *Philadelphia Becomes Fourth City to Ban Largest Ghost Gun Parts Dealer*, Wash. Post (Apr. 14, 2024), https://perma.cc/HXA7-LKCC.

"must be present in person to complete the purchase, and must fill out paperwork that will forever link them to the gun." *Id.* If a serialized gun is trafficked and recovered in connection with a crime, "law enforcement has a serial number and paperwork that they can trace back to the initial sale." *Id.*

By stark contrast, "*[g]host guns allow traffickers to avoid all of these challenges and risks,*" such that it should come as no surprise that "[l]aw enforcement officers across the country are increasingly encountering trafficking rings that are mass manufacturing and selling untraceable firearms." *Id.* (emphasis added). Ghost gun trafficking rings have been identified in—to name a few states—Florida, Iowa, New Jersey, New York, North Carolina, and Pennsylvania. *Id.* Colorado too. In 2018, federal agents acting undercover arrested two Colorado men for perpetrating a ghost gun trafficking ring out of an apartment in Denver. Denver7, *Undercover ATF Agents Bust Alleged 'Ghost Gun Ring Dealing in AK-47s, Homemade Silencers* (Dec. 4, 2018), https://perma.cc/Y24A-VJTL. From 2020 to 2023, an Aurora man trafficked ghost guns nationwide, "particularly along the US-Mexican border." DOJ, *Aurora Man Sentenced for Dealing Firearms Without a License* (July 25, 2024),

https://perma.cc/KHE3-GMMD.  The Government described this man's
"[3D]-printing of firearm receivers" as "prolific."  Gov't Response to Def.
Objections to Presentence Investigation Report, Dkt. 57, *United States v.
Taconi*, 1:23-cr-00058-CNS (July 3, 2024).

SB 23-279 was a response to this nationwide and Colorado-wide
crisis.  In just the three months before SB 23-279 took effect, a father in
Baltimore shot and killed his two-year-old daughter with a ghost gun; a
man in Massachusetts shot his parent with a ghost gun purchased online;
a ghost gun built from a kit purchased online was used in the murder of
a 65-year-old during a carjacking in Pennsylvania; a man shot a woman
on a California college campus with a ghost gun and then walked into a
supermarket with the gun still loaded; and a man in Richmond County,
New York used a ghost gun to shoot his neighbor.  *See Ghost Gun
Recoveries and Shootings*, Everytown Research & Policy (July 31, 2023),
https://tinyurl.com/3ywjk9b5.

As Colorado Governor Jared Polis commented before SB 23-279
became law, "increasingly we're seeing ghost guns used in gun crime" and
"we've got to find a way to prevent the genie from getting out of the bag
on ghost guns because it threatens to undermine all the other gun safety

measures that Colorado has." Michelle P. Fulcher, *Gov. Jared Polis Says He Supports a Ban on Ghost Guns and Expanding the State's "Red Flag" Law*, CPR News (Jan. 18, 2023), https://tinyurl.com/3zh9an7u.

**3.** Plaintiffs seek to connect their opposition to SB 23-279 to a "tradition" of "at-home gun-making" that traces to before "this nation's founding." Pl. Br. 3 (quotations omitted). According to Plaintiffs, the proliferation of ghost guns and ghost gun-related violence over the last half decade is the direct descendent of this tradition. *See id.* In support of this assertion, Plaintiffs point to passages of the Fifth Circuit's decision in *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023)—which has been stayed pending review on the merits by the Supreme Court—and an article relied upon in the Fifth Circuit's opinion, penned by a lawyer who works for the National Rifle Association, *see* Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35 (2023). As Plaintiffs would have it, the connection between ghost guns and criminal violence drawn by Colorado, several other states, and the federal government wrongly maligns a venerable American tradition.

As Colorado's brief demonstrates, this argument is flatly wrong because it relies on a plainly mistaken account of the historical record.

24

*See* Gov't Br. 47–52.[10]    Forthcoming scholarship thoroughly rebuts Greenlee's work and the wider "self-made arms narrative."  Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Calif. L. Rev. (forthcoming 2025), available at https://tinyurl.com/2wxbnmj5 ("Delay"). As Professor DeLay explains, Greenlee makes at least three fatal errors.

*First*, the self-made-arms narrative "defines 'arms making' to include an implausibly huge range of activities."  *Id.* at 58.  It counts everything from making "firearms from scratch" to "filling paper cartridges with … gunpowder and a lead ball" as "arms-making." *Id.*

*Second*, "the narrative conflates amateurs with professionals," which elides that "[g]host gun kits" of today "are not aimed at professionals" and are "explicitly designed for and marketed to amateurs." *Id.* at 58–59.  Greenlee does not and could not "substantiate a longstanding tradition of 'amateur made arms.'" *Id.* at 59.

