Case No. 24-1209

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, CHRISTOPHER JAMES HIESTAND RICHARDSON, MAX EDWIN SCHLOSSER, JOHN MARK HOWARD, and ROCKY MOUNTAIN GUN OWNERS

*Plaintiffs-Appellants*,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado,

*Defendant-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, CASE NO. 24-CV-00001-GPG-STV, THE HONORABLE JUDGE GORDON P. GALLAGHER

## APPELLANTS' REPLY BRIEF

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Plaintiffs-Appellants*

Oral Argument Requested

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

I.  The State Posits That its Regulation Promotes
    Important Governmental Interests ....................................................1

II.  Plaintiffs Challenge the Statute as Applied and Facially ...............2

III.  The Whole Point of The Manufacturing Ban Was
      to Prohibit Exactly the Conduct in Which Plaintiffs
      Desire to Engage....................................................................................4

      A.  Introduction ...............................................................................4

      B.  Plaintiffs Did Not Argue that the Statute Prohibits
          Assembly of Parts into a Firearm ...............................................5

      C.  The Prime Sponsor Said Unambiguously That the
          Purpose of the Statute is to Prohibit Plaintiffs
          Proposed Conduct ......................................................................7

      D.  The Definition of Unfinished Frame Contemplates
          Further "Manufacturing" by Gun Builders ............................10

      E.  The "Marketing" Provision of the Definition Applies
          to Kits With 80 Percent Frames...............................................12

      F.  The State's Model Airplane Analogy Fails ..............................12

      G.  The State's Legislative History Analysis is Misguided ..........14

IV.  Plaintiffs Are Not Arguing "Against Their Interests"...................16

V.  The State's Amici Did Not Get the Memo ......................................17

VI.  Plaintiffs' Claims Are Ripe...............................................................18

VII.  The State "Over-Describes" the Asserted Constitutional
       Wrong.................................................................................................19

VIII.  The State's Attempts to Distinguish Plaintiffs' Authorities
        Fails ..................................................................................................21

i

IX.  The Statute is Not Presumptively Lawful ......................................23

    A.  The Statute is Not Exempt from Constitutional Review .........23

    B.  Plaintiffs Are Not Engaged in Commercial Sales ...................25

X.  The State's Historical Analysis is Meritless ...................................26

    A.  Introduction ...........................................................................26

    B.  The Existence (Not the Extent) of Private Gun Making
       in the Founding Era is the Relevant Inquiry ...........................27

    C.  The State Points to Zero Founding Era Analogues ................29

XI.  The State Has No Response to Plaintiffs' Abusive
     Licensing Argument ........................................................................33

XII.  The Remaining Factors Favor Plaintiffs .....................................34

XIII.  Conclusion................................................................................35

Privacy Redaction Certification .............................................................35

Paper Copy Certification .......................................................................35

Virus Scan Certification.........................................................................35

CERTIFICATE OF SERVICE................................................................36

WORD COUNT AND TYPEFACE ......................................................37

# TABLE OF AUTHORITIES

Page(s)

## Cases

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) .............. 22

*Essentia Ins. Co. v. Hughes*, 2024 CO 17, 545 P.3d 494 ....................... 9

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .......................... 22

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953
  (9th Cir. 2014) ................................................................... 20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ........................................... 1, 4, 19, 21, 23-30, 32-33

*Rhode v. Bonta*, 2024 WL 374901 (S.D. Cal. Jan. 30, 2024) ................ 19

*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022) ..................... 20-21

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ............. 22-23

*United States v. Alston*, 2023 WL 4758734
  (E.D.N.C., Jul. 28., 2023) ................................................... 22

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ................... 23

*United States v. Morgan*, 2024 WL 3890184
  (D. Kan. Aug. 21, 2024) ...................................................... 24

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ....................2, 23-25, 33

*United States v. Smith*, 2024 WL 4138621
  (N.D. Okla. Sept. 10, 2024) ................................................. 24

*VanDerStok v. Garland*, 86 F.4th 179, 185 (5th Cir. 2023),
  cert. granted, 144 S. Ct. 1390 (2024) ....................................... 3, 18

*Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) ............................. 24

**Statutes**

18 U.S.C. § 921(a)(3)(A)–(B) ..................................................................... 6

C.R.S. § 18-12-111.5 (SB 23-279; the Statute).. 1. 2, 4, 5, 7, 9, 11, 14, 16, 17, 21-23, 25, 28, 29, 30, 35

C.R.S. § 18-12-111.5(1) – (4) (the "Serialization Provisions") ..2, 3, 5, 15, 19, 21, 25, 29, 30

C.R.S. § 18-12-111.5(5) (the "Manufacturing Ban") ..2-7, 9-14, 16-18, 20, 25, 26, 30,33, 34

Gun Control Act of 1968, 18 U.S.C.A. § 921, *et seq.* ....................... 6, 8, 13

**Other Authorities**

ATF, *Are "80%" or "Unfinished" Receivers Illegal?* ............................... 10

