Case No. 24-1209

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

NATIONAL ASSOCIATION FOR GUN RIGHTS, CHRISTOPHER JAMES HIESTAND RICHARDSON, MAX EDWIN SCHLOSSER, JOHN MARK HOWARD, and ROCKY MOUNTAIN GUN OWNERS

*Plaintiffs-Appellants*,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado,

*Defendant-Appellee*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, CASE NO. 24-CV-00001-GPG-STV, THE HONORABLE JUDGE GORDON P. GALLAGHER

---

## APPELLANTS' OPENING BRIEF

---

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Plaintiffs-Appellants*

Oral Argument Requested

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................iv

PRIOR OR RELATED APPEALS............................................................v

GLOSSARY ......................................................................................vi

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE ................................................................3

    A.    Introduction....................................................................3

    B.    Modern Privately Made Firearms and the
           ATF's Historic 80% Rule .......................................................4

    C.    The Plaintiffs Engaged in the American Tradition
           of Making PMFs ...................................................................9

    D.    The Colorado General Assembly Clamps Down on
           Privately Made Firearms ....................................................11

    E.    The Statute Infringes Plaintiffs' Second Amendment
           Rights ..............................................................................13

    F.    Procedural History ............................................................15

SUMMARY OF ARGUMENT ................................................................16

ARGUMENT .......................................................................................19

I.    The Individual Plaintiffs Have Standing ....................................19

    A.    The Elements of Standing...................................................19

    B.    Plaintiffs Have Suffered an Injury in Fact..........................19

    C.    The Traceability and Redressability Factors
           are Met ..............................................................................25

    D.    Summary: Plaintiffs Have Standing ..................................26

II.   The District Court's Analysis of the Individual
Plaintiffs' Standing is Erroneous.................................... 26

    A.    Standard of Review and Preservation ..............................26

    B.    The District Court Erred When It Held That
the Manufacturing Ban Applies Only to 3D Printing........26

    C.    The District Court Correctly Held That Richardson
Has Standing ...................................................................34

    D.    The District Court Erred When It Held That This
Matter is Not Ripe...........................................................35

    E.    Summary: The District Court Erred When It
Ruled the Individual Plaintiffs Do Not Have Standing .....39

III.   NAGR and RMGO Have Standing....................................39

IV.   Preliminary Injunction Standard ...................................41

V.   Plaintiffs Are Likely to Prevail on the Merits ...............42

    A.    Standard of Review and Preservation ..............................42

    B.    The Legal Framework of Second Amendment
Challenges .......................................................................42

    C.    The Plain Text Covers Plaintiffs' Conduct .........................44

    D.    The Statute is Not Consistent With the Nation's
History and Tradition of Firearms Regulation .................48

    E.    Conclusion: Plaintiffs Are Likely to Prevail .....................59

VI.   The District Court's Cursory *Bruen* Analysis is Flawed............60

    A.    Introduction....................................................................60

    B.    The Statute is Not a Presumptively Lawful
Regulation of Commercial Sales .......................................60

C.    The Statute is Not Saved by *Bruen* Footnote 9 .................. 64

VII.   The Remaining Factors Favor Entry of Injunctive Relief ........... 68

A.    Plaintiffs Have Suffered Irreparable Harm ..................... 68

B.    The Balance of Harms and Public Interest
Factors Support Entry of Injunctive Relief ....................... 69

CONCLUSION ....................................................... 71

STATEMENT REGARDING ORAL ARGUMENT ............................. 72

Privacy Redaction Certification ........................................ 72

Paper Copy Certification ............................................. 72

Virus Scan Certification .............................................. 72

CERTIFICATE OF SERVICE ............................................ 73

WORD COUNT AND TYPEFACE ........................................ 74

SPECIAL APPENDIX 1 Order of the District Court

SPECIAL APPENDIX 2 Statute

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ainscough v. Owens*, 90 P.3d 851 (Colo. 2004) ......................................xi

*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020)..................................69

*Aptive Env't, LLC v. Town of Castle Rock, Colorado*,

    959 F.3d 961 (10th Cir. 2020) ..........................................................26

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ................................69, 70

*Baker v. USD 229 Blue Valley*, 979 F.3d 866 (10th Cir. 2020) ...........23

*Brown v. Buhman*, 822 F.3d 1151 (10th Cir. 2016)..............................26

*Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742

    (10th Cir. 2010)................................................................................70

*Citizen Ctr. v. Gessler*, 770 F.3d 900 (10th Cir. 2014) ..........................21

*City & Cnty. of Denver v. Dennis*, 2018 CO 37, 418 P.3d 489 ........29, 31

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898

    (10th Cir. 2012)..........................................................................36, 38

*D.C. v. Heller*, 554 U.S. 570 (2008) .........................................................

*DeWilde v. Att'y Gen. of United States*, 2024 WL 1550708

    (10th Cir. Apr. 10, 2024)...........................................42, 44, 57, 60-62

*Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59 (1978) .35

*Duncan v. Bonta*, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023)..........46

*Elrod v. Burns*, 427 U.S. 347 (1976) .....................................................69

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)....................46, 69

*Frank v. Lee*, 84 F.4th 1119 (10th Cir. 2023)

    (cert. denied, 144 S. Ct. 1349 (2024) ................................................24

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,

    916 F.3d 792 (10th Cir. 2019) ........................................................42, 69

*Freedom Newspapers, Inc. v. Tollefson*, 961 P.2d 1150

    (Colo. App. 1998) ................................................................................31

*Garland v. VanDerStok*, 144 S. Ct. 1390 (2024)....................................9

*Hooper v. City of Tulsa*, 71 F.4th 1270 (10th Cir. 2023) ......................29

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082

    (10th Cir. 2006).....................................................................................21

*Klinger v. Adams Cnty. Sch. Dist. No. 50*, 130 P.3d 1027

    (Colo. 2006) ..........................................................................................32

*Larson v. Valente*, 456 U.S. 228 (1982)................................................36

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,

    103 F.4th 748 (10th Cir. 2024) ...........................................................42

*Loper Bright Enterprises v. Raimondo*, 2024 WL 3208360

    (U.S. June 28, 2024) ..............................................................................8

*Luis v. United States*, 578 U.S. 5 (2016) ................................................45

*Massachusetts v. EPA*, 549 U.S. 497 (2007)..........................................36

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..........................42, 43

*Miller v. Bonta*, 2023 WL 6929336(S.D. Cal. Oct. 19, 2023) ...............46

*Murthy v. Missouri*, 2024 WL 3165801 (U.S. June 26, 2024) .............. 41

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

 597 U.S. 1 (2022) .................................... 18, 42, 43, 56-62, 64, 68, 71

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................ 41, 70

*People v. Patton*, 2016 COA 187, 425 P.3d 1152 ................................... 31

*Peck v. McCann*, 43 F.4th 1116 (10th Cir. 2022) ................................. 20

*Preston v. Dupont*, 35 P.3d 433 (Colo. 2001) ....................................... 31

*Rhode v. Bonta*, 2024 WL 374901 (S.D. Cal. Jan. 30, 2024) ............... 47

*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022) . 20, 21,43, 44, 46

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) .............. 41

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ..................... 36

*Sky Fun 1 v. Schuttloffel*, 27 P.3d 361 (Colo. 2001) ............................. 32

*Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024) ................ 40

*Stockman's Ass'n v. United States Fish & Wildlife Serv.*,

 30 F.4th 1210 (10th Cir. 2022) ........................................................ 19

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (reh'g en banc

 granted, opinion vacated, 93 F.4th 1150 (9th Cir. 2024) ................ 23

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ........... 45, 62

*United States v. Alston*, 2023 WL 4758734 (E.D.N.C., Jul. 28., 2023). 45

*United States v. Rahimi*, 2024 WL 3074728 (U.S. June 21, 2024) ...... 44

*Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061

 (10th Cir. 2001) ............................................................................... 70

*VanDerStok v. Garland*, 680 F. Supp. 3d 741 (N.D. Tex.)

   , *aff'd in part, vacated in part, remanded*, 86 F.4th 179

   (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390 (2024) .......................7

*VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023),

   *cert. granted*, 144 S. Ct. 1390 (2024) ................................3, 4, 7, 8, 37

**Statutes**

5 U.S.C. § 706(2)(C) ....................................................................................7

18 U.S.C.A. § 921, *et seq.* ..........................................................................xi

18 U.S.C. § 921(a)(3) .................................................................................27

18 U.S.C. § 921(a)(3)(A)–(B) .......................................................................4

18 U.S.C. § 921(a)(10) ...............................................................................67

28 U.S.C. § 1292(a)(1) .................................................................................2

28 U.S.C. § 1331 ..........................................................................................1

Colorado Senate Bill 23-279 .......................................xii, 11, 12, 61, 65

C.R.S. § 18-12-111.5 .........................................................................xii, 12

C.R.S. § 18-12-111.5(1)(a) ...................................................................12, 62

C.R.S. § 18-12-111.5(2)(a) ..........................................................................12

C.R.S. § 18-12-111.5(3)(a) ..........................................................................13

C.R.S. § 18-12-111.5(4) ..............................................................................62

C.R.S. § 18-12-111.5(5)(a) ..........................................................................13

C.R.S. § 18-12-111.5(5)(a)(I) ...........................................................14, 27, 28

C.R.S. § 18-12-111.5(5)(a)(II) .....................................................................27

U.S. CONST. amend. II.........................................................................42

**Other Authorities**

27 C.F.R. § 478.92(a)(2).....................................................................37

33 Fed. Reg. 18558 (Dec. 14, 1968) ..............................................xi, 4

ATF, *Are "80%" or "Unfinished" Receivers Illegal?*...........viii, xi, 5, 9, 27

ATF, *Current Processing Times* ..........................................................*66*

ATF, *How to Become an FFL in 10 Easy Steps* ...................................*66*

Black's Law Dictionary (11th ed. 2019)........................................28, 30

Colorado Bureau of Investigation Firearms InstaCheck

    Unit Homepage.................................................................................65

Colorado Bureau of Investigation, InstaCheck

    Statistics for May 2024 ...................................................................65

*Definition of "Frame or Receiver" and Identification of Firearms*,

    87 FR 24652-01 (codified at 27 C.F.R. pts. 447, 478,

    and 479 (2022) ("2022 Rule")................................x, 7-9, 17-18, 35-38

Joseph G.S. Greenlee, *The American Tradition of Self-Made*

    *Arms*, 54 St. Mary's L.J. 35, 48 (2023)................................................3

Tamara Keel, NRA Shooting Illustrated, *Why Polymer*

    *Pistols Are the Future of Handguns*............................................*xi, 10*

*Webster's Encyclopedic Unabridged Dictionary of the*

    *English Language* (Random House, 1996).....................................30

*The Writings of Thomas Jefferson* (Paul Ford ed., 1904) ...................49

# PRIOR OR RELATED APPEALS

None.

## GLOSSARY

**The 1968 Rule**. The ATF's 1968 rule defining "frame or receiver" set forth at 33 Fed. Reg. 18558 (Dec. 14, 1968).

**The 2022 Rule**. The ATF's *Definition of "Frame or Receiver" and Identification of Firearms*, 87 FR 24652-01 (codified at 27 C.F.R. pts. 447, 478, and 479 (2022)).

**80 percent frame**. A colloquial term for an unfinished frame or receiver blank. See ATF, *Are "80%" or "Unfinished" Receivers Illegal?*, available at https://bit.ly/4bYbkWd (last reviewed June 19, 2024).

**ATF**. The United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

**DIY**. Do it yourself.

**FFL**. Federal Firearms Licensee. As set forth in the FFL Application, there are several types of FFLs, including licensed firearms dealers and licensed firearms manufacturers.

**FFL Application**. Application for Federal Firearms License, available at https://bit.ly/3VE6pD2.

**Ghost gun**. A colloquial term for "privately made firearm" as defined below.

**Gun Control Act**. The Gun Control Act of 1968, 18 U.S.C.A. § 921, *et seq*.

**Howard**. Plaintiff-Appellant John Mark Howard.

**NAGR**. Plaintiff-Appellant National Association for Gun Rights.

**Plastic**. See "Polymer."

**PMF**. See "Privately made firearm."

**Polymer**. Modern pistol frames are often made of a high-performance polymer. See Tamara Keel, NRA Shooting Illustrated, *Why Polymer Pistols Are the Future of Handguns*, available at https://bit.ly/3KUv6pQ (last visited June 20, 2024). This polymer material is a type of plastic. *Id.*

**Polymer80**. Polymer80, Incorporated. Polymer80 is in the business of selling unfinished frames and receivers. The "80" in Polymer80's name refers to 80 percent frames and 80 percent receivers.

**Privately made firearm**. Privately made firearm (or a "PMF") denotes a firearm that is made by an individual instead of a licensed manufacturer. A privately made firearm is intended for strictly individual use. It is not intended to be sold, gifted, or otherwise transferred. See Schlosser, App. Vol. III, 518:17-519:4.

**Richardson**. Plaintiff-Appellant Christopher James Hiestand Richardson.

**RMGO**. Plaintiff-Appellant Rocky Mountain Gun Owners.

**SB 23-279**. Colorado Senate Bill 23-279 enacted by the Colorado General Assembly on May 5, 2023, and signed by Governor Polis on June 2, 2023.

**Schlosser**. Plaintiff-Appellant Max Edwin Schlosser.

**The State**. The State of Colorado. Governor Polis is sued in his official capacity. The Governor is the embodiment of the State. *Ainscough v. Owens*, 90 P.3d 851, 858 (Colo. 2004).

**The Statute**. C.R.S. § 18-12-111.5.

## STATEMENT OF JURISDICTION

C.R.S. § 18-12-111.5 (the "Statute") bans possession of both finished and unfinished unserialized firearm frames and firearms. The Statute also prohibits private individuals from making frames and receivers unless they obtain a federal firearms manufacturer license.

Plaintiffs brought this action challenging the Statute under the Second Amendment. App. Vol. I, 10.[1] The district court had jurisdiction over this action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. On January 15, 2024, Plaintiffs filed a motion seeking a preliminary injunction enjoining enforcement of the Statute. App. Vol. I, 27. The district court denied Plaintiffs' motion for preliminary injunction in an order dated May 2, 2024. Special Appendix 1 ("Sp. App. 1"), 24. Plaintiffs appealed the district court's order to this Court on May 16, 2024. App. Vol. II, 508. This

---

[1] Plaintiffs will cite the Appendix by volume and page, e.g., App. Vol. I, __.

Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) (order

denying request for preliminary injunction appealable).

## STATEMENT OF THE ISSUES

1.     Did the district court err when it held that the individual

Plaintiffs lack standing to challenge the Statute's ban on

manufacturing frames and receivers?

2.     Did the district court err when it held that the Statute's

manufacturing ban applies only to 3D printers?

3.     Did the district court err when it held that the individual

Plaintiffs lack standing to challenge the Statute's ban on

acquisition of unfinished frames and receivers?

4.     Did the district court err when it held that this matter is not

ripe for adjudication?

5.     Did the district court err when it held that NAGR and RMGO

lack associational standing?

6.     Did the district court err when it held that the Statute does

not likely violate the Second Amendment?

7.     Did the district court abuse its discretion when it denied

Plaintiffs' motion for preliminary injunction?

## STATEMENT OF THE CASE

### A.    Introduction

"The tradition of at-home gun-making predates this nation's founding, extends through the revolution, and reaches modern times." *VanDerStok v. Garland*, 86 F.4th 179, 185 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390 (2024) (citing Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 48 (2023)). "Considering this long tradition, the federal government has never required a license to build a firearm for personal use." *Id.* (internal citation and quotation marks omitted). Indeed, "there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries." *Id.* (internal citation and quotation marks omitted).

In accordance with this centuries-long tradition, Plaintiffs purchased the materials necessary to make PMFs from a company called Polymer80 and built privately made firearms for their personal use. App. Vol. III, 518:3-7; 519:8-11; 525:21-526:1; 535:2-12; 547:11-12. But in 2023, the Colorado General Assembly

enacted the Statute, which prohibits Plaintiffs from engaging in this constitutionally protected activity. Accordingly, Plaintiffs have brought this Second Amendment challenge to the Statute.