*Third*, this narrative misrepresents what "consumers are actually

---

[10] Colorado also correctly explains how the history, properly understood, confirms that the proliferation of ghost guns "presents a clear example of 'unprecedented societal concerns' and 'dramatic technological changes' that have altered the 'regulatory challenges' from what 'preoccupied the Founders in 1791 or the Reconstruction generation in 1868.'"  Gov't Br. 47 (citing *Bruen*, 597 U.S. at 27).

doing with ghost gun kits," because they "are not *making* guns, but rather *assembling* them." *Id.* (emphasis added).  In other words, those who assemble ghost guns are no more part of a tradition of gunmaking than someone who orders and then assembles a cabinet from IKEA is part of a venerable tradition of bespoke furniture-making.  *Id.*  As a convicted Colorado ghost gun trafficker described the guns he had assembled:  "I would just, you know, put them together like a puzzle."  *USAO District of Colorado: Ghost Gun Public Service Announcement*, YouTube (Dec. 18, 2022), https://www.youtube.com/watch?v=-HLM973uF2g.

The history, properly understood, forecloses Plaintiffs' efforts to posit an innocent explanation as to why one might prefer an unserialized firearm.  There is simply no "tradition of amateurs assembling firearms" in this country; most "gunsmithing in eighteenth century America amounted to repair work"; and there were "no parts kits in early America," whereas "3D-printed guns and kits enable consumers with no skill, experience, or special tools to quickly assemble high-quality firearms."  DeLay at 192–231.  The recent explosion of unchecked access to firearms is owed to "dramatic technological changes" and, as Professor DeLay observes, "[n]othing like that has ever existed before in American

life." *Id.* at 231.  Ghost guns are new, the commensurate rise in ghost gun crime is equally new, and common sense and empirical evidence leave little question as to why law-breakers prefer ghost guns:  they help avoid detection by law enforcement.  For a law-abiding citizen, serialization and background checks are the unremarkable duties of responsible gun ownership, but for a would-be criminal, they are existential threats, with unserialized weapons providing a ready-made solution to evade law enforcement.

Moreover, nothing in SB 23-279 stops hobbyists from continuing to assemble firearms.  The law only requires that they do so using *serialized* parts.  And even for the few and far between hobbyists interested not just in assembly, but 3-D printing or welding a homemade firearm—a scenario not presented by this case, because none of the Plaintiffs have standing to bring that form of claim, *see* Gov't Br. 19–26—one need only apply for a license and pay a $150 fee.  ATF, *How to Become a Federal Firearms Licensee in 10 Easy Steps* (Apr. 6, 2020), https://tinyurl.com/3xft395j; 27 C.F.R. § 478.42(a)(2) (setting $50 per year fee for manufacturers); *id.* at § 478.49 (providing three-year period for license).  For comparison, the expense of "complete" firearm-building

kits from one prominent firearm-assembly merchant ranges from $611 to $1,226.99.   80% Arms, *Gun Build Kits* (last visited Aug. 12, 2024), https://tinyurl.com/57styjfr.

In sum, the ease with which one can continue to assemble or even manufacture firearms after SB 23-279 confirms that the law is not directed at and will not impair any tradition of gunsmithing.   To the contrary, SB 23-279 takes aim at the public safety epidemic of ghost guns, which are, and have always been, devices for skirting and expressing contempt for law enforcement.   Take, in closing, a marketing campaign from one ghost gun seller, which openly mocked the efforts of law enforcement to use serial numbers to trace a firearm to its point of sale:



28

Everytown Research & Policy, *Untraceable: The Rising Specter of Ghost Guns* 13 (May 14, 2020), https://perma.cc/3Q63-G8CU.

The target audience of ghost gun purveyors is not gunsmiths, but those who—as in this image—would sport a middle-finger to law enforcement. There is no reason to prefer such a firearm to a serialized firearm that furthers a "lawful purpose." *Price*, 2024 WL 3665400, at *7.

## CONCLUSION

The Court should affirm the district court's decision.

September 13, 2024                    Respectfully submitted,

                                     *s/ Kathleen R. Hartnett*
                                     KATHLEEN R. HARTNETT
                                     COOLEY LLP
                                     3 Embarcadero Center
                                     San Francisco, CA 94111
                                     Telephone: (415) 693-2000
                                     khartnett@cooley.com

                                     ADAM M. KATZ
                                     COOLEY LLP
                                     500 Boylston Street
                                     Boston, MA 02116-3736
                                     Telephone: (617) 937-2000
                                     akatz@cooley.com

                                     *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief (1) complies with the type-volume limits of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32, the brief contains 5,872 words; and (2) complies with the typeface and type-style requirements of Fed. R. App. P. 32(a) because the brief was prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

/s/ *Kathleen R. Hartnett*

KATHLEEN R. HARTNETT

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that (1) all required privacy redactions have been made in this brief pursuant to 10th Cir. R. 25.5; (2) this electronic submission is an exact copy of the hard copies that will be submitted to the Court; and (3) this brief has been scanned for viruses using the most recent version of SentinelOne, version 23.3.3.264 [September 13, 2024], and according to that program the document is virus-free.

/s/ *Kathleen R. Hartnett*
KATHLEEN R. HARTNETT

**CERTIFICATE OF SERVICE**

I certify that on September 13, 2024, I caused the foregoing brief to be filed through this Court's electronic filing system, which will serve a notice of electronic filing on all registered users.

/s/ *Kathleen R. Hartnett*
KATHLEEN R. HARTNETT