## I.    The State Posits That its Regulation Promotes Important Governmental Interests

SB 23-279 is like every other unconstitutional law that was ever enacted – the government that enacted it thinks it is a good idea. Therefore, the State devotes much of its Response to policy arguments in favor of the Statute. See Resp. 1, 4, 5, 6, 7, 23, 49, 60, 61.[1] Fortunately for American citizens, the fact that their government believes it has good reasons to infringe on their liberty has no bearing on the constitutional analysis. "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). Colorado has not demonstrated that its law is consistent with the nation's history and tradition of firearm regulation. Indeed, as discussed

---

[1]The State's amici also advance policy arguments in favor of the Statute. See Brief of District of Columbia, *et al*. (ECR 37); "States Brief"), 9-16; and brief of Brady Center to Prevent Gun Violence, *et al*. (ECF 40; "Lobbyist Brief"), 14-29. The amici's policy arguments are equally irrelevant.

extensively in the Opening Brief,[2] its own expert testified that the evidence is overwhelmingly to the contrary. Therefore, regardless of the merits (or lack thereof) of the State's policy arguments, the law is unconstitutional and should be enjoined.

## II. Plaintiffs Challenge the Statute as Applied and Facially

The State implies that Plaintiffs have brought *only* a facial challenge to the Statute[3] and cites the Supreme Court's discussion of such challenges in *United States v. Rahimi*, 144 S. Ct. 1889 (2024). The State is wrong. Plaintiffs brought both as applied and facial challenges. App. Vol. I, 17.

This distinction is important. Subsections 111.5(1) – (4) (the "Serialization Provisions") ban the possession, sale, purchase, transfer or transport of unserialized unfinished frames, finished frames and firearms. Subsection 111.5(5) (the "Manufacturing Ban") prohibits making firearm frames and receivers whether or not the maker intends to serialize the frame or receiver. Federally

_____

[2] Op. Br. 49-56.
[3] The State cites App. Vol. 1 at 39. It is unclear how this part of the record supports the State's assertion that Plaintiffs have brought only a facial challenge.

licensed firearms manufacturers are exempt from the Manufacturing Ban.

Plaintiffs take no position regarding whether requiring commercial sellers of frames and firearms to serialize their products is a valid regulation of commercial sales. But as applied to Plaintiffs, the Serialization Provisions are certainly not valid regulations of commercial sales because Plaintiffs made (and desire to continue making) privately made firearms for their personal use. Their PMFs will not be sold or otherwise transferred to anyone. Therefore, the State cannot justify its regulation by pretending Plaintiffs are engaged in commercial sales.

The Manufacturing Ban is not limited to do-it-yourself makers of PMFs. It applies to all gun builders – from a lone do-it-yourself hobbyist in his garage to massive companies like Smith & Wesson with thousands of employees and hundreds of millions of dollars in revenue. To be sure, Smith & Wesson has obviously long been a federally licensed firearms manufacturer and is thus exempt from the ban. But the issue to be determined here is whether the State may constitutionally impose the same burdensome licensing

requirements on an individual as it imposes on massive companies. In other words, as applied to Plaintiffs, the Manufacturing Ban makes a lone individual go through the same arduous, expensive, and time-consuming licensing process as Smith & Wesson. Such abusive licensing requirements are unconstitutional under *Bruen*. See 597 U.S. at 39, n. 9.

## III. The Whole Point of The Manufacturing Ban Was to Prohibit Exactly the Conduct in Which Plaintiffs Desire to Engage

### A. Introduction

The district court correctly held that "Section 18-12-111.5(5)(a)(I)-(b)(I) prohibits a person who is not a federally licensed firearm manufacturer from manufacturing . . . a frame." Sp. App. 1, pg. 21, n. 18. But the district court erred when it held that Subsection 111.5(5) does not prohibit manufacturing frames from unfinished "80 percent frames" such as those Plaintiffs purchased from Polymer80. See *Id*. The court's misreading of the Manufacturing Ban led it to hold that Plaintiffs do not have standing to seek injunctive relief because the Statute does not

prohibit their intended conduct of making frames from unfinished 80 percent frames.

## B. Plaintiffs Did _Not_ Argue that the Statute Prohibits Assembly of Parts into a Firearm

The State attempts to defend the district court's error. Resp. 19-26. That attempt fails. The State mainly defends by conflating the "assembly" of multiple parts into a completed firearm with "manufacturing" a single part (i.e., a frame). In response, Plaintiffs will start with a point of agreement. The State correctly states the way the various subsections of the Statute work together:

> [The Serialization Provisions] thus prohibit possessing or selling unserialized frames or receivers, whether finished or unfinished, and unserialized firearms. . . [The Manufacturing Ban] cuts off another means to acquiring unserialized firearms without a background check – self-manufacture . . .

Resp. 23.

The State then goes off the rails when it writes:

> Under [Plaintiffs'] view, the statute allows people to possess serialized frames or receivers (Colo. Rev. Stat. § 18-12-111.5(1)(a), (3)(a)), but prohibits them from _assembling_ the frames or receivers into a completed firearm.

_Id._ (emphasis added).