**B.    Modern Privately Made Firearms and the ATF's Historic 80% Rule**

In the Gun Control Act of 1968 (the "Gun Control Act") Congress defined the word "firearm" to mean "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive *[or] the frame or receiver of any such weapon*." 18 U.S.C. § 921(a)(3)(A)–(B) (emphasis added). In 1968, the ATF issued a rule (the "1968 Rule") that defined "frame or receiver" to mean "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18558 (Dec. 14, 1968).

In longstanding regulatory guidance, the ATF took the position that a piece of metal became a "frame or receiver" (and therefore a federally regulated firearm) only after it is 80% complete. *VanDerStok v. Garland*, 86 F.4th 179, 198 (5th Cir. 2023) (*cert. granted*, 144 S. Ct. 1390 (2024)) (Oldham, J.

4

concurring).[2] The ATF provided the following guidance on its website: "*ATF has long held* that items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm [under the 1968 Rule]." ATF, *Are "80%" or "Unfinished" Receivers Illegal?*, available at https://bit.ly/4bYbkWd (last reviewed June 19, 2024) (emphasis added).

In its guidance, the ATF provided the photographs set forth below to help explain the difference between regulated firearms and unregulated 80 percent blanks. *Id*. The first two photographs depict blanks with solid unmachined fire-control cavities. According to the ATF, these blanks did not "meet the Gun Control Act definition of a firearm." *Id*. The third photograph depicts a receiver with a partially machined fire-control cavity. According to the ATF, this item does meet the Gun Control Act definition of a firearm. *Id*.

---

[2] *VanDerStok* is not a Second Amendment case. It is an administrative law case. For reasons explained below, the issues discussed in the case bear on the resolution of this matter.



Following the ATF's guidance, for decades millions of Americans lawfully purchased blanks like those depicted in the first two photographs and worked on them in garages and

workshops to make completed frames and receivers. *VanDerStok*, 86 F.4th at 199-200 (Oldham, J. concurring).

All of that changed in 2022 when the ATF enacted the 2022 Rule. After almost 50 years of uniform regulation, the ATF attempted to expand the scope of its regulatory reach by supplanting the 1968 Rule and its longstanding guidance with a new definition of "frame or receiver." *VanDerStok*, 86 F.4th at 189. For the first time, the ATF expanded the definition of "frame or receiver" to include incomplete frames and receivers and weapons parts kits. Thus, after many years of assuring the makers of PMFs that so-called 80% frames and receivers are not regulated firearms, in 2022, the ATF abruptly changed course and insisted that they are firearms after all.

In *VanDerStok*, the plaintiffs challenged the portions of the 2022 Rule that expanded the definition of "frame or receiver" to include incomplete frames and receivers and weapons parts kits. 86 F.4th at 187. The district court held that the ATF had exceeded its statutory authority and vacated the 2022 Rule in its entirety under 5 U.S.C. § 706(2)(C). *VanDerStok v. Garland*, 680 F. Supp.

3d 741, 771 (N.D. Tex.), *aff'd in part, vacated in part, remanded*, 86

F.4th 179 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390 (2024). The

Fifth Circuit agreed with the district court that the ATF had

exceeded its authority. The Court wrote:

> ATF must operate within the statutory text's existing limits.
> The [2022] Rule impermissibly exceeds those limits, such
> that ATF has essentially rewritten the law. This it cannot
> do, especially where criminal liability can . . . be broadly
> imposed without any Congressional input whatsoever. *An
> agency cannot label conduct lawful one day and felonious the
> next* – yet that is exactly what ATF accomplishes through its
> [2022] Rule.

86 F.4th at 197 (emphasis added).[3]

While the Fifth Circuit agreed with the district court that the

challenged provisions of the 2022 Rule are invalid, it disagreed with

the remedy the district court imposed. The circuit court held that

the district court's vacatur of the entire 2022 Rule (rather than just

---

[3] See also *Loper Bright Enterprises v. Raimondo*, 2024 WL
3208360, at *13 (U.S. June 28, 2024) (agency interpretations
issued contemporaneously with the statute which have remained
consistent over time especially useful in determining statute's
meaning).

the two challenged portions of the rule) was overbroad and
remanded the case for entry of a more limited remedy. *Id*.[4]

## C.     The Plaintiffs Engaged in the American Tradition of Making PMFs

A privately made firearm (or a "PMF") denotes a firearm that
is made by an individual (as opposed to a licensed manufacturer)
that is intended for strictly personal use.
Schlosser, App., Vol. III, 518:17-519:4. A PMF is not intended to
ever be sold, gifted, or otherwise transferred. *Id*. Polymer80,
Incorporated ("Polymer80")[5] produces and sells so-called "80
percent frames" and "80 percent receivers." Schlosser, App., Vol.
III, 517:2-13. An 80 percent frame is a frame that is inoperable until
it is fully manufactured to accept the firing components and other
items that are required for firing. *Id*., 517:10-13. As discussed
above, for many years, the ATF did not consider such 80 percent
blanks to be regulated by the Gun Control Act. See ATF, *Are "80%"
or "Unfinished" Receivers Illegal?*, *supra*.

_____

[4] The Supreme Court granted certiorari on April 22, 2024. *Garland
v. VanDerStok*, 144 S. Ct. 1390 (2024). The case is pending and
the 2022 Rule is currently effective.
[5] Polymer80 is one of the plaintiffs in *VanDerStok*.

Over the course of three to four years, Plaintiff Schlosser purchased 80 percent frames from Polyermer80 and made three PMFs. *Id.*, 518:3-7; 519:8-11; 525:21-526:1. Specifically, he made three Glock-pattern handguns from the kits he purchased. *Id*. He made all three handguns for his personal use. *Id.*, 526:2-3.

Schlosser testified regarding the process of making PMFs from the kits he received from Polymer80. *Id.*, 519:12-520:8. The kit came with a jig and drill bits of the necessary sizes. *Id*. It also included an 80 percent frame, which "is just a piece of plastic[6] until you can manufacture it into a firearm." *Id*. 519:17-19. Schlosser purchased a drill press and drilled holes for the firing group. *Id.*, 519:22-520:3. He also removed material from the 80 percent frame, which allowed for various parts to be attached. *Id*. Schlosser "messed up" a couple of kits and it took him two days (total of 6-7

---

[6] Schlosser referred to the polymer material he removed as "plastic." The polymer material used in firearm frames is a type of plastic. See Tamara Keel, NRA Shooting Illustrated, *Why Polymer Pistols Are the Future of Handguns*, available at https://bit.ly/3KUv6pQ (last visited June 20, 2024). Thus, in this context, the terms "polymer" and "plastic" are interchangeable.

hours) to finally make a fully functional handgun. *Id.*, 520:4-8, 526:4-13.

Plaintiff Richardson also purchased three 80 percent frames from Polymer80, and he made one into a Glock-patterned handgun. Richardson, App., Vol. III, 535:2-12. The manufacturing process for Richardson was similar to the process described by Schlosser, though it took him closer to 12 hours to make his PMF. *Id.*, 536:2-16. Plaintiff Howard also purchased kits from Polymer80. Howard, App., Vol. III, 547:11-12. Howard made PMFs from these kits, including a Glock-patterned handgun. *Id.*, 547:19-548:1.

**D.   The Colorado General Assembly Clamps Down on Privately Made Firearms**

The Colorado General Assembly perceived two problems with PMFs: (1) PMFs are not generally imprinted with serial numbers, which makes them difficult to trace; and (2) DIY gunmakers are not required to obtain a background check. Rep. Boesenecker, Colorado House of Representatives, Second Reading of SB 23-279, May 4, 2023 (time 1:42:40 to 1:44:08), available at https://archive.org/details/colorado-house-2023-legislative-day-116. Accordingly, on May 5, 2023, the Colorado General Assembly

enacted SB 23-279. Governor Polis signed the bill on June 2, 2023. The Statute, which is codified at C.R.S. § 18-12-111.5, is set forth at length in Special Appendix 2.

The Statute addresses the serialization issue by requiring unfinished firearm frames and the PMFs made from the frames to be imprinted with serial numbers. The Statute addresses the background check issue by requiring anyone who wishes to make a PMF to first obtain a federal firearms manufacturer license.[7]

The following provisions of the Statute are particularly relevant to this action:

1.    Subsection 111.5(1)(a) makes it illegal to *possess* an unfinished firearm frame or receiver unless it has been imprinted with a serial number.

2.    Subsection 111.5(2)(a) makes it illegal to *purchase* an unfinished firearm frame or receiver unless it has been imprinted with a serial number.

---

[7] As discussed in detail below, requiring a person to obtain a full-blown federal firearms license to satisfy a "background check" requirement is like hitting a fly with a sledgehammer. It is abusive and therefore unconstitutional.

3. Subsection 111.5(3)(a) makes it illegal to *possess or purchase* a privately made firearm or a finished frame or receiver unless it has been imprinted with a serial number.

4. Subsection 111.5(5)(a) makes it illegal for anyone other than a federally licensed firearms manufacturer to *make* a firearm frame or receiver.

In summary, the Statute prohibits: (1) acquiring or possessing an unserialized unfinished frame or receiver; (2) acquiring or possessing an unserialized firearm, frame, or receiver; (3) and making a frame or receiver unless one is a federally licensed firearms manufacturer. Violation of the Statute is a class 1 misdemeanor for a first offense and a class 5 felony for subsequent offenses.

## E.   The Statute Infringes Plaintiffs' Second Amendment Rights

The impact of the Statute on Plaintiffs can be divided into two categories: (1) The prohibition on making PMFs; and (2) The serialization requirement.

Subsection 111.5(5)(a)'s prohibition on making frames and receivers is the functional equivalent of prohibiting making

privately made firearms. Schlosser, App. Vol. III, 521:14-522:4. This is because to make a firearm, one must first make a frame or receiver. *Id.*, 521:17-522:1. Schlosser, Richardson, and Howard all responded to the manufacturing ban by ceasing to make PMFs. Schlosser, App. Vol. III, 522:2-11; Richardson, App. Vol. III, 539:13-17; Howard, App. Vol. III, 550:12-551:6. Plaintiffs are not alone. C.R.S. § 18-12-111.5(5)(a)(I) bans making firearms for the overwhelming majority of people in Colorado. Anyone who is not a federally licensed firearms manufacturer is barred from making guns. This means that as of January 1, 2024, out of a population of 5.8 million people in Colorado, only 630 licensed manufacturers may exercise their right to make guns without fear of criminal prosecution. Rhodes, App. Vol. III, 558:5-10.

With respect to the serialization issue, Schlosser testified that his PMF handguns and unfinished frames were not imprinted with serial numbers. Schlosser, App. Vol. III, 520:9-14. Accordingly, he destroyed his handguns and unfinished frames to avoid violating the Statute. *Id.*, 520:15-521:8. Richardson testified that his PMF handgun was not imprinted with a serial number, and he destroyed

it to avoid violating the Statute. Richardson, App. Vol. III, 536:20-537:6. He testified that he removed his unserialized unfinished frames from the State to avoid violating the Statute. *Id*., 537:9-538:3. Howard testified that he avoided violating the Statute by having his PMFs and unfinished frames imprinted with serial numbers. Howard, App. Vol. III, 548:2-23. He testified that he would not have done so but for the requirements of the Statute. *Id*.

## F.    Procedural History

Plaintiffs filed their Complaint on January 1, 2024, the day the Statute became effective. App. Vol. I, 8. On January 15, 2024, Plaintiffs filed a motion requesting the district court to preliminarily enjoin enforcement of the Statute. App. Vol. I, 27. A hearing was held on Plaintiffs' motion on March 14, 2024. App. Vol. III, 510. The district court denied Plaintiffs' motion for preliminary injunction in an order dated May 2, 2024. Sp. App. 1, 24. Plaintiffs filed a timely notice of appeal on May 16, 2024. App. Vol. II, 508.

## SUMMARY OF ARGUMENT

Plaintiffs have standing to challenge the Statute because they have established the three elements of standing, i.e., injury in fact, traceability, and redressability. The district court erred when it held that the individual plaintiffs lack standing to challenge the Statute's ban on manufacturing frames and receivers. The court ruled that the manufacturing ban applies only to using 3D printers to make firearm frames. Plaintiffs have not used 3D printers in the past and presented no evidence they intend to use them in the future. Therefore, the district court ruled they have not suffered an injury in fact because the manufacturing ban does not affect them.

The district court's ruling conflicts with the plain text and manifest purpose of the Statute. The whole point of the manufacturing ban is to ensure that "all DIY firearm builders" undergo a background check by requiring them to obtain a federal firearms manufacturer license. This includes DIY firearm builders like Plaintiffs who make firearms from 80 percent frames *and* DIY firearm builders who make firearms using 3D printers. Limiting the reach of the manufacturing ban to only DIY builders who make

firearms using 3D printers obviously conflicts with the statutory purpose of ensuring that all DIY firearms builders undergo a background check.

The district court erred when it held that Plaintiffs' challenge to the Statute's ban on acquisition of 80 percent frames is not ripe for adjudication. The district court's error lies in conflating the issues of redressability and ripeness. The court held that because Polymer80 is required by the 2022 Rule to imprint 80 percent frames with serial numbers, Plaintiffs have no ability to acquire unserialized 80 percent frames and therefore enjoining the Statute's ban would not provide them with complete relief. This is wrong for two reasons. First, it is well settled that to establish standing, a plaintiff is not required to establish "complete redressability." Rather, the plaintiff is required only to show that a favorable decision will redress "an injury," not "every injury." Secondly, the assumption on which the district court based its holding is manifestly wrong as a factual matter as its own factual findings demonstrate. The district court found that Plaintiff Richardson removed unfinished frames from the State. Richardson

is not subject to the 2022 Rule. Therefore, but for the Statute's ban, one of the other Plaintiffs could acquire an unfinished frame from Richardson or any other private individual. Thus, the district court's assumption that FFLs like Polymer80 are the exclusive source of 80 percent frames conflicts with its own factual findings.

NAGR and RMGO meet all of the elements of associational standing. Therefore, the district court erred when it ruled these organizations do not have standing. Moreover, it is not necessary to address the organizations' standing at this stage, because the standing requirement is met so long as one plaintiff has standing.

Turning to the merits, under *Bruen*, when the Second Amendment's plain text covers an individual's conduct, the government must demonstrate that its regulation is consistent with the Nation's historical tradition of firearm regulation. Here, the Statute burden's Plaintiff's right to keep and bear firearms. A gun must be purchased or made for a person to keep it, and the statute bars the latter. The government failed to show that the Statute is consistent with Founding era history. Indeed, its own expert inadvertently demonstrated just the opposite, i.e. that there was a

robust Founding-era tradition of self-made arms, and the government never regulated (much less prohibited) that practice. Finally, the remaining preliminary injunction factors favor Plaintiffs. Therefore, the district court abused its discretion when it denied Plaintiffs' motion for preliminary injunction.

<div align="center">

**ARGUMENT**

</div>

## I.    The Individual Plaintiffs Have Standing

### A.    The Elements of Standing

To establish standing a plaintiff must show three elements: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 30 F.4th 1210, 1219 (10th Cir. 2022) (internal citations and quotation marks omitted).

### B.    Plaintiffs Have Suffered an Injury in Fact

Plaintiffs sought a pre-enforcement injunction prohibiting the State from enforcing the Statute against them. App. Vol. I, 39. Plaintiffs can demonstrate an injury sufficient to establish standing

for such pre-enforcement relief by showing: "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by statute, and there [3] exists a credible threat of prosecution thereunder." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (internal citation and quotation marks omitted). Plaintiffs have established all three of these elements.[8]

First, Plaintiffs' intended conduct is arguably affected with a constitutional interest. Plaintiffs desire to acquire unserialized 80 percent frames for the purpose of making PMFs for their personal use. Plaintiffs also desire to manufacture PMF handguns from those 80 percent frames without first having to go through the lengthy and difficult process of becoming a licensed federal firearms manufacturer.