5

The State misconstrues Plaintiffs' argument. Subsection 111.5(5) does not prohibit the mere *assembly* of various parts into a complete firearm, and Plaintiffs never argued that it does. Rather, Subsection 111.5(5) prohibits "manufactur[ing] . . . a frame or receiver . . ." In other words, the subsection prohibits *making* a particular piece of a firearm.[4] It does not prohibit *assembling* multiple pre-made pieces into a firearm. The prohibition on making frames plainly includes making a frame from an unfinished 80 percent frame. Indeed, that is the main purpose of the provision as discussed in the next section.[5]

---

[4]This is true whether or not the frame is subsequently serialized. In other words, the Manufacturing Ban prohibits making frames period full stop. The district understood that this is Plaintiffs' view. Sp. App. 1, pg. 20, n. 18. It is difficult to understand why the State would suggest Plaintiffs have a different view.

[5]The Manufacturing Ban prohibits making a firearm (as opposed to merely a frame of a firearm) in the sense that it prohibits making the most essential component of a firearm. Indeed, the Gun Control Act defines a frame as a firearm (18 U.S.C. § 921(a)(3)(A)–(B)), even though a frame, standing alone, is not a functional firearm.

6

**C.  The Prime Sponsor Said Unambiguously That the Purpose of the Statute is to Prohibit Plaintiffs Proposed Conduct**

The State admits that the Manufacturing Ban prohibits manufacturing frames using methods other than 3-D printing. Resp. 21, n. 4. What other methods of making frames are prohibited? One need only consult the prime sponsor of SB23-279 to know that one of the prohibited methods (indeed, the main method she had in view) was making frames from 80 percent frames included in kits acquired on the internet.

Senator Fields was the prime Senate sponsor of SB23-279. She stated:

> This bill is about regulating those who want to **make** their own guns. They have these do-your-own kits that you can buy online or you can go to a store, and you can buy a unserialized, untraceable kit to **make** a full functioning gun . . .
>
> So if you are a criminal . . . then go buy a kit . . . and you can **create** an assault weapon just like an AR-15 . . .
>
> In under two hours, with a hammer and a screwdriver, you can **make** your own gun.

Statement of Senator Fields, Colorado Senate, Second Reading of SB 23-279, April 27, 2023 (time 5:05:35 to 5:06:04; 5:07:11 to 5:07:35; and 5:08:35 to 5:08:46), available at

7

https://archive.org/details/colorado-senate-2023-legislative-day-109-pt-1and-2 (last accessed September 21, 2024) (emphasis added).

When Senator Fields referred to making guns from kits purchased online, she was obviously referring to kits like those Polymer80 sold to Plaintiffs, which included an unfinished 80 percent frame. This is obvious because the Gun Control Act defines a finished frame as a firearm. See discussion at Op.Br. 4-7. Thus, the online kits to which Senator Fields was referring did not contain finished frames and other parts that merely need to be assembled into a completed firearm. We know this because if the kits contained finished frames, under federal law the seller would have been required to serialize them and obtain a background check prior to selling them. The State's expert is correct about this matter when he writes that under the Gun Control Act, partially finished frames are not legally regarded as firearms, and sellers of online kits included unfinished frames in the kits to comply with federal law. Declaration of Brian Delay, App. Vol. I, 79-80.

The State says that the Manufacturing Ban applies only to making frames from "raw materials." Resp. 20. That would surprise Senator Fields, who said that the bill is about regulating those who want to make guns from kits purchased online. People make guns from those kits by completing the unfinished frames that come in the kits.

The obvious purpose of the Manufacturing Ban is to prohibit people from making guns from kits without a background check. The State's interpretation undermines that purpose by limiting the application of the statute only to making frames from "raw materials," as if the General Assembly were worried about the unregulated manufacture of frames by companies with the industrial capacity to make frames from raw steel. This interpretation must be rejected. See *Essentia Ins. Co. v. Hughes*, 2024 CO 17, ¶ 33, 545 P.3d 494, 501 (statute must be construed in the context of the legislature's purpose in enacting the statute).

### D.    The Definition of Unfinished Frame Contemplates Further "Manufacturing" by Gun Builders

The fact that the Manufacturing Ban prohibits completing 80 percent frames into functional frames is plain from the definition of "unfinished frame or receiver," which states:

> "Unfinished frame or receiver" means any forging, **casting**, printing, extrusion, **machined body**, or similar article that has reached a **stage in manufacture** when it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm; or that is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed, assembled, or converted.

C.R.S. § 18-12-111.5(1)(l) (emphasis added).

Recall ATF's longstanding guidance regarding 80 percent frames: "ATF has long held that items such as receiver blanks, '**castings**' or '**machined bodies**' in which the fire-control cavity area is completely solid and un-machined have not reached the '**stage of manufacture**' which would result in the classification of a firearm according to the GCA." ATF, *Are "80%" or "Unfinished" Receivers Illegal?*, available at https://bit.ly/4bYbkWd (last reviewed September 21, 2024) (emphasis added).