In *Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022), the court reviewed a law similar to the Colorado Statute. The Delaware law prohibited acquiring unserialized unfinished frames and

---

[8] Indeed, the district court correctly held that Plaintiff Richardson met all three *Peck* elements with respect to the 80 percent frames he removed from the State. Sp. App. 1, 11-12.

receivers and it banned making unserialized PMFs. The court held that the Delaware law likely violated the Second Amendment and entered a preliminary injunction. *Id*. at 615. Thus, the court held that the Delaware plaintiffs' conduct was likely *actually* protected by the Constitution. It follows that the similar conduct in which these Colorado Plaintiffs desire to engage is at the very least *arguably* protected by the Constitution.

At the standing stage it is not necessary to establish that Plaintiffs will prevail on their constitutional claims. The standing inquiry must not be conflated with evaluation of the merits. "For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014) (*quoting Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc)). "Rather, we must assume for purposes of the standing inquiry that each claim is legally valid." *Id.*

Plaintiffs' intention to engage in this conduct is concrete and immediate. For example, Schlosser testified as follows:

> Q. So do you have an understanding, sitting here today, whether but for this statute that we're talking about today you would make privately made handguns in the future?
>
> A. Yes.
>
> Q. And what is that understanding?
>
> A. I would 100 percent continue to make PMFs in the future.
>
> Q. How sure are you of that?
>
> A. Positive.
>
> Q. And how soon would you want to be able to do that?
>
> A. I had plenty of unfinished frames I would have started immediately.

Schlosser, App., Vol. III, 522:9-19.

Richardson and Howard testified similarly. Richardson, App., Vol. III, 539:18-25 (would love to make PMF as soon as possible); Howard, App., Vol. III, 550:20-551:9 (100% sure he would make PMFs as soon as he could). This is not the sort of "some day"

intention to engage in the protected conduct that courts have held does not establish standing.[9]

In *Teter v. Lopez*, 76 F.4th 938, 944 (9th Cir. 2023) (reh'g en banc granted, opinion vacated, 93 F.4th 1150 (9th Cir. 2024)), the court held that the plaintiffs' forced dispossession of their arms combined with their inability to acquire replacements constituted an Article III injury for purposes of seeking injunctive relief. Recently, this Court cited *Teter's* standing analysis in *DeWilde v. Att'y Gen. of United States*, 2024 WL 1550708 (10th Cir. Apr. 10, 2024). The Court held the plaintiffs lacked standing, but in doing so it distinguished *Teter*. The Court stated that in *Teter* the plaintiffs had standing because they suffered "more concrete injuries." *Id*. at *3. The injuries suffered by the *Teter* plaintiffs (i.e., forced dispossession of weapons and a present desire to obtain replacements if the statute were invalidated) are practically identical to those suffered by the Plaintiffs in this case.

---

[9] See, e.g., *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 874 (10th Cir. 2020) ("some day" allegation insufficient).

There is no question that the Statute prohibits plaintiffs from acquiring the unserialized unfinished frames. Indeed, that is one of its major purposes. There should also be no question that because plaintiffs are not federally licensed firearms manufacturers, the Statute prohibits them from making PMFs (whether serialized or not).[10]

Finally, there is a credible threat of prosecution under the Statute. Indeed, the State assured the district court that the public interest would be adversely affected if the Statute were not enforced. App. Vol. I, 72. Moreover, as this Court recently held, "The threat of prosecution is generally credible where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage, and the state has not disavowed any intention of invoking the provision against the plaintiff." *Frank v. Lee*, 84 F.4th 1119, 1134 (10th Cir. 2023) (cert. denied, 144 S. Ct. 1349 (2024)) (internal citations and quotation marks omitted). Far from

---

[10] The district court erroneously held that the Statute prohibits only 3D printing of arms, as opposed to making arms from 80% firearms. Sp. App. 1, pg. 21, n. 18. As discussed in detail below, this holding was manifestly erroneous.

disavowing any intention to enforce the Statute, the State insists that enforcement is necessary for public safety purposes. App. Vol. I, 72.

The State argued that "the Act doesn't prevent any of the Plaintiffs from purchasing kits and assembling firearms. The Act only requires that Plaintiffs obtain a serialization from a federal firearm licensee. Plaintiffs thus have not pointed to an injury that 'actually exist[s]' because the statute does not proscribe their proposed conduct." App. Vol. I, 62. This is plainly wrong. The Statute prohibits both acquiring unserialized 80 percent frames and making firearms from 80 percent frames. Those are the injuries of which Plaintiffs complain. It hardly makes sense to argue that the Plaintiffs are not injured by an unconstitutional Statute because they have the option of complying with it.

## C. The Traceability and Redressability Factors are Met

There should be no dispute that Plaintiffs' alleged constitutional injuries are traceable to the Statute. Moreover, it should be uncontested that Plaintiffs' injuries would be redressed by a judicial conclusion that the Statute is unconstitutional. See

*Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 978 (10th Cir. 2020).

### D.    Summary: Plaintiffs Have Standing

Plaintiffs' evidence established that they have suffered an injury in fact, that their injury is traceable to the Statute, and that their injury would be redressed if the Court were to hold the Statute unconstitutional. Accordingly, they have met their burden of establishing Article III standing.

## II.    The District Court's Analysis of the Individual Plaintiffs' Standing is Erroneous

### A.    Standard of Review and Preservation

The Court reviews issues of standing de novo. *Brown v. Buhman*, 822 F.3d 1151, 1168 (10th Cir. 2016). The issues raised regarding the interpretation of subsection 111.5(5)(a) were preserved. See Sp. App. 1, pg. 20-21, n. 18 where the district court quoted Plaintiffs' position and rejected it. The issues regarding redressability and ripeness were preserved. App. Vol. III, 660.

### B.    The District Court Erred When It Held That the Manufacturing Ban Applies Only to 3D Printing

Recall that under the Gun Control Act, the term "firearm"
includes the "frame or receiver" of a firearm. 18 U.S.C. § 921(a)(3).
Under longstanding regulatory guidance, the ATF took the
position that a piece of metal became a federally regulated "frame
or receiver" only after it was 80% complete. ATF, *Are "80%" or
"Unfinished" Receivers Illegal?*, available at https://bit.ly/4bYbkWd
(last reviewed June 19, 2024). Therefore, a person literally
manufactures a frame when he takes an 80 percent frame and
performs the steps necessary to finish it.

Following the ATF's guidance, Plaintiffs acquired 80 percent
frames from Polymer80 and made firearm frames from them.
Schlosser, App. Vol. III, 519:12-520:8; Richardson, App. Vol. III,
535:2-12; Howard, App. Vol. III, 547:11-12. Thus, they
manufactured these frames. The Statute prohibits all persons
from manufacturing firearm frames in the State.[11] Specifically,
C.R.S. § 18-12-111.5(5)(a)(I) states: "A person shall not
manufacture or cause to be manufactured, including through the

---

[11] C.R.S. § 18-12-111.5(5)(a)(II) provides an exception for federally
licensed firearm manufacturers.

use of a three-dimensional printer, a frame or receiver of a firearm." Thus, subsection 111.5(5)(a)(I) plainly prohibits the practice of acquiring 80 percent frames and finishing them. The Statute bans making all frames (not merely unserialized frames). Thus, as discussed above, Plaintiffs suffered injury-in-fact because the Statute bans their participation in the centuries-long tradition of self-making firearms.

The district court disagreed. It interpreted this subsection as follows:

> Plaintiffs allege that "[o]n its face, C.R.S. § 18-12-111.5(5)(a)(I) makes it illegal for anyone who is not a federally licensed firearms manufacturer to make a firearm – period full stop" (D. 26 at 7). Plaintiffs attempt to argue that the Statute prevents any and all manufacturing of PMFs, including assembling unfinished frame or receiver kits, "even if the person intends to have the firearm stamped with a serial number" (*id*.). This argument is unavailing. . . .

> Section 18-12-111.5(5)(a)(I)-(b)(I) prohibits a person who is not a federally licensed firearm manufacturer from manufacturing, including through the use of 3D printing, a frame or receiver . . . A plain reading of the text indicates that subsection (5) prohibits 3D printing of frames and receivers but leaves open the possibility of including other forms of production or technologies capable of replication. *See Manufacture*, Black's Law Dictionary (11th ed. 2019) (Defined as "any material form produced by a machine from an unshaped composition of matter"). *The Court does not find that § 18-12-111.5(5) operates to ban the assembly of*

> *purchased, serialized unfinished frames or receivers into a*
> *PMF.*

Sp. App. 1, pg. 21, n. 18 (emphasis added).

The district court erred when it held that the Statute only

"prohibits 3D printing of frames and receivers but leaves open the

possibility of including other forms of production . . ."

Sp. App. 1, pg. 21, n. 18. Based on this error, the court further

erred when it held that none of the individual Plaintiffs have

standing to challenge subsection 111.5(5) because none of them

expressed an intention to make a frame or receiver using a 3D

printer or presented evidence that they are capable of

manufacturing a frame or receiver by another method.

Sp. App. 1, pg. 2, n. 3, 16 and 21, n. 18.

This statutory interpretation[12] issue turns on the meaning of

the words "manufacture" and "including." Under Colorado law, a

statute is interpreted based on the plain and ordinary meaning of

the text. *City & Cnty. of Denver v. Dennis*, 2018 CO 37, ¶ 12, 418

P.3d 489, 494.

---

[12] This Court reviews questions of statutory interpretation de novo.
*Hooper v. City of Tulsa*, 71 F.4th 1270, 1282 (10th Cir. 2023).

"*Manufacture*." Partially quoting Black Law Dictionary's definition of the noun "manufacture," the district court interpreted the term extremely narrowly to mean: "any material form produced by a machine from an unshaped composition of matter." Sp. App. 1, pg. 21, n. 18 (partially quoting *Manufacture*, Black's Law Dictionary (11th ed. 2019)). Based on this narrow definition, the court held that the statute bans only 3D printing frames from scratch and leaves open other methods of manufacture.

The problem with this is that the district court quoted a definition of the *noun* version of the term (and that only partially). The Statute obviously uses the term as a verb ("A person shall not manufacture . . ."). The verb form of the word means "the making of goods or wares by manual labor or by machinery" or "the making or producing of anything." *Webster's Encyclopedic Unabridged Dictionary of the English Language* (Random House, 1996). Nothing in the definition of the verb supports the district court's extremely narrow reading of the Statute. The definition of the verb plainly encompasses "making" a finished frame from an unfinished frame.

"*Including*." The Statute states that "[a] person shall not manufacture . . . *including* through the use of a three-dimensional printer . . . a frame . . ." (emphasis added). The district court held that this language prohibits *only* the use of a 3D printer to make a frame. Sp. App. 1, pg. 21, n. 18. This interpretation violates two rules of statutory construction. First, the district court essentially read the word "including" out of the Statute. But a court may not subtract words from a statute. *Dennis*, *supra*, ¶ 12. Moreover, the word "include" is used as a term of extension or enlargement. *Freedom Newspapers, Inc. v. Tollefson*, 961 P.2d 1150, 1154 (Colo. App. 1998). It "denotes that the examples listed are not exhaustive or exclusive," *Preston v. Dupont*, 35 P.3d 433, 439 (Colo. 2001), but only illustrative, *People v. Patton*, 2016 COA 187, ¶¶ 14-16, 425 P.3d 1152. When the district court held that the Statute bans only 3D printing, it violated this rule by reading the example as exhaustive rather than merely illustrative. Surprisingly, the district court itself seemed to recognize this problem. At first it stated: "The Court is cognizant of the word 'including' within the manufacturing clause. It is possible that this clause could

31

implicate another method of manufacturing or replication that is distinct from 3D printing." Sp. App. 1, pg. 2, n. 3. But then it held exactly the opposite. Sp. App. 1, pg. 21, n. 18. This was error.

Finally, and most importantly, the district court's interpretation flies in the face of the purpose of the Statute. The goal of statutory construction is to reach a "reasonable result consistent with the General Assembly's intent." *Sky Fun 1 v. Schuttloffel*, 27 P.3d 361, 370 (Colo. 2001). A court must avoid interpreting a statute in a way that would defeat the obvious intent of the legislature. *Klinger v. Adams Cnty. Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo. 2006). Here, the whole point of subsection 111.5(5)(a) is to prohibit *anyone* from making a firearm frame unless they first go through a background check. This is obvious from the plain text as discussed above. But even if the text were ambiguous, the legislative history of the Statute reveals that the primary purpose of the subsection is to require all DIY gun makers to undergo a background check. The Statute does not explicitly require a background check as such. It accomplishes the background check goal indirectly by requiring all DIY gunmakers

32

to obtain a federal firearms manufacturing license. An extensive

background investigation is required to obtain such a license.[13]

Representative Boesenecker, the prime House sponsor of

SB 23-279, stated this explicitly and unambiguously.

> The bottom line is simply this. Gaps in the law allow people
> to build do-it-yourself or DIY homemade guns, also known as
> ghost guns, using unregulated, unserialized parts and kits
> without first undergoing a background check. . . .
>
> [SB 23-279] prohibits the unlicensed manufacture of *all
> firearms* in the state by requiring people who wish to build
> their own firearms in the state to first obtain a federal
> firearms license. This will ensure that *all DIY firearm
> builders* undergo a thorough background check and comply
> with all the federal regulations applicable to the
> manufacture of firearms.

Rep. Boesenecker, Colorado House of Representatives, Second

Reading of SB 23-279, May 4, 2023 (time 1:42:40 to 1:44:08),

available at https://archive.org/details/colorado-house-2023-

legislative-day-116 (emphasis added).

According to the bill's prime sponsor, one of the main

purposes of the law is to require "all DIY firearm builders" to

obtain a background check by requiring them to obtain a federal

---

[13] See FFL Application, available at https://bit.ly/3VE6pD2.

firearms manufacturing license. This statutory purpose would

obviously be undermined by the district court's interpretation,

which would require that only DIY firearms builders who build

their firearms using 3D printers to obtain a license.

In summary, the Statute, in the words of the prime sponsor,

bans "all DIY firearm builders" who are not licensed federal

firearms manufacturers from making frames. This plainly

includes DIY builders who build frames from kits as well as those

who build frames using 3D printers. The district court's holding

that the ban applies only to those who build frames using 3D

printers is supported by neither the plain text nor the manifest

purpose of the Statute. It follows that the district court's holding

that the individual Plaintiffs lack standing to challenge subsection

111.5(5)(a) because they do not use 3D printers was erroneous.

## C. The District Court Correctly Held That Richardson Has Standing

Plaintiff Richardson moved two of his unfinished

frames out of the State. Richardson, App. Vol. III, 537:18-22. The

district court correctly held that Richardson has standing to assert

a claim for injunctive relief so that he can retrieve these

unfinished frames. Sp. App. 1, pg. 11-12.

### D.    The District Court Erred When It Held That This Matter is Not Ripe

The district court held that the individual plaintiffs' claim

for injunctive relief to acquire unfinished frames and receivers is

not ripe for adjudication. Sp. App. 1, pg. 15. The court held that

the claim is not ripe because Polymer80 (the company from which

Plaintiffs previously acquired their 80 percent frames) is required

by the 2022 Rule to serialize its unfinished frames, at least until

the company's claims against the ATF are resolved by the

Supreme Court. Sp. App. 1, pg. 14-15.

There are two problems with the district court's analysis.

First, the analysis confuses the issue of ripeness with the issue of

redressability. Redressability is meant to foster the "concrete

adverseness which sharpens the presentation of issues upon

which the court so largely depends for illumination of difficult

constitutional questions." *Duke Power Co. v. Carolina Envtl.*

*Study Group*, 438 U.S. 59, 72 (1978). "[T]he relevant inquiry is

whether . . . the plaintiff has shown an injury to himself that is

35

likely to be redressed by a favorable decision." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976).

The district court never held that the Plaintiffs had failed to demonstrate a distinct injury. Rather, it held that their claims are not ripe because while the 2022 Rule is in operation, they will not have a route to complete relief so that they can acquire unfinished frames. Sp. App. 1, pg. 15. But the Supreme Court has rejected interpretations of the redressability requirement rule that demand "complete redressability," stressing that a plaintiff need show only that a favorable decision would redress "an injury," not "every injury." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n. 15 (1982)).