As the title of the ATF guidance implies, the point of the guidance is to assure do-it-yourself gun builders that

10

manufacturing frames by completing 80 percent frames is not illegal under federal law. And the point of the Manufacturing Ban is to close the "loophole" in firearms regulations Colorado lawmakers perceived[6] resulted from the ATF's guidance. There cannot be the slightest doubt that the statutory terms "casting," "machined body," and "stage of manufacture" harken back to the identical terms used in the ATF guidance.[7]

This conclusion is particularly relevant with respect to the phrase "stage of manufacture." The definition states that an "unfinished frame" is one that has reached a particular "stage of manufacture." This makes sense only in the context of a continuing manufacturing process. Like the ATF guidance, the Statute contemplates a stage of manufacture of a frame in which it is not yet functional and a further stage of manufacture that renders it

---

[6] See statement of Rep. Boesenecker, Colorado House of Representatives, Second Reading of SB 23-279, May 4, 2023 (time 1:42:40 to 1:44:08), available at https://archive.org/details/colorado-house-2023-legislative-day-116 (referring to "gaps in the law").

[7] See statement of Rep. Armagost, Colorado House of Representatives, Second Reading of SB 23-279, *supra* (bill's language refers to ATF regulations).

functional. The manufacturing that occurs when a do-it-yourself gun builder completes the unfinished frame into a functional frame is the act that is prohibited by the Manufacturing Ban.

### E.    The "Marketing" Provision of the Definition Applies to Kits With 80 Percent Frames

The fact that the Manufacturing Ban is directed at 80 percent frames found in kits purchased online is made even clearer by the last clause of the definition of "unfinished frame or receiver" set forth above. That clause defines an unfinished frame as one that is marketed to the public to become a functional frame once completed. The State's expert, Brian DeLay, cites the following marketing materials for online kits: "They [i.e., kits] are explicitly designed for and *marketed* to amateurs. On its website, for instance, 80% Arms assures customers that its . . . jigs make it 'ridiculously easy for a non-machinist to finish their 80% lower in under one hour with no drill press required.'" DeLay Dec. App. Vol I, 83 (emphasis added).

### F.    The State's Model Airplane Analogy Fails

The State argues that a child "assembles" (as opposed to manufactures) a model airplane from pieces that have already been

12

manufactured by the manufacturer. Resp. 22. That is true. The State then states: "*assembling* the parts in a firearm parts kit is not manufacturing but *creating* those parts . . . is manufacturing." *Id*. (emphasis in the original). That is also true, but, ironically, this example demonstrates why the State is wrong. The Manufacturing Ban does not prohibit assembly of pieces into a firearm. It prohibits *making one of the pieces* – i.e., the frame. And that is what Plaintiffs want to do.

Again, the whole purpose of the Manufacturing Ban was to close the perceived regulatory loophole that allowed a piece of a firearm (i.e., the frame) to be made free from government regulation. Under the longstanding ATF guidance, a do-it-yourself gun builder could start with an 80 percent frame – which was not considered a frame under the Gun Control Act – and do the work necessary to complete that 80 percent frame into a finished frame. The do-it-yourself builder was not required to undergo a background check.

Going back to the State's analogy, the toy company creates (i.e., manufactures) the parts of the model airplane. A do-it-yourself

gun builder creates one of the parts (i.e., the frame) of a firearm, and Plaintiffs agree with the State that "*creating* [that part] is manufacturing."

## G. The State's Legislative History Analysis is Misguided

The State quotes the testimony of District Attorney John Kellner. Resp. 24. Mr. Kellner states that as far as he is concerned, it is fine for "enthusiasts" to create their own firearms so long as they are serialized. But that is not what Manufacturing Ban does. That provision prohibits a person from making a firearm frame period full stop. This is true whether or not the maker intends to have the frame serialized. Thus, Mr. Kellner's testimony reveals that he does not understand the Statute.

The State then refers to Representative Boesenecker's statement that the Statute "prohibits the unlicensed manufacture of all firearms [by ensuring] that all DIY firearm builders undergo a thorough background check and comply with all the federal regulations applicable to the manufacture of firearms." Resp. 25. Yes, that is what the Manufacturing Ban does. But the State then asserts that Plaintiffs' argument is "circular" because they assume

the "DIY firearm builders" mentioned by Representative
Boesenecker refers to people assembling parts from kits. The State
is wrong. Plaintiffs' argument does not assume "DIY firearm
builders" refers to people *assembling* parts from kits. Rather,
Plaintiffs' argument assumes "DIY firearm builders" includes
people *making* frames from 80 frames. As discussed in detail,
Plaintiffs are correct about that.

The State then sets forth a lengthy quotation from another
part of Representative Boesenecker's statement. Resp. 26.
Ironically, the second part of that quotation destroys the State's
argument. In the first part of the quotation, Representative
Boesenecker states that hobbyists may continue to *assemble* guns
if they "acquir[e] . . . the frame or receiver – that would be serialized
prior to your beginning that process. . . . So, yes, if you are a
hobbyist that enjoys assembling AR-15s, you simply need to acquire
the proper serialized parts . . . to do that." Resp. 26. In this
statement Representative Boesenecker is clearly referring to the
provisions of the Serialization Provisions that require frames to be

imprinted with serial numbers. No one disputes that the Statute allows assembling firearms from previously serialized frames.