Thus, to establish redressability, Plaintiffs need not show that a favorable decision would get them completely "out of the woods." *Id.*, 678 F.3d at 903. Instead, Plaintiffs have established redressability because a favorable decision would relieve their problem "'to some extent,' which is all the law requires." *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007)). As long

as there are "discrete injuries" redressable by the requested relief, it does not matter that Plaintiffs may have other obstacles to overcome. *Id.* "An opposite holding . . . would contravene Supreme Court precedent so as to require complete redressability." *Id.* (internal citations and quotation marks omitted).

In this case, Plaintiffs' injuries are redressable because the Statute represents a discrete injury to them because it prohibits them from acquiring unserialized 80 percent frames. The fact that Plaintiffs might have other obstacles to overcome does not defeat redressability.

The second problem with the district court's analysis is that it wrongfully assumes that Polymer80 (or other FFLs subject to the 2022 Rule) are the exclusive source of 80 percent frames. The district court's own factual findings demonstrate this is not true. The 2002 Rule is not applicable to private individuals. 27 C.F.R. § 478.92(a)(2) (only FFLs are required to serialize PMFs). *See also VanDerStok*, 86 F.4th at 201 (Oldham, J. concurring) (2022 Rule exempts private individuals from serializing their frames and receivers.). Therefore, but for the prohibitions of the Colorado

Statute, Richardson could sell one of his 80 percent frames that he removed to another state to, for example, Howard. Thus, Howard's inability to acquire an 80 percent frame from Richardson (or any other private individual) is completely independent of the 2022 Rule's restriction on FFLs selling 80 percent frames to him. But for the Statute, he could do so today.

In summary, the district court sidestepped the redressability issue by holding that the dispute is not ripe because "Plaintiffs' constitutional injury hinges on little more than speculation and contingency" because the 2022 Rule "precludes Plaintiffs from lawfully carrying out their intended activities." Sp. App. 1, pg. 14. This is not true. First, with respect to Polymer80 (and other FFLs), even if a favorable decision would not afford Plaintiffs complete relief, it would alleviate their problem "'to some extent' which is all the law requires." *Consumer Data Indus. Ass'n*, *supra*. It alleviates this problem by clearing a path to acquiring 80 percent frames from FFLs should Polymer80 prevail in *VanDerStok*. The fact that this second obstacle remains does not defeat redressability. An opposite holding would contravene

38

Supreme Court precedent so as to require complete redressability.

Secondly, the district court was wrong when it stated that

Plaintiffs' claims are speculative or contingent because a favorable

decision would allow them to acquire 80 percent frames from non-

FFLs immediately. Thus, an injunction would remove all obstacles

Plaintiffs face in obtaining 80 percent frames from private parties.

### E.    Summary: The District Court Erred When It Ruled the Individual Plaintiffs Do Not Have Standing

Plaintiffs have established that they have standing. The

district court's holding that they do not have standing to challenge

the manufacturing ban is based on a misunderstanding of the text

and purpose of the Statute. The ban applies to Plaintiffs'

activities, and they have therefore suffered an injury in fact.

Plaintiffs have standing to challenge the prohibition on their

acquisition of 80 percent frames. This is especially true with

respect to the acquisition of such frames from private individuals.

### III.   NAGR and RMGO Have Standing

An organization has standing to bring suit on behalf of its

members if (1) at least one of its members would have standing to

sue in the member's own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit. *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024). Taylor Rhodes, RMGO's Executive Director, and Dudley Brown, NAGR's President, testified regarding these issues. At least one of each of the organizations' members has standing. Indeed, all of the individual plaintiffs are members of both RMGO and NAGR. Schlosser, App. Vol. III, 516:15-18; Richardson, App. Vol. III, 534:15-19; Howard, App. Vol. III, 546:5-9. RMGO's and NAGR's purpose is to defend Second Amendment rights. Rhodes, App. Vol. III, 558:19-21; Brown, App. Vol. III, 567:13-15. NAGR and RMGO are seeking injunctive and declaratory relief only. Compliant, App. Vol. I, 17. Accordingly, the participation of their individual members is not necessary.

The district court denied associational standing to NAGR and RMGO for the same reasons it denied standing to the individual plaintiffs. Sp. App. 1, pg. 14. Accordingly, the court

erred for the same reason it erred with respect to the individual plaintiffs as discussed above. Even if this were not the case, there is no need to address RMGO's and NAGR's standing separately at this stage of the litigation. The standing requirement is satisfied if "at least one plaintiff" has standing. *Murthy v. Missouri*, 2024 WL 3165801, at *7 (U.S. June 26, 2024).

## IV.    Preliminary Injunction Standard

To obtain a preliminary injunction, "the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). When the government is the party opposing the injunction, the third and fourth elements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The goal of a preliminary injunction is to preserve the status quo pending trial. *RoDa Drilling*, 552 F.3d at 1208. The "status quo" is the last uncontested status between the parties before the

dispute arose. In the context of a newly enacted law, the last peaceable uncontested status was the status existing before the government enacted the challenged law. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 798 n.3 (10th Cir. 2019). Thus, Plaintiffs seek to preserve the status quo.

## V.   Plaintiffs Are Likely to Prevail on the Merits

### A.   Standard of Review and Preservation

This Court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 751 (10th Cir. 2024). This Court reviews the lower court's factual findings for clear error and its conclusions of law de novo. *Id.* Plaintiffs preserved all of these issues. App. Vol. I, 27-39 and App. Vol. II, 435-445.

### B.   The Legal Framework of Second Amendment Challenges

The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597

U.S. 1 (2022). The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra.* In *Bruen*, the Court set forth the following standard for resolving Second Amendment challenges: "We reiterate that the standard for applying the Second Amendment is as follows: [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 597 U.S. at 24.

Thus, "[t]he correct starting orientation is that no arm may be prohibited." *Rigby*, 630 F. Supp. 3d at 614, n. 13 (internal citation and quotation marks omitted). "If a plaintiff challenges the government's prohibition, it is on the government first to prove the banned arm is dangerous and unusual, and if not that it is not commonly possessed, or not commonly possessed by law-abiding citizens, or not commonly possessed for lawful purposes or militia readiness." *Id.*

### C.    The Plain Text Covers Plaintiffs' Conduct

Handguns are the "quintessential self-defense weapon," and the right of law-abiding citizens to acquire them for the purpose of self-defense (especially in the home) is protected by the Second Amendment. *Heller*, 554 U.S. at 629. There is no constitutionally relevant difference between a commercially manufactured handgun and a self-manufactured version of the same firearm bearing no serial number. They are functionally identical in all relevant respects. Schlosser, App. Vol. III, 529:1-7. At least at the textual level of analysis, an unserialized PMF is a bearable arm. And like all bearable arms, it is prima facie protected by the Second Amendment. *United States v. Rahimi*, 2024 WL 3074728, at *6 (U.S. June 21, 2024).

Plaintiffs' proposed conduct is acquiring 80 percent frames and making PMF handguns from them. Making a handgun, even a handgun that has no serial number, is covered by the plain text of the Second Amendment. *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022) (enjoining Delaware statute similar to Colorado

Statute). This is true because the right to keep and bear arms implies a right to manufacture arms. *Id.,* 630 F. Supp. 3d at 615.

The State argues the Second Amendment protects only the right to carry or possess arms a citizen already has and it does not include a right to manufacture arms because the word "manufacture" is not in the text. App. Vol. I, 65. But common sense dictates that one cannot keep and bear an arm if one has not acquired it in the first place. *See United States v. Alston*, 2023 WL 4758734, *8 (E.D.N.C., Jul. 28., 2023) ("As a logical matter, it is impossible to 'keep' or 'bear' arms without first receiving them. If the Second Amendment protects the possession and use of firearms, it must also protect their acquisition – otherwise, the Amendment would protect nothing at all.").

The State insists, however, that no ancillary rights are implied by the Second Amendment *at all*. App. Vol. I, 65. This is plainly wrong as a matter of general constitutional law. "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Thus, the right to keep and bear

arms implies a corresponding right to acquire arms and to obtain the bullets necessary to use them. *Id*. "Without protection for these closely related rights, the Second Amendment would be toothless." *Id*. As the Ninth Circuit noted in *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017), the Second Amendment right to keep and bear arms wouldn't mean much without the ability to acquire arms. *See also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (right to possess firearms implies a corresponding right to acquire them).

"Similarly, here, the right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm." *Rigby*, 630 F. Supp. 3d at 615. *See also Miller v. Bonta*, 2023 WL 6929336, at *6 (S.D. Cal. Oct. 19, 2023) (appeal pending) (right to possess firearm is covered by plain text and therefore it "should go without saying" that right to manufacture is as well); and *Duncan v. Bonta*, 2023 WL 6180472, at *17 (S.D. Cal. Sept. 22, 2023) (appeal pending) (same regarding manufacture of firearm magazines).

The State replies that the "plain text" step is not satisfied because "[t]he plain text of the Second Amendment does not include a right to assemble unserialized firearms from a purchased firearms kit." App. Vol. I, 64. Here the State uses a tactic often employed by governments in Second Amendment cases. The tactic was described as follows in *Rhode v. Bonta*, 2024 WL 374901, at *5 (S.D. Cal. Jan. 30, 2024):

> The [] argument employs a rhetorical device to over-describe in detail the asserted constitutional wrong. Having over-described the alleged constitutional right, it is then argued that the detailed description of the asserted right is not covered by the plain text of the Constitution. . . .The flaw in this approach is that it focuses on the details of the constitutional wrong and then asserts that these details are not covered by the text of the Constitution.

The State's attempt to employ this rhetorical device is wrong because all that is necessary for Plaintiffs to satisfy the "plain text" step is to establish that the statute burdens the right to keep and bear arms. *Id*. The details of the burden are not relevant at the "plain text" step. Those details become relevant at the "history and tradition" step where government has the opportunity to demonstrate that the burden is constitutional because it is

consistent with the Nation's history and tradition of firearms regulation.

In summary, because Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment, that conduct is presumptively protected by the Constitution.

### D.    The Statute is Not Consistent With the Nation's History and Tradition of Firearms Regulation

The State had the opportunity to rebut the presumption that Plaintiffs' conduct is protected by the Constitution by demonstrating that the Statute is consistent with the Nation's historical tradition of firearm regulation. It failed to do so.

Plaintiffs submitted the Declaration of Joseph Greenlee regarding the "history and tradition" issue. App. Vol. II, 447-483. Mr. Greenlee demonstrated that in the Founding era, "many Americans did privately make firearms; [] the government was aware of the practice and sometimes encouraged it; and [] the practice was traditionally unregulated." *Id*. at 24. As Jefferson once wrote, "Our citizens have always been free to make, vend, and

export arms. It is the constant occupation and livelihood of some of them." *Id*.[14]

This evidence was undisputed. Indeed, in stunning testimony, the State's own expert witness utterly obliterated its "history and tradition" argument. Dr. Brian DeLay is a professor of history at the University of California at Berkeley. App. Vol. III, 572:19-20. The State offered and the district court accepted Dr. DeLay as an expert on the history of firearms in the 18th and 19th centuries. *Id*., 585:14-16. The only reasonable conclusion that can be drawn from Dr. DeLay's testimony is that far from being consistent with the Nation's historical tradition of firearms regulation, the Statute is directly contrary to that tradition. Because Dr. DeLay established Plaintiffs' case for them so effectively, they will quote his testimony extensively.

First, Dr. DeLay testified that in the Founding era most firearms were made by large, organized concerns and a small fraction were self-made by individuals:

---

[14] Quoting Letter from Thomas Jefferson to George Hammond (May 15, 1793), in 7 *The Writings of Thomas Jefferson* 326 (Paul Ford ed., 1904).

Q.  . . .the vast majority of arms were -- in the Founding Era were manufactured by concerns organized as such for that purpose in northwest Europe, correct?

A.  Correct. . . .

Q.  . . . in the Founding Era in America, the Colonies, there was a much smaller-scale enterprise going on in which individuals produced firearms, correct?

A.  Correct.

Then Dr. DeLay testified that the Founding era practice is identical to the practice today:

Q.  . . . The vast majority of arms were made by companies in Europe, correct?

A.  Correct.

Q.  A very small proportion were made by individuals in America?

A.  Correct.

Q.  Today, the vast majority of arms are made by companies?

A.  Correct.

Q.  And a very small proportion are made by individuals?

A.  Correct.

Q.  So in the limited sense that I've just described, how is that not identical?

A.  For those factors, I agree it's identical.

App. Vol. III, 616:1-4 and 109:1-14.

Dr. DeLay testified that even the way Founding-era individuals made their firearms is analogous to the way Plaintiffs made their PMFs:

> Q. In the Founding Era, individuals, with perhaps an apprentice or a Founding Era – a family member, would import some parts, like barrels and locks, and, together with other parts that they either made themselves or acquired from other people, built the finished firearms?
>
> A. Some gunmakers did do the process you just described, yes.
>
> Q. And today, an individual who acquires parts from, say, Polymer80 and then takes that part and other parts that they've acquired from other sources or made themselves can build a firearm?
>
> A. Well, I suppose that's -- that's true, with the major difference being that there's not the same level of skill involved.

*Id.*, 622:22 to 623:9.

> Q. You said it was more efficient to get the parts than to make them from a hunk of metal in the Founding Era, and you said it was more efficient to get the parts from companies than make them from a hunk of metal in the Modern Era. In that -- that limited respect, that's an identical situation, correct?
>
> A. In that very limited respect, it's the same.

*Id.*, 626:3-9.

Dr. DeLay testified further:

Q.  So you agreed that in the Founding Era, it was not the norm to make a gun -- for an individual to make a gun totally from scratch?

A.  Correct.

Q.  And so when an individual was going to make a gun during the Founding Era, he got a head start by getting some of the parts from Europe and building the arm with other parts that were sourced locally?

A.  Gunsmiths relied on a mix of imported and self-made parts. . . .

Q.  Okay. Today, is it your understanding that it's not the norm for an individual not associated with a company to make a gun totally from scratch?

A.  That's my understanding. . . .

Q.  . . . an individual who wants to make guns in the Founding Era did so by getting a head start from parts that were imported from northwest Europe, and the same happens today. Someone who wants to make a gun does so by getting a head start from someone like Polymer80.

A.  Well, gunmakers in the Colonial Era often relied upon -- partly upon imported parts, and my understanding is that individuals who assemble guns from kits rely on materials from companies.

Q.  So in that respect, they're -- the situations are pretty much identical.

> A.    Those two very particular aspects of the situation are the same.

*Id.*, 634:25 to 636:16.

In summary, the State's own expert testified that the practice of building privately made arms in the Founding era was similar, if not identical to, the practice today. Then, in extremely significant testimony, Dr. DeLay testified as follows concerning the absence of regulation of that practice in the Founding era:

> Q.    [T]he Founding Fathers were aware of crime?
>
> A.    Yes. They would have been aware of crime.
>
> Q.    And they were specifically aware of gun violence? That's not a new thing, either, is it?
>
> A.    Gun violence is not a new thing.
>
> Q.    And the Founding Fathers were aware of it?
>
> A.    Sure.

*Id.*, 642:5-11.

> Q.    The Founding Fathers could have enacted a law saying, You can't take those parts from Europe and use them to make your own guns, individuals, couldn't -- couldn't they have?
>
> A.    They could have.
>
> Q.    And yet they didn't.

53

> A.    They did not.
>
> Q.    As a matter of fact, far from prohibiting the practice, they encouraged it, as we discussed, by -- with cash -- up to and including cash payments.
>
> A.    They encouraged gunsmiths to produce firearms, that's correct.
>
> Q.    With the parts they got from Europe?
>
> A.    Or by their -- you know, by themselves. But -- but mainly they were done with a mixture of imported and self-made parts.

*Id.*, 644:6-20.

Dr. DeLay then gave testimony that destroys the State's

history and tradition argument beyond hope of recovery:

> Q.    [A]s a historian of the Founding Era, it is true that there was no tradition in the Founding Era of government prohibiting individuals from making firearms in any way they saw fit.
>
> A.    There was no tradition of the government prohibiting gunsmiths from producing firearms in any way they sought -- they thought fit.