In the second part of his quotation, Representative Boesenecker goes on to say: "*What you won't be able to do* is purchase a bulk pack of 80% finished receivers online, finish those – with a drill press or a router with a drill bit and a hand drill . . ." (emphasis added). And why won't one be able to do that? Because, as explained above, the Manufacturing Ban prohibits that. Representative Boesenecker agrees with Plaintiffs. The Manufacturing Ban prohibits completing 80 percent frames into finished frames.

## IV.   Plaintiffs Are Not Arguing "Against Their Interests"

The State wonders why Plaintiffs argue "against their interests" that the Statute prohibits making frames from unfinished 80 percent frames. Resp. 13. That is a fair question, and the answer is that the district court's interpretation of the Statute is not merely incorrect. It is not even remotely plausible. Yes, it would be nice if the district court were correct and Plaintiffs could just ignore the Manufacturing Ban and go back to what they were

doing. But Subsection 111.5(5) is a criminal statute, and the district court's erroneous construction of that provision is not binding on the Colorado state courts. It would be cold comfort indeed if Plaintiffs were to rely on the district court's construction of the Statute only to be convicted in a state court that interprets the law as the Colorado General Assembly obviously intended it to be interpreted.

## V.    The State's Amici Did Not Get the Memo

Someone forgot to give the State's amici the memo that they are supposed to say that the Manufacturing Ban does not prohibit making functional frames from unfinished frames. The amici write: "In recent years, advances in firearms technology have contributed to the rapid proliferation of 'ghost guns': unserialized and untraceable firearms that can be *built* at home, including from easily assembled weapon parts kits." State's Brief, 1. Parts kits are acquired for the "purpose of *building* a firearm." *Id*. at 7. Parts kits require "only basic tools and instructions to *build* a functional firearm." *Id*. at 15.

## VI.    Plaintiffs' Claims Are Ripe

The district court held that Plaintiffs' claims are not ripe because the ATF's 2022 Rule[8] requires companies like Polymer80 to serialize the unfinished frames they sell. The district court assumed that since Plaintiffs have no ability to acquire unserialized unfinished frames from which to make frames, they are not harmed by the Manufacturing Ban. This is wrong factually because, as set forth in the Opening Brief, Plaintiffs do have the ability to acquire unserialized unfinished frames from sources other than Polymer80 and companies like it. Op.Br. 37-38. It is wrong legally for two reasons: (1) Even if Plaintiffs purchased a serialized frame from Polymer80, the Manufacturing Ban *still prohibits* them from making a finished frame from it; and (2) Plaintiffs are not required to establish "complete redressability" to proceed with their claims.

The State responds by conflating PMFs with unfinished frames. Resp. 31. The State says that even if there are individuals

---

[8] The 2022 Rule was ruled invalid by the Fifth Circuit in *VanDerStok v. Garland*, 86 F.4th 179, 185 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390 (2024). The Supreme Court will review the Fifth Circuit's opinion in its term that begins next month.

with unserialized PMFs, those PMFs cannot be transferred and therefore Plaintiffs cannot acquire them. But Plaintiffs do not want to acquire *PMFs* in order to make PMFs. That makes no sense. As explained in the Opening Brief (Op.Br. 37-40), Plaintiffs could acquire unfinished *frames* from non-FFLs[9] and complete them. Therefore, the State's argument is a non sequitur.

The State does not attempt to address Plaintiffs' "complete redressability" argument and thus appears to concede the matter.

## VII. The State "Over-Describes" the Asserted Constitutional Wrong

The State says the plain text of the Second Amendment is not implicated by the Serialization Provisions, because the text does not expressly state a right to keep and bear *non-serialized* arms. Resp. 35-36. As discussed in the Opening Brief, the State is attempting to evade *Bruen's* first step by "over-describing" the constitutional wrong. Op. Br. 47 (citing *Rhode v. Bonta*, 2024 WL 374901, at *5 (S.D. Cal. Jan. 30, 2024)). The Serialization Provisions ban the possession, sale, purchase, transfer, and

---

[9] The 2022 Rule does not prohibit non-FFLs from transferring unfinished frames.

transport of certain firearms and firearm parts. Thus, Plaintiffs'
conduct obviously implicates the plain text, because Plaintiffs can
neither keep nor bear the banned firearms and parts. *Rigby v.
Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022).

The State ignores the plain text implications of the
Manufacturing Ban and appears to concede that that provision does
implicate the plain text.[10] But the text is also obviously implicated
by the Manufacturing Ban because it bans making an item (i.e., a
frame) necessary for firearms to operate. Without frames, the right
to acquire handguns would be meaningless. The Ninth Circuit
made this concept clear in *Jackson v. City & Cnty. of San Francisco*,
746 F.3d 953, 967 (9th Cir. 2014), when it stated, "without bullets,
the right to bear arms would be meaningless." The word "bullet"
appears nowhere in the Second Amendment, but the right to
acquire bullets is protected. The same is true regarding the word
"frame."