*Id.*, 645:7-13.

> Q.    And going one further, there was no tradition in the Founding Era of even regulating the individual making of firearms by individuals.

A.   Well, government issued various sorts of incentives, and I suppose that's a form of regulation. But in terms of limiting, no, I'm unaware of any attempt by government to limit American gunmakers from producing firearms.

*Id.*, 645:14-20.

With respect to the serialization requirement in particular, Dr. DeLay testified:

Q.   With the exception of guns that were manufactured or came into government service, there was no Founding Era requirement that any manufacturer put a stamping -- identifying stamp on their guns?

A.   Not to my knowledge.

Q.   Matter of fact, the government requiring serial numbers is a modern phenomenon, isn't it? Didn't happen until the, I think, 20th century?

A.   My understanding is that the government began requiring serialization in the 20th century.

Q.   So an individual who made a firearm through whatever process in the Founding Era was never required by government to put a stamp on it unless the purchaser was the government itself?

A.   That's my understanding.

*Id.*, 648:19-649:8.

According to the State's expert, during the Founding era, individuals engaged in small-scale do-it-yourself firearm-making

that was functionally equivalent to the private manufacturing Plaintiffs engaged in before Colorado criminalized it. This is critical to the Court's resolution of this matter. The State asserts that small-scale do-it-yourself gun-making from component kits is a problem. But the Founders were well aware of a functionally identical practice and they did not regulate it, much less prohibit it. Indeed, far from discouraging small-scale private manufacturing, the Founders actively encouraged it. The Founders were also aware of gun violence and could have passed a law prohibiting the practice of self-manufactured guns as a way to address that problem, but they did not. Nor did they require identification marks to be imprinted on the guns.

*Bruen* noted that when a challenged regulation addresses an issue that existed in the 18th century, the lack of a similar historical regulation addressing the issue is evidence that the challenged regulation is unconstitutional. 597 U.S. at 26. Thus, the Founders could have enacted a regulation identical to the Colorado Statute to address the same problem the Colorado General Assembly perceived. But they chose not to do so. Thus, under

*Bruen*, the Statute is not consistent with the Nation's history and tradition of firearm regulation and is therefore unconstitutional.

The State's case is dead in the water, but it gamely perseveres with so-called "analogue" evidence from Professor Robert Spitzer. App. Vol. I, 139-180. Professor Spitzer points to regulations of gunpowder storage, knives, trap guns, and clubs and suggests that those regulations are analogous to the Statute. Resp. 11-13. Here, the State is following a tradition that dates all the way back to *Heller* of spewing a list of random regulations and saying "voilà, analogues." In *Bruen*, the court specifically disapproved this practice. The Court wrote that at a high enough level of generality, everything is infinitely analogous to everything else. 597 U.S. at 29. Therefore, listing random regulations will not do. Instead, the government must demonstrate "relevantly similar" regulations that are similarly justified (the "why" question) and that impose similar burdens (the "how" question). *Id*. The State does not even attempt to comply with *Bruen's* instructions. For example, it refers to laws regulating the public carry of knives and laws requiring the safe storage of gunpowder, but it does not even begin to explain how

57

the "why" and "how" of those laws are similar to the "why" and "how" of the challenged Statute.

Finally, the State offers the Declaration of Bloomberg Professor Daniel Webster in support of its *policy arguments*. Dr. Webster holds a doctorate in health policy. App. Vol. II, ¶ 3. He states that he is providing opinions on the following: "current research relevant to unserialized, privately-made firearms (PMFs) use in crime and how the growing availability of PMFs affects both the criminal acquisition of and use of firearms to commit violent crime and gun trafficking to supply individuals in the underground gun market." *Id*. ¶ 2. The State's public policy expert's opinions are irrelevant to the Court's resolution of Plaintiffs' Second Amendment challenge. *Bruen* specifically held that opinions on policy issues such as those expressed by Dr. Webster are out of bounds. The Court wrote:

> To justify its regulation, *the government may not simply posit that the regulation promotes an important interest*. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Only if a firearm regulation is consistent with this Nation's historical tradition* may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. at 17 (internal citation and quotation marks omitted; emphasis added).

*Bruen* made policy arguments off-limits in Second Amendment cases, and the State's public policy expert's opinions have no bearing on the issues before the Court, i.e., whether the Second Amendment's plain text covers Plaintiffs' conduct or whether the Statute is consistent with the Nation's historical tradition of firearm regulation.

### E.  Conclusion: Plaintiffs Are Likely to Prevail

In summary, Plaintiffs have met their burden under *Bruen's* "plain text" step. The plain text of the Second Amendment covers their conduct. The Statute is therefore presumptively unconstitutional. The State cannot carry its burden under *Bruen's* "history and tradition" step because there is no 18th-century (or even 19th- or 20th-century) history or tradition of regulating personally made firearms. Accordingly, the State did not rebut the presumption of unconstitutionality, and Plaintiffs will likely prevail on the merits.

## VI.    The District Court's Cursory *Bruen* Analysis is Flawed

### A.    Introduction

Turning from the standing issue to the merits of Plaintiffs' claims, the district court described the Supreme Court's Second Amendment precedents and the parties' respective positions. Sp. App. 1, pg. 18-23. Then, in a one-paragraph analysis, the court held that the Statute is a presumptively lawful condition on the commercial sale of firearms. Sp. App. 1, pg. 23. The district court did not perform *any Bruen* analysis. In other words, the court did not (1) determine whether the Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment, and, if so (2) whether the Statute is consistent with the Nation's history and tradition of firearms regulation. There are numerous problems with the district court's cursory analysis.

### B.    The Statute is Not a Presumptively Lawful Regulation of Commercial Sales

The Statute is not primarily a regulation of commercial sales. But even assuming for the sake of argument that it is, the district court's analysis would nevertheless fail. In *Heller*, the Court stated that its opinion should not be taken to cast doubt on "laws imposing

60

conditions and qualifications on the commercial sale of arms," which it described as "presumptively lawful." *Id.* 554 U.S. at 626–27 and n.26. The district court relied on this language to argue that SB 23-279 is exempt from a full-blown application of the *Bruen* test. But *Heller's* "presumptively lawful" language must be read in light of *Bruen*, which clarifies the test for assessing all Second Amendment claims. No part of that test involves presuming lawfulness. *See Bruen*, 597 U.S. at 24. Instead, once the plain text is implicated, it is the government's burden to prove that the law is consistent with the history and tradition of firearms regulation. *Id.* Nothing in *Bruen* suggests that regulations on commercial sales are subject to a different test. *Bruen* did not alter *Heller*; it simply made clear that *Heller* was only stating that it presumed restrictions of the type it listed would be found lawful to some extent when the proper analysis was conducted. This dicta from *Heller* should not be construed to exempt the government from meeting its burden under *Bruen*.

Moreover, the district court's assumption that all regulations of commercial firearms sales are exempt from the *Bruen* test surely

61

proves too much because it has no limiting principle. As the Ninth Circuit observed in *Teixeira*, "if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial sale of firearms, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms" altogether. *Id.* 873 F.3d at 688 (internal citation and quotation marks omitted). Such an overall ban would obviously "be untenable under *Heller*." *Id*. Yes, the State has the authority to impose conditions and qualifications on the commercial sale of arms. But as *Teixeira* recognized, that authority is not without limits, and it may not be exercised in a way that fails the *Bruen* test.

In addition, the parts of the Statute implicated by Plaintiffs' claims are not "laws imposing conditions and qualifications on the commercial sale of arms" in any event. Surely, a "commercial sale" is the *sine qua non* of such a law. But only subsections 111.5(2) and (4) of the Statute regulate sales. Subsection 111.5(1)(a) makes it illegal to *possess* an unserialized unfinished firearm frame even if one did not acquire it in a commercial sale (i.e., by gift or

inheritance or private sale). Similarly, subsection 111.5(3)(a) makes it illegal to *possess* an unserialized firearm or finished firearm frame regardless of how it was acquired. Most significantly, there is no possible way the district court's "condition of commercial sale" analysis could be correct with respect to subsection 111.5(5). That subsection does not regulate sales (whether commercial or otherwise) at all. It prohibits non-FFLs from making firearms. In other words, it is illegal for a private individual to *make* a firearm frame for his personal use even if another person never sees it (much less purchases it).

Finally, the district court's analysis is internally contradictory. Recall that the district court correctly held that Plaintiff Richardson has standing to seek injunctive relief with respect to the unfinished firearm frames he removed from the State. Sp. App. 1, pg. 11. But the court then held that Richardson's substantive claims fail because the Statute is a presumptively lawful regulation of commercial sales. This makes no sense. Richardson does not want to acquire the out-of-state frames. He already owns them. Thus, whatever burden the Statute imposes on

Richardson with respect to those frames, that burden cannot be a regulation of commercial sales. Moreover, as discussed above, but for the Statute, Plaintiff Richardson could transfer one of his out-of-state 80 percent frames to one of the other Plaintiffs (or anyone else) in a private transaction (whether by sale or gift). Such a transaction would not be a "commercial sale." Nevertheless, it is prohibited by the Statute. Thus, even under the district court's reasoning, the Statute does something more than merely regulate commercial sales.

### C.    The Statute is Not Saved by *Bruen* Footnote 9

The district court also gave a nod to *Bruen's* holding that certain licensing schemes are consistent with the Second Amendment. Sp. App. 1, pg. 22. This too is unavailing. *Bruen* noted that laws that license public carry of firearms that have a "shall-issue" provision are likely constitutional. 597 U.S. at 39, n. 9. Importantly, the Court added two provisos to this observation: (1) abusive permitting schemes (such as those that impose lengthy waiting times) are subject to constitutional challenge even if they

are "shall issue" schemes; and (2) the standards imposed must be "narrow" and objective. Colorado's Statute fails on both grounds.

The Statute is abusive because it denies *all* "ordinary citizens" the right to make firearms. The term "background check" as used by the proponents of SB 23-279 is extremely misleading. The normal background check that occurs when a person purchases a firearm is conducted by the Colorado Bureau of Investigation's Firearms InstaCheck Unit. See Firearms InstaCheck Unit page on CBI's website at https://bit.ly/3RKA6kH (last visited June 27, 2024). As the name of the unit implies, such background checks usually occur in minutes while the firearm purchaser waits.[15]

In stark contrast, the "background check" requirement imposed on a would-be builder of a privately made firearm are extremely onerous. Indeed, no "ordinary citizen" is eligible to make a PMF at all. Only federally licensed firearms manufacturers may lawfully make PMFs in Colorado. And the requirements to obtain such a license are extensive and time-consuming.

---

[15] In May 2024, the average turnaround time for a CBI InstaCheck was 40 minutes. InstaCheck Statistics for May 2024, available at https://bit.ly/3XM HaRH (last visited June 27, 2024).

To make even one PMF, a person must obtain a federal firearms manufacturer license. This is a "Type 7" federal firearms license. FFL Application, pg. 1. To obtain this license, the applicant must (1) complete the extensive application; (2) submit a fingerprint card; (3) submit a photograph; (4) deliver a copy of the application to the local chief law enforcement officer; (5) release medical information to the ATF; and (6) pay the application fee. FFL Application, Instructions. Then, after the application is complete, the applicant must submit to an interview by an ATF investigator. ATF, *How to Become an FFL in 10 Easy Steps*, https://www.atf.gov/resource-center/how-become-federal-firearms-licensee-10-easy-steps (last visited June 27, 2024). The investigator then submits a report to his/her supervisor and makes a "recommendation." The supervisor reviews the report and makes a further "recommendation" to the Federal Firearms Licensing Center. *Id*. Only then is the applicant eligible to receive a license. The process usually takes two months from the time the ATF receives a completed application. See ATF, *Current Processing*

*Times*,    https://www.atf.gov/resource-center/current-processing-times (last visited June 27, 2024).

This is obviously not a process that "ordinary" Colorado citizens go through. Indeed, out of a population of 5.8 million people in Colorado, there are only 630 people who hold a Type 7 federal firearms manufacturers license. Rhodes, App. Vol. III, 558:5-10.

In addition, the standards imposed by the Statute are not "narrow." Subjecting citizens to a full-blown, months-long investigation by a federal agency is the veritable opposite of a "narrow" standard.

The difference between the regulatory burden on *buying* and *making* a single handgun is extreme. To buy a handgun, the process is simple and the background check takes mere minutes. In contrast, to make a single privately made handgun, the process is arduous and takes two months. Requiring Plaintiffs to obtain a Type 7 FFL is a "hitting a fly with a sledgehammer" approach to background checks. Federal law defines firearms manufacturer as "any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution." 18

U.S.C. § 921(a)(10). The Type 7 license application process is designed for such large-scale manufacturers. Under the Colorado Statute, a single person making a single handgun exclusively for his personal use is required to submit to the same process as a company like Smith and Wesson that makes millions of firearms for commercial sale. The Type 7 license was never intended to cover Plaintiff's conduct and therefore the State's decision to require ordinary citizens to go through that process to exercise their Second Amendment rights is obviously the sort of abusive process that disqualifies the Colorado Statute from coming under the rubric of *Bruen* footnote 9.

In summary, the district court erred when it failed to engage in a meaningful analysis of *Bruen's* "plain text" and "history and tradition" steps. The cursory analysis the district court did engage in is manifestly incorrect.

## VII.  The Remaining Factors Favor Entry of Injunctive Relief

### A.    Plaintiffs Have Suffered Irreparable Harm

The district court did not engage with the remaining preliminary injunction factors, but in the interests of completeness

Plaintiffs will. Plaintiffs have established that they will likely prevail on the merits of their constitutional claim. Violation of constitutional rights per se constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury). The *Elrod* principle applies in the Second Amendment context. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). In *Baird*, the court held that in cases involving a Second Amendment claim, a likelihood of success on the merits usually establishes irreparable harm. *Id.*, at 1048. Moreover, such a likelihood "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying principle in Second Amendment context); and *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."); *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

**B.  The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief**

69

Finally, the balance of harms and public interest factors[16] favor injunctive relief. A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors decisively in his favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (internal citation and quotation marks omitted; cleaned up). In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Court held that when applying these factors courts must be mindful that even if a state is pursuing a legitimate goal (in that case deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah*

---

[16] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

*Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

The State argues the Statute furthers an important governmental interest. As discussed above, that is the point of Dr. Webster's evidence. But even if the Statute did further an important policy goal, that fact would be irrelevant under *Bruen*. Indeed, such an argument is in effect a backdoor means-end test of the type rejected by *Bruen*. 597 U.S. at 23 (rejecting means-end scrutiny in Second Amendment cases). *Bruen's* rejection of means-end scrutiny would be nullified if courts were to eschew such scrutiny while examining the merits of a Second Amendment claim, only to bring such scrutiny right back in when determining whether to grant a remedy for a constitutional violation.

## CONCLUSION

The district court abused its discretion when it denied Plaintiffs' motion for preliminary injunction. Accordingly, Plaintiffs respectfully request the Court to reverse the district court's decision and remand for entry of preliminary injunctive relief.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because this appeal involves important issues of constitutional law.

Respectfully submitted,


*/s/ Barry K. Arrington*
_____
Barry K. Arrington

**Privacy Redaction Certification**:   No privacy redactions were required.

**Paper Copy Certification**:   The paper copies of this brief to be submitted to the clerk of the Court are exact copies of the version submitted electronically.

**Virus Scan Certification**:   The digital form of this document submitted to the Court was scanned for viruses using Webroot SecureAnywhere, and according to the program the document is virus-free.

# CERTIFICATE OF SERVICE

The undersigned certifies that on July 5, 2024, he served a true and correct copy of the foregoing document by e-filing it with the CM/ECF system, which will serve the document on:

Michael T. Kotlarczyk
Matthew J. Worthington
Office of the Colorado Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado  80203

*/s/ Barry K. Arrington*
_____

Barry K. Arrington

## WORD COUNT AND TYPEFACE

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7) (excluding the items listed under Fed.R.App.P.32(f)) because this brief contains **12,878** words.