---

[10] Perhaps the State deemed a plain text analysis of the
Manufacturing Ban unnecessary because it assumed it would
prevail on its standing defense to Plaintiffs' challenge to
Subsection 111.5(5). If so, as set forth above, that assumption was
unwarranted.

Whether the State's ban on the possession and transfer of certain firearms and essential firearm parts is constitutional is a separate question that must be resolved under *Bruen's* second step. Similarly, whether it is constitutional for the State to prohibit a private individual from making frames unless he goes through the same arduous, expensive, and time-consuming licensing process as a major firearms company is also a separate question that must be resolved under *Bruen's* second step.

## VIII. The State's Attempts to Distinguish Plaintiffs' Authorities Fails

The State argues that *Rigby v. Jennings* is distinguishable because the Delaware statute enjoined in *Rigby* did not provide a way for makers of PMFs to obtain serial numbers and the Serialization Provisions do. Resp. 39. This is a distinction that makes no difference. The Serialization Provisions ban the possession and transfer of certain firearms and firearm parts. The issue is whether that ban is constitutional under *Bruen* step two. It makes no difference with respect to that analysis that the State has provided a way to come out from under the ban by complying with the Statute's requirements.

The State attempts to distinguish *United States v. Alston*, 2023 WL 4758734 (E.D.N.C., Jul. 28., 2023), on the ground that the prohibitions of the Statute are not "logically connected" to the receipt of firearms. Resp. 40. But that is not true. The Statute prohibits Plaintiffs from receiving certain firearms, specifically those that are self-manufactured.

The State writes that in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the court did not state that there is an implied right to acquire firearms. Resp. 41. This argument is puzzling, because the court said that very thing: "The right to possess firearms for protection implies a corresponding right to acquire [them] . . ." *Id.* at 704.

Finally, the State attempts to distinguish *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017). Resp. 41. The State's argument here is also puzzling, because it acknowledges that in *Teixeira* the Ninth Circuit held the very thing for which Plaintiffs cited the case – i.e., that the Second Amendment's text implies a right to acquire firearms. Resp. 42. Indeed, the Ninth Circuit recently reaffirmed that holding. See *B & L Prods., Inc. v. Newsom*,

104 F.4th 108, 118 (9th Cir. 2024) (citing *Teixeira* for the proposition that the Second Amendment protects the right to acquire firearms as an ancillary right necessary to the realization of the right to keep and bear arms).

## IX. The Statute is Not Presumptively Lawful

### A. The Statute is Not Exempt from Constitutional Review

The district court held that the Statute is a constitutional "condition on the commercial sale of firearms." Sp. App. 1, 23. The State's attempt to defend this holding is not successful. First, the State misunderstands the Court's holding in *Rahimi* concerning "preemptively lawful" regulations. Resp. 43. The State's position appears to be that *Rahimi* stated that if a regulation falls within the list of presumptively lawful regulations set forth in *Heller*, it is per se constitutional and a *Bruen* analysis is not necessary. The State is wrong.[11]

This Court adopted the per se rule advocated by the State in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009)

---

[11] For one thing, *Rahimi* did not concern any of the *Heller* categories, and anything it said regarding the issue is dicta.

(concerning felons in possession), and reiterated the per se rule in the post-*Bruen* case of *Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023). But two weeks after *Rahimi* was decided, the Supreme Court vacated *Vincent* and remanded for reconsideration in light of *Rahimi*. *Vincent v. Garland*, 144 S. Ct. 2708 (2024). While the Supreme Court's order did not address *Vincent's* merits, it did cast doubt on this Court's resolution of this issue. Indeed, the order would make no sense if *Vincent* were correct. Rather, as the court in *United States v. Morgan*, 2024 WL 3890184, at *4 (D. Kan. Aug. 21, 2024), wrote, the order vacating *Vincent* indicates that the Supreme Court means that the constitutionality of all laws regulating firearms must be evaluated under the *Bruen* framework. See also *United States v. Smith*, 2024 WL 4138621, at *5 (N.D. Okla. Sept. 10, 2024) (same).

In *Heller*, the Court assumed that certain "longstanding" laws would survive constitutional scrutiny because they are longstanding and therefore likely to be consistent with the nation's historical tradition. That assumption did not create an irrebuttable presumption that every statute that can somehow be characterized

as a regulation of commercial sales is exempt from constitutional scrutiny, and neither *Bruen* nor *Rahimi* said otherwise.

**B.    Plaintiffs Are Not Engaged in Commercial Sales**

More to the point, the district court's characterization of Plaintiffs' proposed conduct as involving a "commercial sale" upon which the State may impose conditions never made sense in the first place. Plaintiffs take no position regarding whether requiring commercial sellers of firearms and frames to serialize their products is a valid regulation of commercial sales. But as applied to Plaintiffs, the Serialization Provisions are certainly not a valid regulation of commercial sales for the simple reason that Plaintiffs never engaged in commercial sales. Plaintiffs made (and desire to continue making) privately made firearms for their personal use. Thus, while the Serialization Provisions might be considered the regulation of commercial sales in some contexts, as applied to Plaintiffs' proposed conduct they are not.