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R. App.P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface (fourteen-point Century Schoolbook) using Microsoft Word.

Date: July 5, 2024

*/s/ Barry K. Arrington*

_____

Barry K. Arrington

Case No. 24-1209

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, CHRISTOPHER
JAMES HIESTAND RICHARDSON, MAX EDWIN SCHLOSSER,
JOHN MARK HOWARD, and ROCKY MOUNTAIN GUN
OWNERS

*Plaintiffs-Appellants*,

v.

JARED POLIS, in his official capacity as Governor of the State of
Colorado,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO, CASE NO. 24-CV-00001-GPG-STV,
THE HONORABLE JUDGE GORDON P. GALLAGHER

## APPELLANTS' SPECIAL APPENDIX 1
## DISTRICT COURT ORDER

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Plaintiffs-Appellees*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-00001-GPG-STV

NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHRISTOPHER JAMES HIESTAND RICHARDSON,
MAX EDWIN SCHLOSSER,
JOHN MARK HOWARD, and
ROCKY MOUNTAIN GUN OWNERS,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## ORDER

---

      Before the Court is Plaintiffs' Motion for Temporary Injunction (D. 8).  The Court held an evidentiary hearing on the motion on March 14, 2024.  The Court DENIES the motion for the following reasons.

## I.  BACKGROUND

      Plaintiffs challenge the constitutionality of Colorado Revised Statute § 18-12-111.5 and seek to enjoin its enforcement.[1]  Colorado enacted Senate Bill 23-279 in June 2023, making it unlawful to possess or transport certain firearm components that lack a serial number and that can be assembled into a privately made firearm (PMF), colloquially called a "ghost gun" (D. 1-1).

---

[1] The Court draws the operative background facts predominantly from Plaintiffs' Complaint (D. 1) along with the parties' briefs and supporting exhibits (D. 8, D. 23, D. 26) and the evidentiary hearing held on March 14, 2024 (D. 27, D. 28).

Section 18-12-111.5, which became effective on January 1, 2024, requires an unassembled frame or receiver to be serialized before the effective date and prohibits a person using a three-dimensional printer (3D printer) to manufacture a frame or receiver.[2]   Section 18-12-111.5 provides, inter alia, that:

> A person shall not knowingly possess or transport an unfinished frame or receiver; except that it is not an offense if the unfinished frame or receiver is required by federal law to be imprinted with a serial number and has been imprinted with a serial number by a federal firearms licensee pursuant to federal law or subsection (7) of this section.
>
> [. . .]
>
> A person shall not manufacture or cause to be manufactured, including through the use of a three-dimensional printer, a frame or receiver of a firearm.[3]

Colo. Rev. Stat. § 18-12-111.5(1)(a), (5)(a)(I).  A person who violates subsection (1), (2), (3), (4), or (5)(a) of the Statute commits unlawful conduct involving an unserialized firearm, frame, or receiver. This offense is categorized as a class 1 misdemeanor unless it is a second or subsequent offense, which is a class 5 felony. § 18-12-111.5(6)(a)-(b).  A person does not violate the Statute if they have the PMF, frame, or receiver imprinted with a serial number by a federal firearms

---

[2] Prior to January 1, 2024, a person who owned an unserialized PMF, frame or receiver of a firearm, or 3D printed firearm could have the PMF or the frame or receiver of the firearm imprinted with a serial number by a federal firearms licensee (FFL) who was authorized to provide serialization services.  § 18-12-111.5(5)(b)(I).  Based on the language of the Statute, it appears to this Court that after January 1, 2024, a person is not prohibited from purchasing an unserialized frame or receiver (assuming that federal law does not regulate this), having the firearm part serialized, and then assembling a serialized PMF  *See* § 18-12-111.5(3)(b)(II).  However, after January 1, 2024, it appears from the language of the Statute that a person may not 3D print an unserialized frame or receiver to manufacture a PMF, regardless of whether the person seeks to have the 3D-printed frame or receiver serialized by an FFL at a later date. *See* § 18-12-111.5(5)(a)(I), (b)(I).

[3] The Court is cognizant of the word "including" within the manufacturing clause.  It is possible that this clause could implicate another method of manufacturing or replication that is distinct from 3D printing.  Plaintiffs, however, presented no argument regarding this issue and adduced no evidence regarding whether any Plaintiffs wished to manufacture a firearm from the ground up (via metal fabrication and woodworking) or by any other method.  As will be discussed below, Plaintiffs do not have standing to address subsection (5).  *See infra* note 18.

licensee (FFL) and undergo a background check pursuant to Colorado Revised Statute § 18-12-112.5.  § 18-12-111.5(7)(a), (c).

Plaintiffs' challenge to the Statute can be divided into two distinct issues: (1) the purchase of firearm parts kits for an unfinished frame or receiver without serial numbers from a third party, the assembly of these kits into a PMF, and the possession of the PMF in Colorado sans serialization, and (2) the creation of firearm parts—in particular the frame or receiver—via three-dimensional printing (3D printing), the assembling of these 3D-printed parts into a functioning PMF, and the possession of the PMF in Colorado sans serialization.  Plaintiffs allege that Colorado's ban on the purchase of unserialized firearm parts kits, the prohibition of 3D printing of frames or receivers, and the criminalization of possession of the unserialized PMF (whether assembled by kit or 3D-printed) violates their rights under the Second Amendment of the United States Constitution (*see* D. 1).

Before analyzing § 18-12-111.5 and the instant motion, some background pertaining to *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023), is necessary to provide context to this Order. In April 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued a Final Rule that defined the terms "firearm" and "frame or receiver" as including partially complete, disassembled, or nonfunctional frames or receivers and weapon parts kits.  Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24653 (Apr. 26, 2022).  Per the Final Rule, the purpose of the definitions was "to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a component necessary for the functioning of the weapon could be traced if later

involved in a crime." *Id.* The Final Rule paid particular focus to PMFs due to the difficulty in tracing ownership of the firearm. *Id.* at 24652.

In 2022, several plaintiffs filed a petition for review in the United States District Court for the Northern District of Texas, arguing that the Final Rule exceeded the ATF's congressionally delegated authority under the Gun Control Act, 18 U.S.C. § 921. The Northern District of Texas ruled in a series of preliminary injunctions that the ATF exceeded its authority beyond the statutory language when defining "frame or receiver" and "firearm" and that a "weapon parts kit is not a firearm." *See VanDerStok v. Garland*, 625 F. Supp. 3d 570, 577-80 (N.D. Tex. 2022), *opinion clarified*, No. 4:22-CV-00691-O, 2022 WL 6081194 (N.D. Tex. Sept. 26, 2022). On November 9, 2023, the U.S. Court of Appeals for the Fifth Circuit held that the two challenged portions of the Final Rule were an improper expansion of the ATF's statutory authority, vacated the District Court's vacatur order, and remanded the case back to the District Court for further consideration of the remedy. *VanDerStok v. Garland*, 86 F.4th 179, 196–97 (5th Cir. 2023).[4]

On August 8, 2023, the U.S. Supreme Court stayed the District Court's June 30, 2023, order and July 5, 2023, judgment. On April 22, 2024, the U.S. Supreme Court granted the Government's petition for a writ of certiorari. *Garland v. VanDerStok*, No. 23-852, 2024 WL 1706014 (U.S. Apr. 22, 2024). As of the writing of this Order, the ATF's Final Rule is enforced and requires, inter alia, that firearm parts (i.e., frames or receivers) sold by manufacturers of firearm parts kits have serial numbers. *See* 87 Fed. Reg. at 24654 ("The rule requires persons who engage in the business of dealing in weapon and frame or receiver parts kits defined as firearms to

---

[4] The Court notes that this regulation is being challenged under the Administrative Procedures Act rather than the Second Amendment.

be licensed, mark the frames or receivers within such kits with serial numbers and other marks of

identification, and maintain records of their acquisition and disposition.").

## II. FINDINGS OF FACT

The Court heard testimony from the following Plaintiffs during the Evidentiary Hearing on

March 14, 2024:  Christopher Richardson, Max Schlosser, and John Howard.[5]  The Court also

heard expert testimony, for Defendant, from Brian DeLay, Ph.D., an Associate Professor of

History and the Preston Hotchkis Chair in the History of the United States at the University of

California, Berkeley (D. 23-1 at 3).  Finally, the Court reviewed the Declaration of Joseph Greenlee

(D. 26-1)[6] and the Declaration of Brian Delay (D. 23-1).

Plaintiff Richardson is a member of Rocky Mountain Gun Owners (RMGO) and the

National Association for Gun Rights (NAGR) (D. 8-4 at 1).  Plaintiff Richardson has purchased

three 80 percent frames from Polymer80, Inc. (Polymer80),[7] assembled one into a PMF, and

wishes to continue to do so without serializing the PMFs (D. 28 at 26).  Plaintiff Richardson

testified that he chose not to undergo the serialization process, destroyed his PMF, and removed

his two remaining firearm parts kits to another state (*id.* at 27-28).  Plaintiff Richardson testified

that he owns approximately ten other firearms with serial numbers, passed a background check for

two firearm purchases, and that there is no difference in the operability of a firearm regardless of

---

[5] The Court also heard testimony from Taylor Rhodes, a representative of Rocky Mountain Gun Owners (RMGO), and Dudley Brown, a representative of the National Association for Gun Rights (NAGR) (*see* D. 28).  The Court did not give much weight to their testimony as they merely testified as to the interests of their respective organization.

[6] Defendant did not object to this declaration being attached in Plaintiffs' Reply.  Plaintiffs did not have Mr. Greenlee testify as an expert witness during the Evidentiary Hearing.

[7] Polymer80 is a company that manufactures kits with components that are technically inoperable until assembled by the individual into a PMF.  Based on the testimony of the Plaintiffs, Polymer80 no longer sells unserialized parts kits due to the enforcement of the ATF's Final Rule.  All Plaintiffs testified that they purchased their kits from Polymer80 and not from other manufacturers of frame or receiver parts kits (e.g., JSD Supply and 80 Percent Arms).

whether it possesses a serial number (*id*. at 32).  Plaintiff Richardson did not testify that he *currently* had the capabilities to 3D print or that he had 3D-printed frames or receivers in the past.  Rather, he testified that "absent this statute, [he] would have noncriminalized access to that" (*id*. at 34).  The Court further inquired:

> THE COURT: Would it be possible, before it becomes a receiver, to take that piece of plastic in, assuming you wanted to, and get a serial number affixed to it?
>
> THE WITNESS: I do not personally know of any print files that have accommodations for serial plates, which are typically required to be metal.  And so I'm not sure that I have the necessary expertise or knowledge to answer that.

(*Id*. at 34-35).  Plaintiff Richardson has not 3D printed firearm components and it does not appear to the Court that he has the knowledge or experience to 3D print firearm components, especially frames or receivers, in order to assemble a PMF (*id*. at 35).  On redirect examination, Plaintiff Richardson answered in the affirmative when asked if he had "the capability to 3D print firearms or firearm parts."  Plaintiffs' counsel did not clarify for the Court what "capability to 3D print" entailed (i.e., whether this capability pertained to the ability to purchase a 3D printer at a future date, whether Plaintiff Richardson already owned or had access to a 3D printer, or even whether he had the capabilities to purchase or create digital 3D models of firearms in order to 3D print frames or receivers).

Plaintiff Schlosser is a member of RMGO and the NAGR as well as a federal firearms licensee (FFL) holder and runs a firearms business, Skyline Distributions, full-time (*id.* at 7, 14).  Plaintiff Schlosser testified that he has purchased multiple products from Polymer80, in particular, "80 percent lowers that were constructed into Glock-pattern firearms" (*id.* at 10).  Plaintiff Schlosser testified that he destroyed the Glock-pattern PMFs and his unfinished, unserialized

frames or receivers rather than serialize them (*id.* at 11-12).  Plaintiff Schlosser testified that he

had not sought to obtain the FFL license that would authorize him to serialize his PMFs and opted

to destroy his PMFs and unfinished kits rather than obtain serialization from another FFL (*id.* at

15).

Plaintiff Howard is a member of both the NAGR and RMGO (D. 8-2 at 1).  Within the last

two years, he has purchased five parts kits from Polymer80, has assembled two PMFs from those

kits (specifically, a Glock 17 pattern frame into a pistol and an AR-15 lower receiver into an AR-

15 rifle), and opted to have his PMFs serialized[8] (D. 28 at 38-39).  Plaintiff Howard testified that

following the enactment of § 18-12-111.5, he paid a $50 fee per PMF or parts kit for serialization

from an FFL but would not have done so if not required by statute (*id.* at 43).  Plaintiff Howard

testified that the serialization does not affect the operability of the PMF (*id.* at 44).

### III.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule"

and should be "granted only in cases where the necessity for it is clearly established."  *U.S. ex rel.

Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d

886, 888 (10th Cir. 1989) (internal quotations and citations omitted).  "The purpose of a

preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury

that will surely result without their issuance."  *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th

Cir. 2005).  To prevail on a motion for a preliminary injunction, the movant must prove: (1) a

substantial likelihood of prevailing on the merits; (2) irreparable injury unless the injunction is

---

[8] Plaintiff Howard testified that one kit was assembled but the PMF was damaged and unusable and cannot be "converted into a firearm" while the other two kits were not completed.

issued; (3) that the threatened injury (without the injunction) outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction will not adversely affect the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (internal quotations and citation omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). The final two preliminary injunction factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Tenth Circuit's definition of "probability of success" is liberal, especially where "the moving party has established that the three 'harm' factors tip decidedly in its favor." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

Because a preliminary injunction is an extraordinary remedy, the plaintiff's right to relief must be clear and unequivocal. *Schrier*, 427 F.3d at 1258 (citation omitted). The Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford the movant all the relief that he could recover at the conclusion of a full trial on the merits. *Id*. at 1259. Here, Plaintiffs' motion falls into the third category.

### III. ANALYSIS

#### A. Standing[9]

Defendant argues that the Individual Plaintiffs lack Article III standing because (1) the Statute only requires that Plaintiffs obtain a serialization from an FFL and (2) NAGR and RMGO

---

[9] Defendant has agreed to waive sovereign immunity and consents to be sued in this Court solely in this case, only in his official capacity as Governor, and only for prospective relief (D. 23 at 3). Regardless, as discussed below, Plaintiffs can only establish standing and subject matter jurisdiction for a limited number of claims for prospective relief and retrospective relief. As the Court finds no basis for retrospective relief, it is unnecessary to address the prospective only nature of Governor Polis' waiver of immunity.

lack standing because they only assert standing based on the interests of their members (D. 23 at 5-6).  Plaintiffs argue that they do have standing because "but for the statute" each Individual Plaintiff would "continue purchasing firearms parts kits and assembling them into firearms" (D. 26 at 4).  Both parties' briefing and oral arguments regarding standing could have been more robust. Indeed, neither side addressed the issue of standing as it relates to the prohibition on 3D printing. Nevertheless, Plaintiffs bear the burden of establishing standing.  *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016).

"[A] court must raise the standing issue sua sponte, if necessary, in order to determine if it has jurisdiction."  *United States v. Colorado Supreme Ct.*, 87 F.3d 1161, 1166 (10th Cir. 1996). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005). Standing jurisprudence has two categories: (1) Article III (which enforces the case or controversy requirement of the United States Constitution) and (2) prudential (a "judicially self-imposed limit[] on the exercise of federal jurisdiction").  *Wilderness Soc'y. v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011).

Standing under Article III is a threshold issue that must be addressed before the putative plaintiff can litigate their claims in federal court.  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76 (1982).  To establish Article III standing, a plaintiff must allege that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  At the preliminary injunction stage of the litigation, a plaintiff must make a "clear showing" that they have standing and are "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); s*ee also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring).