This logic applies with even more force to the Manufacturing Ban. That provision bans *making* firearm frames. It says nothing about *selling* firearm frames (or purchasing or otherwise

25

transferring them). There is no plausible reading of Subsection 111.5(5) pursuant to which it can be characterized as imposing a condition on the commercial sale of firearms.

## X.    The State's Historical Analysis is Meritless

### A.    Introduction

The State's brief is 65 pages long. It devotes only six of those pages to attempting to demonstrate the existence of analogous laws from the Founding era in order to meet its burden under *Bruen* step two. See Resp. 53-56; 64-65.[12] This is not surprising. As demonstrated in the Opening Brief, there are zero laws from the Founding era (or even from much later) that are remotely analogous to the Statute. With such a paucity of material to work with, it is no wonder that the State did its best not to draw further attention to its inability to meet its burden under *Bruen* step two. In the sections below, Plaintiffs will address separately the State's historical analysis with respect to the Manufacturing Ban and the Serialization Provisions.

---

[12] In the State's defense, six pages is more than zero pages, which is what the district court devoted to the issue. See Sp. App. 1, 24, n. 21 (declining to engage in a *Bruen* step two analysis).

**B.** **The Existence (Not the Extent) of Private Gun Making in the Founding Era is the Relevant Inquiry**

The State's expert, Professor DeLay admits that in the Founding era, individuals made privately made firearms. Resp. 47-48. But in his opinion, there was no Founding-era "tradition" of making firearms identical to the way Plaintiffs desire to make firearms. Resp. 48. This misses the point. The issue under *Bruen* step two is whether private gun making occurred in the Founding era. The extent of the practice and whether it differed somewhat from the modern practice is not relevant to the inquiry. Of course Founding-era practices were different from modern practices. But just as the Fourth Amendment applies to modern searches, the Second Amendment applies to modern firearm practices. *Bruen*, 597 U.S. at 28 (citation omitted).

Thus, the issue is not whether there was a widespread tradition of private gun making in the Founding era using methods identical to the methods Plaintiffs desire to use. The issue is whether the Founders knew that private gun making occurred at

all and, if they did, whether they enacted regulations like the Statute to stop it.

*Bruen* explained this concept. In *Heller*, the city perceived a problem – urban firearm violence – and it passed a ban on handguns to address that problem. *Id.*, 597 U.S. at 27. But firearm violence in cities occurred in the Founding era too, and the Founders could have passed a similar ban. *Id.* But they didn't, and therefore D.C.'s ban was not consistent with Founding-era history and tradition. *Id.* The same is true here. In the Founding era the Founders knew about firearm violence, especially in cities. *Id.* Like D.C.'s handgun ban, they could have passed a law banning individuals from making firearms to address that problem, but they did not. This is not disputed. Both sides agree that the Founders knew that individuals made firearms and they did not regulate the practice, much less ban it. See discussion of Professor DeLay's testimony on pages 53 to 54 of the Opening Brief. Thus, under a plain reading of *Heller*, the Statute is unconstitutional.

Professor DeLay disagrees with Plaintiffs' expert Joseph Greenlee about the number of private gun makers in the Founding

era. Resp. 51. And the experts disagree about the impact of privately made firearms on winning the Revolution. *Id*. It is not necessary to resolve this difference of expert opinion. Again, the relevant inquiry is whether the Founders knew about private gun making and, if so, whether they banned or regulated it. The precise extent of private gun making in the Founding era is not relevant so long as the Founders knew about it. Professor DeLay admits that they did. See Op. Br., 53 to 54.

## C.    The State Points to *Zero* Founding Era Analogues

The State's survey of Founding-era laws falls far short of carrying its burden under *Bruen* step two. First, the State points to a grand total of two laws that imposed stamping requirements on firearms. Resp. 64. Even if these laws were analogous to the Statute (they are not), *Bruen* held that three laws are insufficient to establish a widespread tradition of firearm regulation. 597 U.S. at 29. Two laws are certainly insufficient.

Second, the "how" and "why" of the laws identified by the State are very different from the "how" and "why" of the Colorado

Statute.[13] The laws are not analogous to the Manufacturing Ban. The "why" of the historical laws was to ensure that new gun barrels were safe. Thus, the historical laws were product safety regulations. The "why" of the Manufacturing Ban is to ban making frames in the first place, whether they are safe or not, unless a person obtains a background check by obtaining a federal license. The Statute has nothing to do with ensuring that the frames are safe. In summary, the modern law was justified as a background check law. The historical law was a product safety law. These are not close to the same thing. As to the "how" of the laws, the historical laws imposed a small fine for each unsafe barrel. The Statute bans the production of frames altogether. These are not analogous methods of regulation.