### 1. *Individual Standing*

To the extent that an individual plaintiff is seeking prospective injunctive relief, the individual plaintiff "generally has standing if he or she alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder[,]" even if a plaintiff has not been prosecuted or threatened with prosecution.  *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) (internal quotations and citations omitted).  The threatened injury, however, must be a "real and immediate threat of being injured in the future[,]" which means it must be "certainly impending and not merely speculative." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).  An alleged injury that is "contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction." *Id.* at 1283–84.  The Statute regulates three categories of conduct and Plaintiffs must have engaged in said conduct in order to challenge each component of the Statute. Therefore, standing for the Individual Plaintiffs in the instant case falls into three categories: (1) past purchases of frames or receivers to create a PMF; (2) future purchases of frames or receivers to create a PMF; and (3) 3D-printed frames or receivers to create a PMF.

i.   *Past purchases and PMFs assembled before January 1, 2024*

The Individual Plaintiffs' standing for past purchases of unfinished frame or receiver kits can be further categorized based on the actions they took before January 1, 2024, and the type of relief they seek: (1) retrospective relief or (2) prospective relief.  "The injury in fact requirement differs depending on whether the plaintiff seeks prospective or retrospective relief." *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014) (internal quotations omitted).  "A plaintiff seeking retrospective relief . . . satisfies the 'injury in fact' requirement if she suffered a past injury that is concrete and particularized." *Tandy*, 380 F.3d at 1284.  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).  If a plaintiff presents evidence of a past injury to establish standing for retrospective relief, that plaintiff must also "demonstrate a continuing injury to establish standing for prospective relief." *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011).

Plaintiff Richardson purchased three unfinished frames from Polymer80, assembled one into a PMF, destroyed the PMF prior to January 1, 2024, and moved the remaining two unserialized firearm parts kits to another state before the Statute took effect (D. 28 at 26-28).  Plaintiff Richardson has standing to assert a claim for injunctive relief as he seeks prospective relief and meets the injury-in-fact requirement of Article III by (1) showing a continuing or imminent injury, (2) establishing a credible threat of prosecution should Plaintiff Richardson bring his two unserialized firearm parts kits back to Colorado, and (3) moving for a preliminary injunction on the day the Statute took effect.  *O'Shea*, 414 U.S. at 496; *Tandy*, 380 F.3d at 1283; *see also Peck*

*v. McCann*, 43 F.4th 1116, 1130 (10th Cir. 2022).  Indeed, enjoining the enforcement of § 18-12-111.5 would resolve Plaintiff Richardson's alleged injuries by removing the alleged violation of his Second Amendment rights.  *See, e.g., Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 978 (10th Cir. 2020) ("While uncontested by Castle Rock, we also note that the plaintiff['s] injury . . . would be redressed by a judicial conclusion that the Ordinance['s Curfew] is unconstitutional." (alterations in original and internal quotation omitted)).  Specifically, his standing extends only to challenging one portion of the statutory regime at issue, which is the portion dealing with pre-January 1, 2024, purchases.

Plaintiff Schlosser and Howard only have standing to assert a claim for retrospective relief as they cannot show that there "exists a credible threat of prosecution thereunder."  *Aptive Env't, LLC*, 959 F.3d at 974.  Standing for retrospective relief may be based on past injuries but there is no claim for prospective relief if there is no present case or controversy regarding the injury.  *See PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002).  Plaintiff Schlosser testified that he purchased multiple products from Polymer80, destroyed his unserialized Glock-pattern PMFs prior to January 1, 2024, and destroyed his unfinished frames or receivers before the Statute took effect (*id*. at 10-12).  Plaintiff Howard testified that he paid for the serialization of his past five Polymer80 purchases before January 1, 2024 (*id* at 43-44).  While Plaintiffs Schlosser and Howard have standing to assert claims for retrospective relief and seek an award of damages or declaratory relief based on the actions they took to comply with the Statute, they may not base their claims for prospective relief on these past, alleged injuries.  *See Rasmussen*, 298 F.3d at 1203 n.2 (noting that only declaratory relief and monetary damages are available for past constitutional violations).

12

*ii. Future purchases, current controversy, and ripeness*

Article III of the Constitution only permits a federal court to adjudicate actual cases and controversies; thus, issues pertaining to justiciability directly affect a federal court's subject matter jurisdiction. *United States v. Wilson*, 244 F.3d 1208, 1213-14 (10th Cir. 2001) ("Whether a claim is ripe for adjudication, and therefore presents a case or controversy, bears directly on this jurisdiction."). A justiciable controversy is defined as "definite and concrete, touching the legal relations of parties having adverse legal interests; and [must] be real and substantial and admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citations and internal quotations omitted) (second alteration in original).

To determine whether a claim is ripe, the Court must evaluate two issues: "(1) the fitness of the issue for judicial resolution and (2) the hardship to the parties of withholding judicial consideration." *Wilson*, 244 F.3d at 1213. Plaintiffs acknowledged that the serialization requirement is currently regulated by the ATF's Final Rule. During cross-examination, Plaintiff Schlosser testified:

> Q. Okay. And that firearm -- those three firearms, none of them contained a serial number?
> A. No.
> Q. Do any of Polymer80's firearms parts kits, to your knowledge, contain serial numbers?
> A. Now they do.
> Q. Okay. If you obtained one of those kits that contains a serial number, is it your understanding that you cannot manufacture that firearm?
> A. If it has a serial number, it can be manufactured.
> Q. Okay. So you could get a kit with serialized parts and assemble a firearm from those parts?
> A. I could.

(D. 29 at 17-18).  As previously noted, the U.S. Supreme Court granted the Government's petition for a writ of certiorari and will hear oral argument on the ATF's Final Rule next term.  *See VanDerStok*, 2024 WL 1706014.  Currently, unfinished frames or receivers sold by manufacturers must be serialized per the ATF's presently enforced Final Rule.  The Court finds that Plaintiffs' argument, that § 18-12-111.5 unconstitutionally limits their future purchases of unserialized firearm parts kits in order to manufacture PMFs, is currently unripe as serialization currently is required under federal law.[10]  Because federal law sets the baseline requirements (i.e., currently requires manufacturers of firearm parts kits to serialize them before shipping to the customer), there is no active controversy regarding the serialization requirement under § 18-12-111.5; thus, the Court lacks subject matter jurisdiction to review Plaintiffs' challenge regarding the constitutionality of § 18-12-111.5 as it pertains to future purchases of firearm parts kits and serialization.[11]  Regardless of what Colorado law dictates, federal law precludes Plaintiffs from lawfully carrying out their intended activities.

Indeed, Plaintiffs' constitutional injury hinges on little more than speculation and contingency.  Ultimately, they have failed to establish that there is a "substantial controversy" that is ripe for adjudication regarding future purchases of firearm component kits that is "of sufficient

---

[10] The ATF's Final Rule, citing 18 U.S.C. § 927, notes that the Gun Control Act of 1968 (GCA) "does not preempt State or local law unless there is a direct and positive conflict with Federal law such that they cannot be reconciled or consistently stand together."  87 Fed. Reg. 24652 n.68.  The Court interprets this to mean that the GCA sets the baseline regulations and that a State may choose to enforce stricter, constitutionally valid regulations.  *See, e.g., Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000) (noting that federal law creates a "floor" or minimum baseline for compliance by States and preemption principles apply only when state law conflicts).

[11] This would also seem to present a problem for Plaintiffs' claims from a redressability perspective.  *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) ("Article III further requires that the plaintiff demonstrate a substantial likelihood that the relief requested will redress its injury in fact . . .The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." (citations omitted)).  The Court, however, does not need to examine this issue.

immediacy and reality to warrant the issuance of a declaratory judgment" or injunctive relief.[12] *MedImmune, Inc.*, 549 U.S. at 127. It is conceivable that, during the next term, the Supreme Court could determine that the ATF exceeded its congressionally delegated authority when promulgating its Final Rule and that it cannot require manufacturers of firearm parts kits to serialize them before shipping them to customers. At that point, this controversy will be ripe for the Court to revisit. As of now, however, the governing federal law renders this claim too speculative and unripe. Ultimately, the Court will not review Plaintiffs' challenge to Colorado's PMF and firearm parts kits serialization requirement because the Supreme Court has stayed the Northern District of Texas's June 30, 2023, order and July 5, 2023, judgment, federal law currently requires serialization, and manufacturers of such firearm parts kits (e.g., Polymer80) currently do not sell unserialized firearm parts or kits.

### iii.   PMFs and firearm parts via 3D printing

Lastly, the Individual Plaintiffs failed to establish an injury-in-fact sufficient to establish Article III standing at the preliminary injunction stage as it pertains to 3D printing. Plaintiffs had the burden of establishing that they "have suffered an 'injury in fact'—an invasion of a judicially cognizable interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Dahlberg v. Avis Rent A Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1110 (D. Colo. 2000). For an asserted injury to be imminent as it pertains to the Second Amendment, "it must be real and immediate—not remote, speculative, conjectural, or hypothetical." *Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1093 (D. Kan. 2015)

---

[12] Plaintiffs' briefing highlights that only if the Fifth Circuit's decision in *VanDerStok* is affirmed by the Supreme Court, can this Court proceed to examine the constitutionality of § 18-12-111.5. Likewise, if the Supreme Court reverses the Fifth Circuit and holds that the ATF did not exceed the scope of its authority, then there is no active controversy.

(citation omitted).  Furthermore, a credible threat of prosecution cannot be based on "fears that are imaginary or speculative."  *Clark v. City of Shawnee, Kansas*, 228 F. Supp. 3d 1210, 1219 (D. Kan. 2017) (internal quotations and citation omitted).  The Supreme Court has made clear: "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

As previously described, none of the Individual Plaintiffs testified that they had access to a 3D printer, had attempted to 3D print a PMF prior to January 1, 2024, or had attempted to 3D print a PMF since the enactment of § 18-12-111.5 and have it serialized.  Only Plaintiff Richardson discussed 3D printing, but only hinted at his intent or capacity to 3D print a frame, receiver, or PMF in an evasive way: "Absent this statute, I would have noncriminalized access to that. Does that answer the question?" (D. 28 at 34).  Indeed, Plaintiff Richardson testified that he had never 3D printed any firearms or firearm parts before (*id*. at 35).  Merely having future access or capabilities to 3D printing is hypothetical and does not create an imminent injury that gives rise to Article III standing.  Accordingly, the Court finds that Plaintiffs do not have standing to challenge the constitutionality of § 18-12-111.5(5)(a)(I) as it pertains to manufacturing a PMF via 3D printing.

### 2.  *Organizational Standing*

The Court utilizes the same inquiry when analyzing an organization's standing under Article III.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).  An organization can establish an injury in fact if there is a "concrete and demonstrable injury to the organization's activities . . . with the consequent drain on the organization's resources" that results in an

impairment to the organization's ability to fulfill an essential function, purpose, or goal. *Id.* at 379. An organization has standing to bring suit on behalf of its members "when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 169. In this instance, the organization must "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Similar to the above analysis regarding the Individual Plaintiffs, NAGR and RMGO only have associational standing to pursue injunctive relief for claims of constitutional infringement as it pertains to past purchases of unserialized, unfinished frames or receiver kits.[13] *Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). Because there are no Individual Plaintiffs who have Article III standing for 3D-printed frames or receivers and PMFs, NAGR and RMGO similarly do not have Article III standing.[14] Moreover, NAGR and RMGO do

---

[13] Nominal damages and retrospective declaratory judgment apply only to individual claims alone and are not a form of relief that extends standing to an association. Moreover, NAGR and RMGO neither allege any monetary injury to itself nor any assignment of damages claims of its members. *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 328 F. Supp. 3d 1203, 1214 (D. Colo. 2018).

[14] Moreover, even if it is determined on appeal that NAGR and RMGO did have Article III standing to pursue a constitutional claim regarding the 3D printing of frames or receivers in order to manufacture a PMF, the Court would still find that the organizations lack prudential standing and only raise generalized grievances. *See United States v. Windsor*, 570 U.S. 744, 745 (2013) ("Unlike Article III requirements—which must be satisfied by the parties before judicial consideration is appropriate—prudential factors that counsel against hearing this case are subject to countervailing considerations [that] may outweigh the concerns underlying the usual reluctance to exert judicial power.") (internal quotation and citation omitted); *Hill v. Warsewa*, 947 F.3d 1305, 1309–10 (10th Cir. 2020) ("Under the prudential standing doctrine, a party may not rest its claims on the rights of third parties where it cannot assert a valid right to relief of its own." (internal quotation and citation omitted)).

not claim that § 18-12-111.5 makes it difficult or impossible for them to fulfill any of their essential

goals or purposes; thus, NAGR and RMGO do not have standing in their own right. *Havens Realty

Corp.*, 455 U.S. at 379.

### B. Preliminary Injunction[15]

Plaintiffs move to enjoin § 18-12-111.5, arguing that gunsmithing was a "universal need

in early America" and that many individuals were "engaged in gunsmithing as an additional

occupation or hobby" (D. 8 at 1). Plaintiffs argue that "the conduct of making and possessing

PMFs is covered by the plain text of the Second Amendment" and that "the Statute's prohibition

of that conduct is not consistent with this Nation's history and tradition of firearms regulations"

(*id.* at 3). Defendant counters that "[t]he use of these untraceable 'ghost guns' in crimes has spiked

in recent years, creating challenges for law enforcement and undermining public safety," that § 18-

12-111.5 does not violate the Second Amendment as it merely requires anyone possessing an

unserialized firearm frame or receiver to obtain serialization, and that the Statute is consistent with

the nation's history and tradition of regulating self-made firearms and components (D. 23 at 1-2).

The Second Amendment of the United States Constitution states "[a] well regulated Militia,

being necessary to the security of a free State, the right of the people to keep and bear Arms, shall

not be infringed." U.S. Const., amend. II. In 2022, the Supreme Court held that the Second and

---

[15] Because the Court finds that Plaintiffs do not have standing for claims regarding 3D-printed frames or receivers, Plaintiffs' claims regarding Colorado's requirement for serialization of future purchases are unripe, and the proscribed conduct as it pertains to past purchases is not covered by the plain text of the Second Amendment, the Court does not need to analyze the severability of § 18-12-111.5. Colo. Rev. Stat. § 2-4-204; *see I.N.S. v. Chadha*, 462 U.S. 919, 934 (1983). Furthermore, Plaintiffs moved in their Reply to strike the Declaration of Dr. Webster (D. 26 at 2-3). The Court took this motion under advisement during the Evidentiary Hearing (D. 28 at 5). As will be addressed in detail infra, because the Court finds that the Second Amendment's plain text does not cover an individual's conduct regarding possession of unserialized frames or receivers and PMFs from prior purchases, the Court does not need to analyze Plaintiffs' motion to strike Dr. Webster's statements.

Fourteenth Amendments protect the right of law-abiding citizens to carry a handgun for self-defense outside of the home. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 9 (2022). This judgment is consistent with the holdings in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and these cases remain binding precedent. *Id.* "The Second Amendment right is fully applicable to the States" and "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *McDonald*, 561 U.S. at 750, 791.

In *Bruen*, Justice Thomas—writing for the majority—held that:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 17. While the Supreme Court declined to adopt the two-part analysis that most U.S. Courts of Appeals had utilized when analyzing Second Amendment challenges, such a test requires this Court to examine multiple facets of this "one-step" test.[16] *See United States v. Avila*, 672 F. Supp. 3d 1137, 1143 (D. Colo. 2023) ("The Court has carefully read *Bruen* and is sensitive to its admonition that lower courts apply a one-step test. Nonetheless, the opinion's logic is difficult to

---

[16] The Court considers this statement regarding the number of steps to be dicta, which ultimately does not alter the analysis that is required under *Bruen*. For purposes of this case, whether *Bruen*'s rejection of the traditional two-step framework leaves lower courts with a one-part or a multi-part test is irrelevant. The *Bruen* one-step analysis is triggered by a single event, which begins only when the Second Amendment is actually implicated. Just as driving a car could be described as a singular act even though it requires multiple discrete actions, it still requires the ignition of the engine. Here, because the Second Amendment is not implicated, there is no ignition, and the engine is not running. Thus, there is no need for a full *Bruen* analysis, which would include an examination of the Nation's historical tradition of firearm regulation.

collapse into just one step . . . *Bruen*'s directive is best understood as one to eschew means-end analysis in favor of text, history, and tradition.").