The stamping requirements in the historical laws have even less relation to the Serialization Provisions of the Statute. The "how" of the historical statutes required the "prover" to stamp his initials on the proved barrels. These stamps were all obviously

_____

[13] *Bruen* held that the "how" and "why" of laws are the important factors in determining whether a historical law is analogous to a modern regulation in relevant ways. *Id.*, 597 U.S. at 46.

identical for each prover. The "how" of the Colorado statute is to require each frame to be stamped with a unique serial number. Requiring identical stamps is not analogous to requiring unique identification markings because the purposes of the laws (the "why") were radically different. The "why" of the historical laws was to show the barrels had passed a product safety test. The "why" of the Colorado Statute is to identify the gun to aid law enforcement investigations. Those two purposes have nothing to do with each other.

The State's gunpowder barrel regulations (Resp. 54, 64) are completely irrelevant to the historical inquiry. These were fire safety regulations and not even "remotely" analogous to firearm regulations. *Heller*, 554 U.S. at 632.

The State's trap guns laws are also irrelevant. Resp. 55. Those laws prohibited using a gun to make a trap. They did not prohibit (or even regulate) manufacturing guns in the first place. In other words, they were a regulation of the use of already-manufactured guns. The State was incorrect when it said such laws amounted to

"the outright prohibition of certain types of self-produced firearms." Resp. 56. They did no such thing.

In conclusion, the effect of the State's historical evidence is the opposite of what it intended. The paucity of that evidence demonstrates that there was no Founding-era regulatory tradition similar to SB23-279. Even if the number of historical regulations were enough to demonstrate a regulatory tradition (it is not), the motives behind the historical statutes (their "why") and the methods of regulation they employed (their "how") are not remotely analogous to those of the Colorado Statute. Thus, the State's own historical evidence demonstrates that SB23-279 is not consistent with the nation's historical tradition of firearms regulation.

This is true even if one concedes that a "nuanced" approach to the historical inquiry is appropriate. (Plaintiffs do not concede this). *Bruen's* discussion of a more nuanced approach to the historical analysis does not allow the State to pass a law that has no grounding in the historical tradition whatsoever – whether nuanced or otherwise. The State is required to identify how the "challenged regulation is consistent with the principles that underpin our

regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. The State did not come remotely close to doing this.

## XI.    The State Has No Response to Plaintiffs' Abusive Licensing Argument

Federally licensed firearms manufacturers are exempt from the Manufacturing Ban. In this respect, the Manufacturing Ban operates as a sort of backhanded licensing provision in that it forces individuals to go through the federal licensing process in order to make firearm frames. It is not a background check provision as argued by SB23-279's sponsors except to the extent that obtaining a background check is one of the many steps necessary to obtain the license.

In their Opening Brief, Plaintiffs argued that if the Manufacturing Ban is analyzed as a permitting scheme, it nevertheless fails. See Op. Br. 64-68. It fails because the licensing requirements, as least as they are applied to individuals, are the sort of abusive permitting scheme identified in *Bruen* footnote 9. See 597 U.S. at 39, n. 9. The permitting scheme is abusive as applied to individuals (as opposed to large companies) because the requirements to get and maintain a full blown federal firearms

manufacturing license are onerous, time-consuming, expensive, and wildly disproportionate to the State's stated goal of simply requiring do-it-yourself firearms builders to get a background check. Such background checks are normally free and take only minutes. See discussion at Op.Br. 65. The State did not respond to Plaintiffs' characterization of the Manufacturing Ban as an abusive permitting scheme and apparently concedes Plaintiffs' argument.

## XII.  The Remaining Factors Favor Plaintiffs

The State says Plaintiffs have suffered no irreparable injury because they can continue to make PMFs if they simply comply with SB23-279. Resp. 57-58. This argument assumes that the Statute is constitutional. The argument crumbles the moment Plaintiffs establish a likelihood of success on the merits (which they have). It hardly makes sense to argue that a party is not harmed by an unconstitutional statute when all he has to do is comply with it. The State's other arguments regarding the other factors are addressed in the Opening Brief and Plaintiffs will not repeat those arguments here.  See Op.Br. 70-71.

## XIII. Conclusion

For the foregoing reasons, Plaintiffs respectfully renew their request that the Court reverse the district court's decision and remand for entry of preliminary injunctive relief.

Respectfully submitted,


*/s/ Barry K. Arrington*
_____
Barry K. Arrington

**Privacy Redaction Certification**:  No privacy redactions were required.

**Paper Copy Certification**:  The paper copies of this brief to be submitted to the clerk of the Court are exact copies of the version submitted electronically.

**Virus Scan Certification**:  The digital form of this document submitted to the Court was scanned for viruses using Webroot SecureAnywhere, and according to the program the document is virus-free.

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 27, 2024, he served a true and correct copy of the foregoing document by e-filing it with the CM/ECF system, which will serve the document on counsel of record, including:

Peter G. Baumann
Joseph Michaels
Shannon Wells Stevenson
Matthew John Worthington
Office of the Colorado Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado  80203


*/s/ Barry K. Arrington*
_____
Barry K. Arrington

## WORD COUNT AND TYPEFACE

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7) (excluding the items listed under Fed.R.App.P.32(f)) because this brief contains 6,363 words.

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R. App.P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface (fourteen-point Century Schoolbook) using Microsoft Word.

Date:  September 27, 2024

*/s/ Barry K. Arrington*

_____

Barry K. Arrington