Regardless, consistent with the textual analysis conducted by the Supreme Court, this Court must ultimately examine: (1) whether the petitioner is part of "the people" who are protected by the Second Amendment; (2) whether the device (a handgun in *Bruen*) is a firearm that is a weapon in common use today for self-defense; and (3) whether the plain text of the Second Amendment protects the petitioner's proposed course of conduct.  *Bruen*, 597 U.S. at 32.  For purposes of this Order, the Court will assume without deciding that (1) Plaintiffs are people protected by the Second Amendment and (2) a PMF that is constructed from a purchased frame or receiver from a licensed manufacturer, and without a serial number, is a firearm that is a weapon in common use today for self-defense.[17]

The crux of the instant dispute is whether the plain text of the Second Amendment covers Plaintiffs' proposed conduct.  Plaintiffs' argument is as multi-faceted as *Bruen*'s one-step test: (1) "[t]he right to keep and bear arms implies a corresponding right to acquire arms"; thus, (2) Plaintiffs have the right to manufacture arms privately; ergo, (3) the Statute's requirement that Plaintiffs serialize unfinished frames or receivers purchased from a licensed firearms manufacturer infringes upon their Second Amendment rights (D. 26 at 5-7).[18]  Defendant argues that the individual's right to keep firearms is unimpeded because:

---

[17] The Court does not need to reach the question of whether an unfinished frame or receiver kit constitutes a firearm as Plaintiffs are not successful in establishing that the Second Amendment covers their proposed conduct. Furthermore, *Bruen* does not dictate any particular order in which the Court should conduct its analysis when examining these facets under the "one-step" test.

[18] Plaintiffs allege that "[o]n its face, C.R.S. § 18-12-111.5(5)(a)(I) makes it illegal for anyone who is not a federally licensed firearms manufacturer to make a firearm – period full stop" (D. 26 at 7).  Plaintiffs attempt to argue that the Statute prevents any and all manufacturing of PMFs, including assembling unfinished frame or receiver kits, "even if

> [t]he statute does not prohibit Plaintiffs from possessing any particular arm
> or category of arms. Instead, the statute simply requires that, if an individual
> possesses a firearm or firearm component without a serialized number, then
> they must get a serialization affixed.

(D. 23 at 7).   Despite the evolution of the Supreme Court's Second Amendment jurisprudence, the

Supreme Court (either in majority holdings or by the individual justices) has consistently

reaffirmed that there are constitutional limitations to the Second Amendment.   In *Bruen*, Justice

Alito wrote in his concurrence:

> Our holding decides nothing about who may lawfully possess a firearm or
> the requirements that must be met to buy a gun. Nor does it decide anything
> about the kinds of weapons that people may possess. Nor have we disturbed
> anything that we said in *Heller* or *McDonald* . . . about restrictions that may
> be imposed on the possession or carrying of guns.

---

the person intends to have the firearm stamped with a serial number" (*id.*). This argument is unavailing.  Section 18-12-111.5(1)(a) denotes that "[a] person shall not knowingly possess or transport an unfinished frame or receiver; except that it is not an offense if the unfinished frame or receiver is required by federal law to be imprinted with a serial number and has been imprinted with a serial number by a federal firearms licensee pursuant to federal law or subsection (7) of this section."  Separately, § 18-12-111.5(5)(a)(I) specifies that a "person shall not manufacture or cause to be manufactured, including through the use of a three-dimensional printer, a frame or receiver of a firearm." When the statute's text is unambiguous, the Court merely relies upon the text's plain meaning and the inquiry ends. *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021) ("The plain meaning of a statute is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (internal quotations and citation omitted)); *see also People v. Griego*, 409 P.3d 338, 342 (Colo. 2018) ("When the statutory language is clear, we apply the plain and ordinary meaning of the provision . . . In doing so, we give consistent, harmonious, and sensible effect to each part of the statute, and we interpret every word, rendering no words or phrases superfluous and construing undefined words and phrases according to their common usage.").

Examining § 18-12-111.5, it is clear from the plain text that the first four subsections pertain to the purchase and possession of an unfinished frame or receiver and the requirement to have it imprinted with a serial number pursuant to subsection (7).  Section 18-12-111.5(5)(a)(I)-(b)(I) prohibits a person who is not a federally licensed firearm manufacturer from manufacturing, including through the use of 3D printing, a frame or receiver and requires that an individual who owns such a manufactured firearm on or before June 2, 2023, to have it serialized by an FFL on or by January 1, 2024.  A plain reading of the text indicates that subsection (5) prohibits 3D printing of frames and receivers but leaves open the possibility of including other forms of production or technologies capable of replication.  *See Manufacture*, Black's Law Dictionary (11th ed. 2019) (Defined as "any material form produced by a machine from an unshaped composition of matter").  The Court does not find that § 18-12-111.5(5) operates to ban the assembly of purchased, serialized unfinished frames or receivers into a PMF.  Regardless, Plaintiffs do not have standing to challenge this portion of the Statute as none of the Plaintiffs established that they were capable of manufacturing their own frame or receiver.

142 S. Ct. at 2157 (Alito, J., concurring); *see also Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) ("[S]ix of the nine Justices pointed out that *Bruen* was not casting any doubt on this language in *Heller*.").

Thus, this Court relies upon *Heller* to analyze the instant case.  In *Heller*, the Supreme Court noted:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of arms*.

554 U.S. at 626–27 (emphasis added); *see also McDonald*, 561 U.S. at 786 ("We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.").[19]

Justice Kavanaugh clarified in *Bruen* that "the Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes" and that these regimes "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements."  597 U.S. at 79-80 (Kavanaugh, J., concurring).  As long as these regimes "do not

---

[19] William Blackstone, oft-cited for the principle that gun ownership is a fundamental right, also noted that this right to keep arms was not unfettered and that regulations could also be placed upon such ownership and possession:  "[t]he fifth and last auxiliary right of the subject . . . is that of having arms for their defence *suitable to their condition and degree, and such as are allowed by law* . . . ."  2 William Blackstone, Commentaries *143-44 (emphasis added).

grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense" they are constitutionally permissible. *Id*. More recently, the U.S. Court of Appeals for the Tenth Circuit confirmed that *Bruen* did not indisputably and pellucidly abrogate *Heller* and preserved the "shall-issue" regimes and related background checks. *Vincent*, 80 F.4th at 1202 (holding that a federal ban on possession of a firearm by a felon under 18 U.S.C. § 922(g)(1) was constitutional under *Heller*).

The Court finds that § 18-12-111.5—as it pertains to prior purchases for unserialized frames or receivers—imposes a condition on the commercial sale of a firearm, which was recognized as constitutional in *Heller* and that was not abrogated or called into question in any way in *Bruen*. Section 18-12-111.5 does not prevent an individual from buying an unfinished frame or receiver or firearms part kit and in no way infringes upon Plaintiffs' right to acquire arms. Rather, the Statute requires the purchaser to have the frame or receiver serialized by an FFL and to undergo a background check. *See also Avila*, 672 F. Supp. 3d at 1143 ("Fixing a serial number on a firearm has no impact on its operation."). Thus, the Statute is presumptively constitutional under *Heller* and Plaintiffs have failed to establish that the plain text of the Second Amendment extends to the Individual Plaintiffs' intended conduct (i.e., possession of unserialized frames or receivers[20] and PMFs after January 1, 2024). Accordingly, Plaintiffs cannot succeed on the merits of their claim regarding prior purchases and the Court must deny Plaintiffs' motion for injunctive

---

[20] Curiously, the Northern District of Texas concluded that the firearm parts kits containing frames or receivers did not constitute a firearm under 18 U.S.C. § 921. *See VanDerStok*, 625 F. Supp. 3d at 579-82. Thus, there is a conceivable argument that firearm parts kits and unfinished frames or receivers are not protected under the Second Amendment on the basis that they are not arms; however, because the Supreme Court has stayed this judgment the Court does not need to analyze this issue.

relief. Similarly, because the Court finds that the Statute's serialization requirement for past purchases is presumptively lawful, Plaintiffs cannot seek retrospective relief either.[21]

## IV.  CONCLUSION

Accordingly, Plaintiffs' Motion for Temporary Injunction is DENIED (D. 8).


DATED May 2, 2024.

BY THE COURT:

_____
Gordon P. Gallagher
United States District Judge

---

[21] Since the Court finds that the serialization requirement for previously purchased unfinished frames or receivers is presumptively lawful under *Heller*, the Court declines to examine the separate issue of whether such a requirement is in accord with the Nation's history and tradition of regulating firearms. The Court thanks Dr. DeLay for his expert testimony on the history of firearm regulations in America and found his knowledge of the subject matter compelling.

Case No. 24-1209

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, CHRISTOPHER
JAMES HIESTAND RICHARDSON, MAX EDWIN SCHLOSSER,
JOHN MARK HOWARD, and ROCKY MOUNTAIN GUN
OWNERS

*Plaintiffs-Appellants*,

v.

JARED POLIS, in his official capacity as Governor of the State of
Colorado,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO, CASE NO. 24-CV-00001-GPG-STV,
THE HONORABLE JUDGE GORDON P. GALLAGHER

## APPELLANTS' SPECIAL APPENDIX 1
## STATUTES

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Plaintiffs-Appellees*

## Relevant Definitions

C.R.S. § 18-12-101 is the definitional section of Article 12 of Title 18 of the Colorado Revised Statutes. As relevant to C.R.S. § 18-12-111.5, that section states:

(1) As used in this article 12, unless the context otherwise requires: . . .

(b.9) "Federally licensed firearm manufacturer" means a licensed manufacturer as defined in 18 U.S.C. sec. 921(a)(10).

(c.3) "Fire control component" means a component necessary for the firearm to initiate, complete, or continue the firing sequence, including any of the following: Hammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails.

(c.5) "Frame or receiver of a firearm" means a part of a firearm that, when the complete firearm is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if pins or other attachments are required to connect the fire control components. Any part of a firearm imprinted with a serial number is presumed to be a frame or receiver of a firearm, unless the federal bureau of alcohol, tobacco, firearms, and explosives makes an official determination otherwise or there is other reliable evidence to the contrary.

(k) "Three-dimensional printer" or "3-D printer" means a computer-aided manufacturing device capable of producing a three-dimensional object from a three-dimensional digital model through an additive manufacturing process that involves the layering of two-dimensional cross sections formed of a resin or similar material that are fused together to form a three-dimensional object.

(l) "Unfinished frame or receiver" means any forging, casting, printing, extrusion, machined body, or similar article that has reached a stage in manufacture when it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm; or that is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed, assembled, or converted.

1

## C.R.S. § 18-12-111.5

(1)(a) A person shall not knowingly possess or transport an unfinished frame or receiver; except that it is not an offense if the unfinished frame or receiver is required by federal law to be imprinted with a serial number and has been imprinted with a serial number by a federal firearms licensee pursuant to federal law or subsection (7) of this section.

(b) This subsection (1) does not apply to a federally licensed firearm importer or federally licensed firearm manufacturer acting within the scope of the importer's or manufacturer's license.

(2)(a) A person shall not knowingly sell, offer to sell, transfer, or purchase an unfinished frame or receiver; except that it is not an offense if the unfinished frame or receiver is required by federal law to be imprinted with a serial number and has been imprinted with a serial number by a federal firearms licensee pursuant to federal law or subsection (7) of this section.

(b) This subsection (2) does not apply to:

(I) A sale, offer to sell, transfer, or purchase if the purchaser is a federal firearms licensee; or

(II) A temporary transfer to a federal firearms licensee for the purpose of having the firearm or frame or receiver of a firearm imprinted with a serial number pursuant to subsection (7) of this section.

(3)(a) A person shall not knowingly possess, purchase, transport, or receive a firearm or frame or receiver of a firearm that is not imprinted with a serial number by a federal firearms licensee authorized to imprint a serial number on a firearm, frame, or receiver pursuant to federal law or subsection (7) of this section.

(b) This subsection (3) does not apply if:

(I) The person possessing, purchasing, transporting, or receiving the firearm or the frame or receiver of a firearm is a federally licensed firearm importer or federally licensed firearm manufacturer; or

(II) The firearm involved has been rendered permanently inoperable; is a defaced firearm, as described in section 18-12-103; is an antique firearm, as defined in 18 U.S.C. sec. 921(a)(16); or was manufactured before October 22, 1968.

(4)(a) A person shall not knowingly sell, offer to sell, or transfer a firearm or frame or receiver of a firearm that is not imprinted with a serial number by a federal

firearms licensee authorized to imprint a serial number on a firearm pursuant to federal law or subsection (7) of this section.

(b) This subsection (4) does not apply if:

(I) The person selling, offering to sell, or transferring the firearm or frame or receiver of a firearm is a federally licensed firearm importer or federally licensed firearm manufacturer, and the person purchasing or receiving the firearm or frame or receiver of a firearm is a federally licensed firearm importer or federally licensed firearm manufacturer;

(II) The firearm involved has been rendered permanently inoperable; is a defaced firearm, as described in section 18-12-103; is an antique firearm, as defined in 18 U.S.C. sec. 921(a)(16); or was manufactured before October 22, 1968; or

(III) The transfer is a temporary transfer to a federal firearms licensee for the purpose of having the firearm or frame or receiver of a firearm imprinted with a serial number pursuant to subsection (7) of this section.

(5)(a)

(I) A person shall not manufacture or cause to be manufactured, including through the use of a three-dimensional printer, a frame or receiver of a firearm.

(II) This subsection (5)(a) does not apply to a federally licensed firearm manufacturer.

(b)

(I) A person who owns, on the day before June 2, 2023, a firearm or a frame or receiver of a firearm that the person manufactured and that is not imprinted with a serial number by a federal firearms licensee shall, no later than January 1, 2024, have the firearm or the frame or receiver of a firearm imprinted with a serial number by a federal firearms licensee authorized to imprint a serial number on a firearm, frame, or receiver pursuant to federal law or subsection (7) of this section.

(II) This subsection (5)(b) does not apply to a federal firearms licensee.

(6)(a) A person who violates subsection (1), (2), (3), (4), or (5)(a) of this section commits unlawful conduct involving an unserialized firearm, frame, or receiver.

(b) Unlawful conduct involving an unserialized firearm, frame, or receiver is a class 1 misdemeanor; except that a second or subsequent offense is a class 5 felony.

(7)(a) A federal firearms licensee may serialize a firearm or frame or receiver of a firearm, including a finished or unfinished frame or receiver, by imprinting a serial number on the firearm, frame, or receiver. To serialize a firearm, frame, or receiver, the dealer or other licensee must imprint on the firearm, frame, or receiver a serial number beginning with the dealer's or licensee's abbreviated federal firearms license number, which is the first three and last five digits of the license number, followed by a hyphen, before a unique identification number. The serial number must not be duplicated on any other firearm, frame, or receiver serialized by the licensee, and must be imprinted in a manner that complies with the requirements in federal law for imprinting a serial number on a firearm, including the minimum size and depth of the serial number and that the serial number is not susceptible to being readily obliterated, altered, or removed.

(b) The licensee must retain a record concerning a firearm, frame, or receiver serialized by the licensee that complies with the requirements under federal law for the sale of a firearm. In addition to any record required by federal law, a federal firearms licensee that imprints a unique serial number on a firearm, frame, or receiver pursuant to this subsection (7) shall make a record at the time of the transaction of each transaction involving serializing a firearm, frame, or receiver and keep that record. The record must include the following information: The date, name, age, and residence of any person to whom the item is transferred; and the unique serial number imprinted on the firearm, frame, or receiver. A licensee that fails to make and retain a record required in this subsection (7)(b) shall be punished as provided in section 18-12-403.

(c) Returning a newly serialized firearm, frame, or receiver to a person after serializing the firearm, frame, or receiver pursuant to federal law or this subsection (7) is a transfer of a firearm, and a federal firearms licensee that imprints a unique serial number on the firearm, frame, or receiver pursuant to this subsection (7) shall conduct a background check on the transferee pursuant to section 18-12-112.5 before returning the firearm to the transferee. If the transfer is denied, the licensee shall surrender the firearm, frame, or receiver to a law enforcement agency.

4