**Case No. 24-1209**

**United States Court of Appeals**
for the
**Tenth Circuit**

NATIONAL ASSOCIATION FOR GUN RIGHTS, CHRISTOPHER JAMES HIESTAND RICHARDSON, MAX EDWIN SCHLOSSER, JOHN MARK HOWARD, and ROCKY MOUNTAIN GUN OWNERS,

*Plaintiffs - Appellants,*

– v. –

JARED POLIS, in his official capacity as Governor of the State of Colorado,

*Defendant – Appellee.*

On Appeal from the United States District Court for the District of Colorado
The Honorable Gordon P. Gallagher, Case No. 24-cv-00001-GPG-STV

**APPELLEE'S ANSWER BRIEF**

PHILIP J. WEISER
Attorney General
MICHAEL T. KOTLARCZYK *
Assistant Solicitor General
PAT SAYAS*
Senior Assistant Attorney General
KIT SPALDING*
Senior Assistant Attorney General
SAM WOLTER*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone:  720-508-6349
E-Mail:
mike.kotlarczyk@coag.gov;
pat.sayas@coag.gov;
kit.spalding@coag.gov;
samuel.wolter@coag.gov
*Counsel of Record
Attorneys for Governor Polis

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUES ...................................................... 3

STATEMENT OF THE CASE ........................................................... 4

    A. Background of firearm serialization. ................................... 4

    B. The federal government's response to the proliferation of
       ghost guns. ......................................................................... 6

    C. Colorado's response to the proliferation of ghost guns. ......... 8

    D. The complaint and preliminary injunction motion. ............. 10

SUMMARY OF THE ARGUMENT .................................................. 13

ARGUMENT ....................................................................................... 16

   I.  Plaintiffs face several heightened legal standards to reverse a
       district court's denial of a preliminary injunction in a facial
       constitutional challenge ..................................................... 16

   II. The district court correctly held that Plaintiffs have not
       demonstrated standing to challenge the Act's prohibition on
       self-manufactured firearm parts. ....................................... 19

   III. The district court correctly held that it has jurisdiction only
       over Plaintiffs' challenge to the enforcement of the statute with
       respect to past purchases of ghost gun kits. ........................ 26

    A. Because one plaintiff has standing to challenge past
       purchases of firearms, the Court does not need to resolve
       whether all Plaintiffs do. ................................................. 28

    B. The district court correctly held that Plaintiffs' challenge over
       future ghost gun kit purchases is not ripe. ....................... 29

IV. The district court correctly concluded that Plaintiffs are
    unlikely to prevail on the merits of their Second Amendment
    challenge. ...................................................................... 32

    A. The plain text of the Second Amendment does not extend to
        Plaintiffs' proposed conduct of privately assembling
        unserialized firearms. ...................................................... 34

        1.Plaintiffs' desired conduct—to purchase, possess, and assemble
          unserialized firearms—does not fall within the plain meaning of
          "keep and bear Arms."……………………………………………..34

        2.Plaintiffs' out-of-circuit authority does not justify discarding the
          plain language of the Second Amendment…………………………..39

        3.The district court correctly found the Act is a presumptively
          lawful commercial regulation…………………………………………42

    B. The Court does not need to reach the question of whether SB
        23-279 is consistent with the Nation's history and tradition of
        firearm regulation, but ample evidence shows that it is. .............. 45

        1. New "societal concerns" and "dramatic technological changes"
          have created different regulatory challenges Section 18-12-111.5
          is intended to address…………………………………………………..47

        2.The nation has a long history and tradition of regulating firearm
          manufacturing and firearm components…………………………53

V. The remaining preliminary injunction factors, to the extent they
    are addressed at all, favor affirmance..................................... ………..56

    A. Plaintiffs have not established irreparable injury. .........................57

    B. The public interest favors denying the preliminary injunction......59

CONCLUSION .......................................................................... 61

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ........................ 61

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ......... 63

FED. R. APP. P. 28(F) ADDENDUM OF STATUTORY PROVISIONS....65

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Abramski v. United States*, 573 U.S. 169 (2014) .................................... 5, 22

*Accord Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803,(2003) ..... 31

*Ash Creek Min. Co. v. Lujan*, 934 F.2d 240 (10th Cir. 1991) ...................... 31

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009) ................................................................................................ 18

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) .................... 38

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ......................... 59

*Biden v. Nebraska*, 143 S.Ct. 2355 (2023) ................................................ 28

*Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205 (10th Cir. 2014) ................................................................................. 29

*Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) .................................................. 38, 40

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dept. of Safety & Homeland Security*, 108 F.4th 194 (3d Cir. 2024) ..................................................... 59

*District of Columbia v. Heller*, 554 U.S. 570 (2008) 33, 34, 35, 36, 37, 42, 43

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) ...................... 16

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251 (10th Cir. 2024) ................................................................................................ 28

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) .......................... 59

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................... 58

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................ 41

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .................................... 18, 60

*Forth v. Laramie Cnty. Sch. Dist. No. 1,* 85 F.4th 1044 (10th Cir. 2023) ...................................................................... 45, 57

*Garland v. VanDerStok*, 144 S. Ct. 44 (2023) ............................................... 7

*Garland v. VanDerStok,* 144 S. Ct. 1390 (2024)……………………………...8

*Hamer v. City of Trinidad*, 924 F.3d 1093 (10th Cir. 2019) ...................... 20

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ................. 58

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................... 33, 36, 42, 43

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) .................................... 38

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) ..................................... 16

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) .................................................... 32, 33, 34, 35, 37, 43, 46, 47, 49

*New York v. Arm or Ally, LLC*, No. 22-CV-6124 (JMF), 2024 WL 756474 (S.D.N.Y. Feb. 23, 2024) ............................................................ 40

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................. 17, 59

*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022) ......................... 39, 40

*S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143 (10th Cir. 2013) ..... 30

*Samantar v. Yousuf*, 560 U.S. 305 (2010) .................................................. 21

*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005) .......................... 18

*State v. U.S. EPA*, 989 F.3d 874 (10th Cir. 2021) ...................................... 17

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) .............. 41, 42

*United States v. Alston*, 2023 WL 4758734 (E.D.N.C. Jul. 28., 2023) .. 40, 41

*United States v. Cabral*, 926 F.3d 687 (10th Cir. 2019) ............................. 31

*United States v. Dangleben,* No. 3:23-MJ-0044, 2023 WL 6441977
    (D.V.I. Oct. 3, 2023) ............................................................................. 36

*United States v. Langston*, No. 23-1337, 2024 WL 3633233 (1st Cir.
    Aug. 2, 2024) ......................................................................................... 44

*United States v. Rahimi*, 144 S. Ct. 1889 (2024).... 16, 17, 32, 33, 43, 46, 53,
    55, 56

*VanDerStok v. Garland*, 680 F. Supp. 3d 741 (N.D. Tex. 2023) .................. 7

*VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) ................................. 7

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................... 30

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................... 17

*Yates v. United States*, 574 U.S. 528 (2015) .............................................. 21

## STATUTES AND CONSTITUTIONAL PROVISIONS

18 U.S.C. § 922(t)(1) ................................................................................... 23

C.R.S. § 18-12-101 (2024) ...................................................................... 9, 22

C.R.S. § 18-12-111.5 (2024) ................. 9, 10, 19, 20, 23, 34, 36, 38, 40, 49, 56

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ....................... 5

National Firearms Act of 1934, Pub. L. No. 73-494, 48 Stat. 1236 ............. 4

U.S. Const. amend. II ................................................................................. 32

**FEDERAL REGULATIONS**

27 C.F.R pts. 447, 478, and 479......................................................7

87 Fed. Reg. 24,652 (Apr. 26, 2022)..............................................7

**OTHER AUTHORITIES**

*Debate on SB 23-279*, Colo. House of Reps., 74th Gen. Assemb., 1st
    Reg. Sess. (Colo. May 4, 2023) ......................................25, 26

*Hearing on SB 23-279 Before the H. Judiciary Comm.*, 74th Gen.
    Assemb., 1st Reg. Sess. (Colo. May 2, 2023)................................8, 24, 44

*Hearing on SB 23-279 Before the S. Comm. on State, Veterans, &*
    *Military Affairs*, 74th Gen. Assemb., 1st Reg. Sess. (Colo. Apr. 20,
    2023) ........................................................8, 49, 60

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## INTRODUCTION

The statute challenged in this case—which requires all firearms and partially assembled firearms to be serialized—does not prevent Plaintiffs from owning any firearms. It does not affect the operability of any firearms that Plaintiffs already own or may buy in the future. And it does not prevent Plaintiffs from assembling their own firearms from parts kits as a hobby.

What it does is require that all firearms and certain firearms parts contain a serial number and ensures that no one can obtain partially assembled firearms without undergoing a background check. Why? To keep firearms out of the hands of criminals. In recent years, the availability of easy-to-assemble, unserialized firearms parts kits have proliferated, as individuals have been able to obtain them without a background check. Unsurprisingly, this increase in unserialized firearms parts kits has led to a dramatic spike in the use of such weapons in crimes—one study showed a 1000% increase in the recovery of unserialized firearms at crime scenes over a four-year period. Because such kits could be purchased without a background check, nothing prevented criminals from obtaining those firearms. And with no

serial number, those weapons could not be traced by law enforcement. Colorado's statute, SB 23-279 (the "Act"), seeks to close these loopholes.

Even though the Act does not prevent Plaintiffs from owning any firearm or weapons parts kit, Plaintiffs nevertheless seek to enjoin it because, in the words of one Plaintiff, "I feel like the government shouldn't have access to everything that I own." App. Vol. 3 at 529:25-530:1. But such a sentiment is not part of the right to self-defense protected by the Second Amendment. Background checks themselves are based on the idea that the government should know enough about firearm purchasers to ensure they are law-abiding citizens. The Act closes a loophole in the background check system that allowed partially assembled firearms to be purchased without a background check.

The district court properly denied Plaintiffs' request for a preliminary injunction. Plaintiffs failed to establish that they have standing to challenge most of the Act. And to the extent they do have standing, the district court correctly concluded that requiring serial numbers on firearms and firearm parts does not implicate the Second Amendment's protection of the right to keep and bear arms.

## STATEMENT OF THE ISSUES

1.    Did the district court correctly determine that Plaintiffs lack standing to challenge the Act's prohibition on privately manufacturing frames or receivers of firearms?

2.    Because the district court found that at least one Plaintiff had standing (which the Governor does not challenge in this appeal), does this Court need to address the standing of the other plaintiffs?

3.    Did the district court correctly determine that Plaintiffs' challenge to the Act's prohibition on future acquisition of unserialized firearm parts is not ripe because such purchases are currently prohibited by federal law?

4.    Did the district court abuse its discretion when it denied Plaintiffs' motion for preliminary injunction because Colorado's serialization requirement does not impact the Plaintiffs' Second Amendment rights to keep and bear arms, meaning Plaintiffs are unlikely to succeed on the merits of their claim?

## STATEMENT OF THE CASE

### A.    Background of firearm serialization.

The United States has a long history of commercially sold firearms bearing special marks. The earliest example of a state requiring firearms to be marked before being offered for sale is 1805, when Massachusetts passed a law requiring domestic firearms to undergo safety testing and be marked with a stamp showing that the weapon passed inspection. *See* F.R.A.P. 28(f) Statutory Addendum (1805 Massachusetts law imposing fine for manufacturing, selling, or delivering muskets or pistols "without having the barrels proved and stamped"). In the mid-19th century, manufacturers began including serial numbers on their firearms for internal record-keeping. App. Vol. 1 at 146. Although not originally intended to serve law enforcement purposes, states found serialization helpful in investigating crime and began to require serialization in the early 20th century. *Id.* at 79.

The first federal law to require serialization was the National Firearms Act of 1934, which required fully automatic weapons and sawed-off shotguns to have a "manufacturer's number" printed on them. *Id.* at 147. This requirement expanded to cover most firearms through the Gun Control Act of 1968. *Id.* at 147-48. "The twin goals" of the 1968

4

Act's "comprehensive scheme" are "to keep guns out of the hands of criminals and others who should not have them" and "to assist law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014). The first goal is furthered by requiring firearm purchasers to undergo comprehensive background checks. *Id.* The second goal is furthered by requiring serialization on the firearms themselves. *See id.* at 182 ("When police officers retrieve a gun at a crime scene, they can trace it to the buyer and consider him as a suspect.").

Because unserialized firearms simultaneously avoid background checks and are untraceable by law enforcement, such weapons are colloquially called "ghost guns." Serialization, which involves affixing a unique identifying alphanumeric number on the frame or receiver of a firearm, does not affect how a gun operates. App. Vol. 1 at 144.

The Gun Control Act exempted hobbyists who made their own firearms for personal use from the serialization requirement. *Id.* at 79. Over the last 15 years, this exception has turned into a loophole that has significantly burdened public safety. Over this time, "advances in polymers, small-batch parts manufacturing, compact control milling

5

devices, and, most recently, 3D-printing and computer-aided design"
have greatly reduced the barriers for amateurs to assemble unfinished
frames or receivers into fully functional firearms. *Id* at 79-80. Despite
these advances, such unfinished frames or receivers remained exempt
from the requirement of background checks and serialization.

Unsurprisingly, as ghost guns have become easier to assemble,
they have exploded in popularity with criminals. Between 2017 and
2021, the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives
(ATF) reported a 1000% increase in ghost guns recovered by law
enforcement. App. Vol. 2 at 367-68. Given the nature of crime, this
undoubtedly undercounts the actual use of ghost guns. According to one
estimate, ghost guns may account for as many as one out of every four
firearms used in a violent crime, despite representing a much smaller
share of the overall firearms market. *Id.* at 370.

> **B.     The federal government's response to the
>           proliferation of ghost guns.**

Both the federal and state governments have taken action in
response to the growing threat posed by ghost guns. In April 2022, ATF
issued a Final Rule that defined "firearm" and "frame or receiver" to
include weapons parts kits and partially complete frames and receivers

that could readily be converted into a frame or receiver. *See* 27 C.F.R. §§ 478.11, 478.12. The purposes of the Rule change were to "ensur[e] that a component necessary for the functioning of the weapon could be traced if later involved in a crime" and ensure that certain weapons parts kits could not be sold to an individual unless they passed a background check. Definition of "Frame or Receiver" and Identification of Firearms Parts, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R pts. 447, 478, and 479).

Several plaintiffs challenged the Final Rule's legality under the Administrative Procedures Act (but not under the Second Amendment). The Northern District of Texas held that ATF exceeded its authority in promulgating the rules, enjoined their enforcement, and ultimately issued summary judgment invalidating the rules. *VanDerStok v. Garland*, 680 F. Supp. 3d 741 (N.D. Tex. 2023). The Fifth Circuit affirmed. *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023). The Supreme Court has stayed the judgment invalidating the rule, *Garland v. VanDerStok*, 144 S. Ct. 44 (2023), and has granted certiorari to hear the case next term, 144 S. Ct. 1390 (2024). The Final Rule remains in effect pending the Supreme Court's final disposition of the appeal.

### C.    Colorado's response to the proliferation of ghost guns.

After ATF enacted the Final Rule, Colorado passed SB 23-279. It was supported by all of Colorado's district attorneys, the Colorado State Patrol, and the nonpartisan Colorado Association of the Chiefs of Police. *Hearing on SB 23-279 Before the H. Judiciary Comm.*, 74th Gen. Assemb., 1st Reg. Sess. (Colo. May 2, 2023) at 8:30:00, *available at* https://tinyurl.com/5amw9een (testimony of Arapahoe Cnty. Dist. Att'y John Kellner); *Hearing on SB 23-279 Before the S. Comm. on State, Veterans, & Military Affairs*, 74th Gen. Assemb., 1st Reg. Sess. (Colo. Apr. 20, 2023) at 3:18:45, *available at* https://tinyurl.com/4xprsdsm (testimony of Chief Matthew Packard & Chief Brent Newbanks).[1]

The Act principally regulates the "frame or receiver of a firearm," whether finished or unfinished. The "frame or receiver of a firearm" is "a part of a firearm that, when the complete firearm is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components." Colo. Rev. Stat.

---

[1] These hearings will be cited as "House Committee Hearing" and "Senate Committee Hearing" through the rest of the brief.

§ 18-12-101(1)(c.5) (2024). In plain terms, the frame or receiver provides

the structure that holds the critical parts of the firearm together.

An "unfinished frame or receiver" is "any forging, casting,

printing, extrusion, machined body, or similar article that has reached a

stage in manufacture when it may readily be completed, assembled, or

converted to be used as the frame or receiver of a functional firearm."

*Id.* § 18-12-101(*l*). The statute regulates a variety of conduct concerning

unserialized weapons and parts. The following table summarizes the

primary provisions of the statute:

| Statute | Prohibited conduct | Firearm or part |
|---|---|---|
| **§ 18-12-111.5(1)** | Knowingly possess or transport | Unfinished frame or receiver that lacks serial number |
| **§ 18-12-111.5(2)** | Knowingly sell, offer to sell, transfer, or purchase | Unfinished frame or receiver that lacks serial number |
| **§ 18-12-111.5(3)** | Knowingly possess, purchase, transport, or receive | Firearm or frame/receiver that lacks serial number |
| **§18-12-111.5(4)** | Knowingly sell, offer to sell, or transfer | Firearm or frame/receiver that lacks serial number |
| **§ 18-12-111.5(5)** | Manufacture or cause to be manufactured | Frame or receiver |

A violation of these provisions is a Class 1 misdemeanor, or a Class 5

felony if a subsequent offense. *Id.* § 18-12-111.5(6).

As the above makes clear, the statute does not prohibit possessing any firearm, frame or receiver, or unfinished frame or receiver—it just requires that the firearm or firearm part contain a serial number. Under the statute, a federal firearms licensee may serialize a firearm, a frame or receiver, or an unfinished frame or receiver. *Id.* § 18-12-111.5(7)(a). When the licensee returns the serialized firearm or firearm part, they must conduct a background check on the transferee. *Id.* § 18-12-111.5(7)(c).

**D.    The complaint and preliminary injunction motion.**

Plaintiffs—three individuals and two organizations—filed suit on January 1, 2024, the effective date of the Act, alleging that it violated their rights under the Second Amendment. Plaintiffs requested a declaratory judgment that the Act is unconstitutional facially and as applied and sought to enjoin enforcement of the statute. App. Vol. 1 at 17. Plaintiffs then filed a "Motion for Temporary Injunction," requesting facial relief. *Id.* at 39 ("[P]laintiffs respectfully request the Court to enter a temporary restraining order and an order preliminar[il]y enjoining enforcement of the Statute.").

The Governor opposed the motion, arguing that Plaintiffs lacked standing to bring their challenge and in any event the Act is constitutional. *Id.* at 58. The district court held a day-long evidentiary hearing, at which it took testimony from each of the plaintiffs, as well as the Governor's expert, Dr. Brian DeLay, an Associate Professor of History at the University of California at Berkley. App. Vol. 3 at 511.

Following the hearing, the district court denied the preliminary injunction. *See* Special App. I. The court split Plaintiffs' challenge into three parts: (1) enjoining enforcement of the Act against unserialized firearm parts purchased before the Act went into effect; (2) enjoining enforcement of the Act against future purchases of weapons parts kits; and (3) enjoining enforcement of the Act as it relates to 3-D printing and other private manufacturing. In reverse order, the court held:

- Plaintiffs lacked standing to challenge the ban on 3-D printing because they do not have access to a 3-D printer or concrete plans to use one in the future (*id.* at 15-16);

- Plaintiffs' challenge to future purchases of unserialized weapons parts kits was not ripe because such kits cannot be purchased now under federal law (*id.* at 13-15); and

11

- One of the individual plaintiffs (Richardson) and the organizational plaintiffs had standing to challenge the applicability of the Act to previously purchased weapons parts kits (*id.* at 11-12). But those Plaintiffs are unlikely to succeed on the merits because the Act "imposes a condition on the commercial sale of a firearm" and so "is presumptively lawful" under Supreme Court precedent (*id.* at 23). Additionally, the "Plaintiffs have failed to establish that the plain text of the Second Amendment extends to the Individualized Plaintiffs' intended conduct (i.e. possession of unserialized frames or receivers and PMFs [privately made firearms] after January 1, 2024)" (*id.*).[2]

Accordingly, Plaintiffs could not show a likelihood of success on the merits and the district court denied the motion for preliminary injunction. *Id.* at 24.

_____

[2] The district court's standing analysis for the two organizational plaintiffs—NAGR and RMGO—mirrored the analysis for the individual plaintiffs. *Id.* at 16-18. The presence of the organizational plaintiffs therefore did not require a different result as to any of the three holdings.

## SUMMARY OF THE ARGUMENT

The district court correctly denied Plaintiffs' motion for a preliminary injunction for a host of jurisdictional and merits-based reasons. First, the district court denied Plaintiffs' motion as it related to the statute's prohibition on 3-D printing and self-manufacture of guns because none of the Plaintiffs testified they intended to manufacture any firearms with 3-D printers or through other means. Plaintiffs do not dispute this finding, but instead argue that the statute sweeps more broadly than the district court found or the Governor has argued. Plaintiffs argue that the Act's "manufacturing" ban applies to the assembly of firearm kits. But Plaintiffs' interpretation—in addition to being far stricter and seemingly against their interests—is contrary to the plain meaning of the word "manufacture," contrary to the overall statutory structure of the Act, and contrary to statements made throughout the legislative history. These factors all show that the Act is intended to prevent people from obtaining unserialized weapons and close a loophole in the background check system, not to prevent hobbyists from assembling serialized gun kits.

Next, the district court concluded that some, but not all, Plaintiffs lacked standing to challenge the Act's prohibition on possessing previously purchased unserialized firearms, frames, and receivers. The Governor does not challenge the district court's finding that some of the Plaintiffs had standing, so the Court need not further review the standing of the other Plaintiffs (though the Governor agrees with the district court that the other Plaintiffs do lack standing).

As to future purchases of unserialized firearms or frames or receivers, the district court correctly held that the claim is not ripe. Such sales are currently barred by federal law, pending the Supreme Court's decision in *VanDerStok*. For now, at least, Plaintiffs can obtain no meaningful relief as to future purchases because even if they receive an injunction, they would still be unable to purchase unserialized frames or receivers. But even if this portion of Plaintiffs' challenge is ripe, the merits analysis does not meaningfully change as between past and future purchases of unserialized firearms and components, so the district court should be affirmed either on ripeness or on the merits.

As to the merits, the district court did not abuse its discretion when it held Plaintiffs are unlikely to succeed on their Second

14

Amendment challenge. The Second Amendment protects people's rights to keep and bear arms for self-defense. The Act does not affect this right at all. The Act just requires serial numbers be printed on firearms, whether they are assembled or not. It does not impact anyone's right to possess or acquire any firearm. Far from regulating the core right of self-defense, the Act is best understood as a regulation on commercial transactions, a category of firearm regulations the Supreme Court treats as "presumptively lawful."

Even if the Court disagrees, it can still affirm because the Act is consistent with the Nation's history and tradition of firearm regulation and Plaintiffs cannot establish the other factors required for a preliminary injunction (though a remand to the district court to decide these issues in the first instance would be the better course). Ultimately, because Colorado's Act does not implicate any rights protected by the Second Amendment, it is constitutional and the Court should affirm the denial of the preliminary injunction.

## ARGUMENT

I. **Plaintiffs face several heightened legal standards to reverse a district court's denial of a preliminary injunction in a facial constitutional challenge.**

The procedural posture of this case is important. Plaintiffs bring (1) a facial challenge in (2) a preliminary injunction posture, for (3) a type of preliminary injunction that is specially disfavored, and (4) ask this Court to reverse the denial of a preliminary injunction. Each of these elements creates a high bar Plaintiffs cannot clear.

First, the Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). This is because "facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quotations omitted). And "[a]s a general matter," this Court "give[s] all statutes a presumption of constitutionality[.]" *Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012). Accordingly, a facial challenge "is the most difficult challenge to mount successfully because it requires a defendant to establish that no set of circumstances exist under which the Act would be valid." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quotations omitted). "That means that to prevail, the Government need

16

only demonstrate that [the Act] is constitutional in some of its applications." *Id.* Plaintiffs here challenge the Act on its face and so bear the high burden of showing the statute has no constitutionally permissible applications. App. Vol. 1 at 39.

Second, Plaintiffs must clear a high bar when they seek to enjoin a law without allowing the state to mount a full defense. A "preliminary injunction is an extraordinary remedy never awarded as of right," so the plaintiff "must make a clear and unequivocal showing it is entitled to such relief." *State v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (quotations omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, . . . and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[3]

Third, the preliminary injunction Plaintiffs seek here is also "specifically disfavored" because it would "afford the movant[s] all the

---

[3] Ordinarily, plaintiffs must establish both that the balance of equities and the public interest favor a preliminary injunction, but those two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

relief that [they] could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (quotations omitted). Because they are seeking a disfavored injunction, Plaintiffs must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations omitted). The district court held that the heightened standard applies here, which Plaintiffs have not contested. *See* Special App. I at 8.

Finally, the district court denied Plaintiffs' requested preliminary injunction, and this Court "review[s] the denial of a preliminary injunction under an abuse of discretion standard." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009). A district court abuses its discretion only if it "commits an error of law or makes clearly erroneous factual findings." *Id.* (quotations omitted). This Court's "review of a district court's exercise of discretion is narrow, and [it] consider[s] the merits of the case only as they affect that exercise of discretion." *Id.* at 776. An abuse of discretion is "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.* (quotations omitted).

**II.  The district court correctly held that Plaintiffs have not demonstrated standing to challenge the Act's prohibition on self-manufactured firearm parts.**

Subsection (5) of the Act prohibits individuals from manufacturing their own frames or receivers. It provides: "A person shall not manufacture or cause to be manufactured, including through the use of a three-dimensional printer, a frame or receiver of a firearm." Colo. Rev. Stat. § 18-12-111.5(5)(a). Because none of the Plaintiffs testified that they had the means to manufacture their own frames or receivers—in particular, because none of them used or had access to a 3-D printer—the district court held that Plaintiffs lacked standing to challenge this provision. Special App. I at 16.

Plaintiffs do not challenge the district court's finding that they lack access to 3-D printing or other manufacturing methods. Rather, Plaintiffs argue that the district court construed subsection (5) too narrowly, and that "manufacture" includes assembly of firearms parts kits. *See id.* at 21 n.18 ("The Court does not find that § 18-12-111.5(5) operates to ban the assembly of purchased, serialized unfinished frames or receivers into a PMF."). For three reasons, Plaintiffs are wrong.

First, the plain language of "manufacture" does not include assembly of premade parts kits. The "starting point" for statutory interpretation is "the plain language" of the statute. *Hamer v. City of Trinidad*, 924 F.3d 1093, 1103 (10th Cir. 2019). "Significantly, though, the meaning of statutory language, plain or not, depends on context." *Id.* (quotations omitted). Here, "manufacture" has a few dictionary definitions, ranging from broad—"to make into a product suitable for use"—to narrow—"to make from raw materials by hand or by machinery." *Manufacture*, Merriam-Webster.com Dictionary, https://tinyurl.com/3verswh8. While assembling a gun parts kit into a firearm may qualify as "manufacturing" under some of these broader definitions, the statute uses the term "manufacture" more narrowly.

Looking at the context in which "manufacture" is used, it applies to the creation of usable firearm parts from raw materials, not to the assembly of those parts into a functional firearm. The statute's reference to 3-D printing makes this intent clear. A 3-D printer is a "computer-aided **manufacturing device** capable of producing a three-dimensional object from a three-dimensional digital model." Colo. Rev. Stat. § 18-12-111.5(1)(k) (emphasis added). In other words, a 3-D

printer converts raw materials into a three-dimensional object; it does not take pre-existing three-dimensional objects and assemble them, as Plaintiffs seek to do with firearm parts kits. By explicitly referencing 3-D printing as an "included" form of manufacturing, the General Assembly indicated that 3-D printers are "illustrative" of the types of things involved in manufacturing. *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to [legislation].") (quotations omitted).[4]

As another example of the context in which the Act uses "manufacture," it defines "unfinished frame or receiver of a firearm" as "any forging, casting, printing, extrusion, machined body, or similar article that has reached a stage in **manufacture** when it may readily

---

[4] Plaintiffs are correct that subsection (5) is not limited to 3-D printing, but the district court did not hold that it was. *See* Special App. I at 21 n.18 ("A plain reading of the text indicates that subsection (5) prohibits 3D printing of frames or receivers but leaves open the possibility of including other forms of production or technologies capable of replication.").

be **completed, assembled, or converted** to be used as the frame or receiver of a functional firearm." Colo. Rev. Stat. § 18-12-101(1)(*l*) (emphasis added). The statute does not say an unfinished frame or receiver has reached a stage in manufacture where it may be further "manufactured"; rather, it has reached a stage in the process where it may be "completed, assembled, or converted." The manufacturing—the conversion of raw materials into usable parts—has already happened.

By way of analogy, a child who buys and assembles a model airplane kit does not "manufacture" a model airplane. The company that makes all the plastic pieces is the manufacturer. The same is true here: *assembling* the parts in a firearm parts kit is not manufacturing, but *creating* those parts—whether by a large firearm manufacturer or by an individual using a 3-D printer—is manufacturing.

Second, this plain language interpretation of subsection (5) is bolstered by the overall structure and purpose of the Act. When interpreting statutes, courts "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quotations omitted). The purpose of the Act is to close the ghost gun

loophole by which people could obtain unserialized firearms and avoid undergoing a background check. Subsections (1) through (4) of the Act thus prohibit possessing or selling unserialized frames or receivers, whether finished or unfinished, and unserialized firearms. Colo. Rev. Stat. § 18-12-111.5(1)-(4). Subsection (5) cuts off another means to acquiring unserialized firearms without a background check—self-manufacture, especially by means of 3-D printing. Subsection (5) thus works in tandem with subsections (1) through (4) by ensuring that the prohibition on sales or possession of unserialized frames or receivers is not circumvented by people simply creating their own.

But this statutory purpose would not be furthered by prohibiting purchasers from assembling parts kits with serialized frames or receivers. In that scenario, the purchaser underwent a background check when acquiring the serialized parts, so the interest in ensuring that guns are kept out of the hands of criminals has been met. *See, e.g.*, 18 U.S.C. § 922(t)(1); Colo. Rev. Stat. § 18-12-111.5(7). Plaintiffs' contrary interpretation leads to a strange and nonsensical result. Under their view, the statute allows people to possess serialized frames or receivers (Colo. Rev. Stat. § 18-12-111.5(1)(a), (3)(a)), but prohibits them

from assembling the frames or receivers into a completed firearm. But there is no reason for an individual to have a frame or receiver, finished or unfinished, other than to assemble it into a firearm. It makes no sense for the Act to allow someone to possess serialized frames or receivers but then prohibit them from assembling those parts.

Third, this interpretation is confirmed by the legislative history of the Act. The bill sponsors and supporters were concerned with closing the background check loophole posed by ghost guns and assisting law enforcement, not with preventing hobbyists from assembling serialized frames and receivers. As Arapahoe County District Attorney John Kellner stated when testifying in support of the bill in committee,

> Of course, there are hobbyists, there are enthusiasts, there are law-abiding citizens who want to create their own firearms. Fine. Just have a serialized piece of equipment that goes along with it. I think that that is what this bill is ultimately saying. Have a serialized piece, you can still construct it, but you have to go through the background check like everybody else.

*Senate Committee Hearing* at 3:13:00 (testimony of Dist. Att'y John Kellner).

Plaintiffs cite comments from one of the House sponsors of the Act to argue that the bill intends to sweep more broadly. Specifically,

Representative Boesenecker said the Act "prohibits the unlicensed manufacture of all firearms[, which] will ensure that all DIY firearm builders undergo a thorough background check and comply with all the federal regulations applicable to the manufacture of firearms." Opening Br. 33. But Plaintiffs' argument is circular—it assumes that "DIY firearm builders" refers to people assembling parts from kits rather than using a 3-D printer to manufacture parts from raw materials.

Other comments from Representative Boesenecker make clear that "manufacture" refers to something different than assembling firearm kits. For example, his comments emphasize that ghost gun kits and manufacturing are two separate concepts in the Act: "Senate Bill 279 would regulate ghost gun kits **as well as the manufacture of firearms**, helping to keep firearms out of dangerous hands." *Debate on SB 23-279*, Colo. House of Reps., 74th Gen. Assemb., 1st Reg. Sess. (Colo. May 4, 2023) at 1:43:10, *available at* https://tinyurl.com/dcur83cw (statement of Rep. Andrew Boesenecker) (emphasis added). And he, like District Attorney Kellner, recognized that the Act does not prevent hobbyists from assembling ghost gun kits, but only requires that they undergo background checks when they purchase frames or receivers:

> Hobbyists should absolutely be able to continue to assemble firearms for personal use only or obtain a firearms manufacturers license in order to produce and furnish firearms for others, and that happens as a result of acquiring components—specifically, as contemplated in this bill, the frame or receiver—that would be serialized prior to you beginning that process. So yes, if you are a hobbyist that enjoys assembling AR-15s, you simply need to acquire the proper serialized parts—as you can currently buy a serialized lower—to do that. What you won't be able to do is purchase a bulk pack of 80% finished receivers online, finish those—with a drill press or a router with a drill bit and a hand drill—and be in possession of multiple unserialized firearms that become difficult for law enforcement or others to be able to account for should they end up in the hands of someone who is a danger to themselves or someone else.

*Id.* at 3:05:30.

The district court correctly held that subsection (5) does not bar Plaintiffs from assembling firearms from serialized parts kits. Plaintiffs do not have concrete plans to manufacture any firearm components within the meaning of the statute. Therefore, they lack standing to challenge this portion of the statute.

**III.   The district court correctly held that it has jurisdiction only over Plaintiffs' challenge to the enforcement of the statute with respect to past purchases of ghost gun kits.**

The district court divided Plaintiffs' challenge to subsections (1) through (4) of the Act into two parts: an injunction preventing the Act from being enforced with respect to ghost guns and ghost gun kits

Plaintiffs *previously* purchased; and an injunction against the Act from being enforced to bar *future* purchases of unserialized firearms and frames or receivers. The court concluded that one Plaintiff, but not the others, had standing to pursue a preliminary injunction with respect to past purchases of ghost gun kits, and addressed that claim on the merits. But the court held that the challenge with respect to future purchases was not ripe because purchases of unserialized frames or receivers are currently illegal under federal law.

The district court's analysis of these issues was sound. But ultimately, the Court does not need to address this portion of the district court's holding. Because at least one Plaintiff had standing, the district court considered the merits of Plaintiffs' challenge to the Act as it applies to previously purchased ghost gun parts. And that merits analysis does not meaningfully change for future purchases as opposed to past purchases of unserialized firearm parts.

Nevertheless, because Plaintiffs devote a substantial portion of their opening brief to addressing the standing and ripeness issues, *see* Opening Br. 19-39, the Governor responds briefly below.

**A.    Because one plaintiff has standing to challenge past purchases of firearms, the Court does not need to resolve whether all Plaintiffs do.**

The district court concluded that Plaintiff Richardson and the organizational plaintiffs have standing to challenge the Act as it applies to unserialized ghost guns and frames and receivers purchased before the Act went into effect. Special App. I at 16-17. The district court thus proceeded to the merits of that claim.

At the preliminary injunction stage, "[i]f at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S.Ct. 2355, 2365 (2023); *see also Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1263 (10th Cir. 2024) (allowing appeal to proceed where at least one plaintiff had standing even though appeal was moot as to other plaintiffs). The Governor agrees that the Court may therefore proceed to consider the merits of this claim.

Plaintiffs contend the other individual plaintiffs also have standing. Opening Br. 19-26. To the extent the Court addresses that issue, the district court correctly held that Plaintiffs Schlosser and Howard do not have standing to seek a preliminary injunction. "The injury in fact requirement differs depending on whether the plaintiff

seeks prospective or retrospective relief." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014) (quotation omitted). To obtain an injunction, a plaintiff "must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Id.* (quotations omitted).

Here, there is no continuing injury for Schlosser or Howard related to their past purchase of unserialized gun kits. Schlosser testified that he destroyed his unserialized firearms and frames and receivers. Special App. I at 12. Howard, conversely, serialized his previously purchased frames and receivers to comply with the Act. *Id.* Neither currently possess unserialized frames or receivers. Accordingly, the district court correctly held that they lack standing to obtain an injunction related to the statute's enforcement as to past purchases of unserialized frames or receivers.

**B.** **The district court correctly held that Plaintiffs' challenge over future ghost gun kit purchases is not ripe.**

The district court concluded that Plaintiffs' challenge to the Act's prohibition on future purchases of unserialized unfinished frames or receivers was not ripe. *Id.* at 14. "Currently, unfinished frames or

receivers sold by manufacturers must be serialized per the ATF's presently enforced Final Rule." *Id.* So under current federal law, even if Plaintiffs obtained the injunction they seek, they would not be able to purchase unserialized unfinished frames or receivers.

Ripeness "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) (quotations omitted). "In evaluating ripeness, the central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 1152. Plaintiffs' claim ultimately rests on the notion that the Supreme Court will enjoin the ATF's rule in *VanDerStok*, thus allowing the sale of unserialized unfinished frames and receivers. Plaintiffs object that this analysis confuses standing with ripeness. *See* Opening Br. 35-36. But "[t]he doctrines of standing and ripeness substantially overlap in many cases," and whether a claim is ripe ultimately boils down to the question of "'whether the harm asserted ha[s] matured sufficiently to warrant judicial intervention.'" *S. Utah Wilderness Alliance*, 707 F.3d at 1157 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)).

Here, until the Supreme Court resolves the legality of ATF's Rule, it is not clear whether any sales of unserialized unfinished frames or receivers will be permitted. Because such future sales "may not occur as anticipated, or indeed may not occur at all . . . [the] challenge is not yet fit for judicial review." *United States v. Cabral*, 926 F.3d 687, 694 (10th Cir. 2019); *accord Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) ("[A] regulation is not ordinarily considered . . . 'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.").

Plaintiffs finally argue that their challenge is ripe because, but for the Act, they could engage in private sales of unserialized, unfinished frames or receivers. Opening Br. 37-38. But no Plaintiff testified they plan to engage in such private sales. To the contrary, Plaintiff Schlosser testified that PMFs "are not intended to be sold or gifted." App. Vol. 3 at 524:21-23. Such hypothetical injuries, untethered to actual facts, are insufficient to save an unripe claim. *See, e.g.*, *Ash Creek Min. Co. v. Lujan*, 934 F.2d 240, 243 (10th Cir. 1991) ("The ripeness doctrine is

drawn both from Article III limitations on judicial power and from

discretionary policies against deciding hypothetical cases.").

## IV. The district court correctly concluded that Plaintiffs are unlikely to prevail on the merits of their Second Amendment challenge.

Regardless of which Plaintiffs have standing to challenge the Act,

the district court correctly held that they are unlikely to succeed on the

merits. Plaintiffs' claim arises under the Second Amendment, which

states: "A well regulated Militia, being necessary to the security of a

free State, the right of the people to keep and bear Arms, shall not be

infringed." U.S. Const. amend. II. Courts evaluate Second Amendment

claims under a two-step test established in *New York State Rifle &*

*Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). At the first step,

courts must "determine whether 'the Second Amendment's plain text

covers an individual's conduct." *Rahimi*, 144 S. Ct. at 1928 (Jackson, J.,

concurring) (quoting *Bruen*, 597 U.S. at 24). If the plain text does not

cover the conduct, the law does not infringe on Second Amendment

rights. If it does, however, step two of the analysis requires that "[t]he

government must then justify its regulation by demonstrating that it is

consistent with the Nation's historical tradition of firearms regulation.'"
*Id.* (quoting *Bruen*, 597 U.S. at 24).

"'[T]he right secured by the Second Amendment is not unlimited'"
and is "'not a right to keep and carry any weapon whatsoever in any
manner whatsoever and for whatever purpose.'" *Rahimi*, 144 S. Ct. at
1897 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).
Instead, "individual self-defense is 'the central component' of the Second
Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767
(2010) (quoting *Heller*, 554 U.S. at 599). Accordingly, the Supreme
Court has repeatedly recognized that this analytical framework should
not be read to ""cast doubt on longstanding prohibitions on the
possession of firearms by felons and the mentally ill, or laws forbidding
the carrying of firearms in sensitive places such a schools and
government buildings, or laws imposing conditions and qualifications on
the commercial sales of arms." *Heller*, 554 U.S. at 626-27. Such laws are
"presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627
n.26; *accord Rahimi*, 144 S. Ct. at 1902.

Plaintiffs argue that the district court abused its discretion in
denying the preliminary injunction in three ways. First, Plaintiffs argue

33

that the Second Amendment's plain text covers an individual's right to privately assemble unserialized firearms. Second, they argue that § 18-12-111.5 is not a presumptively lawful regulation on the commercial sale of firearms. Third, Plaintiffs assert that § 18-12-111.5 is inconsistent with the nation's history and tradition of firearms regulation. Plaintiffs are mistaken on all three grounds.

## A.   The plain text of the Second Amendment does not extend to Plaintiffs' proposed conduct of privately assembling unserialized firearms.

Under *Bruen*'s first step, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If "the challenged law regulates activity falling outside the scope of the right as originally understood…the analysis can stop there; the regulated activity is categorically unprotected." *Bruen*, 597 U.S. at 18. This approach is "rooted in the Second Amendment's text, as informed by history." *Id.* at 19. A court must therefore give the Second Amendment's text its "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576-77.

Here, the district court correctly held that Plaintiffs "failed to establish that the plain text of the Second Amendment extends to the Individual Plaintiffs' intended conduct." Special App. I at 23.

> **1.    Plaintiffs' desired conduct—to purchase, possess, and assemble unserialized firearms—does not fall within the plain meaning of "keep and bear Arms."**

The Act does not implicate any rights protected by the Second Amendment's text. According to Plaintiffs, their "proposed conduct is acquiring 80 percent frames and making PMF handguns from them." Opening Br. 44. That proposed conduct does not implicate keeping or bearing arms under the plain text of the Second Amendment.

First, the Act does not infringe Plaintiffs' rights to "bear arms." That phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also Bruen*, 597 U.S. at 32 ("'bear' naturally encompasses public carry"). The statute does not impact the right to bear arms, as Coloradans may bear serialized firearms.

Second, the Act does not infringe Plaintiffs' right to "keep Arms." Historically, "'[k]eep arms was simply a common way of referring to possessing arms[.]" *Heller*, 554 U.S. at 583. The Act does not prohibit

possession of any firearm. Instead, § 18-12-111.5 simply requires that owners of PMFs serialize those firearms, as is already required for all commercially manufactured firearms. *See* § 18-12-111.5(7). In fact, one of the Plaintiffs simply serialized his PMFs and so continues to possess them. App. Vol. 3 at 548:2-3, 12-13. The Act therefore does not infringe Plaintiffs' Second Amendment rights to keep and bear arms.

Furthermore, the statute does not affect the core right protected by the Second Amendment. "[I]ndividual self-defense is 'the central component' of the Second Amendment." *McDonald,* 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). The statute's serialization requirement does not remotely interfere with an individual's ability to engage in self-defense. *See United States v. Dangleben,* No. 3:23-MJ-0044, 2023 WL 6441977, *5. (D.V.I. Oct. 3, 2023) ("a person can defend themselves just as effectively with a serialized or deserialized firearm"). Plaintiffs admitted this during the hearing, with Plaintiff Richardson agreeing that the serialized firearms he owns "operate just as well as firearms without serial numbers."[5] App. Vol. 3 at 541:23-5, 542:1. As

_____

[5] To the extent the other Plaintiffs have standing, their rights of self-defense are also not impacted. Plaintiff Schlosser confirmed that his

Plaintiff Schlosser revealed, Plaintiffs object to § 18-12-111.5 not because it infringes on the right to bear arms in self-defense, but because he "feel[s] that the government shouldn't have access to everything that [he] own[s]." *Id.* at 529:25-530:1. But the Second Amendment protects keeping and bearing arms, not privacy.

Instead of arguing that the Act directly infringes their right to keep or bear arms, Plaintiffs instead look beyond the text of the Second Amendment and argue that "the right to keep and bear arms implies a right to manufacture arms." Opening Br. 45. This implied rights argument disregards the clear demands of *Bruen* and *Heller*—courts must begin by determining whether "the Second Amendment's *plain text* covers an individual's conduct." *Bruen*, 597 U.S. at 17 (emphasis added); *see also id.* at 20 ("In *Heller*, we began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language.") (quoting *Heller*, 554 U.S. at 576-77).[6]

---

serialized firearms could be used for individual self-defense, App. Vol. 3 at 528:1-9, and Plaintiff Howard similarly admitted that affixing a serial number "does not change the operability of the firearm." *Id.* at 553:14-16.

[6] Even if the Second Amendment implies some right to acquire, as Plaintiffs argue, "such an implication is not the same thing as being

In any event, the Act does not prohibit acquiring any type of firearm or assembling a serialized firearm parts kit. Instead, the Act merely requires individuals to serialize their PMFs and frames or receivers. *See* Colo. Rev. Stat. § 18-12-111.5(7)(a). That does not implicate the right to "keep and bear Arms."[7]

---

covered by the plain text of the amendment." *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024). Since a right to acquire or manufacture is not in the plain text of the Second Amendment, such an implied right is not subject to *Bruen*'s two-step analysis. The Fifth and Ninth Circuits, for example, have adopted a middle ground approach to claims involving acquiring firearms, with the Ninth Circuit requiring a showing that the challenged law "meaningfully constrains" access to firearms. *See B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024). Colorado's law does not meaningfully restrict acquisition.

[7] This same plain text analysis applies to the Act's ban on 3-D printing, should the Court conclude Plaintiffs have standing to challenge that portion of the statute. *See supra* at 19-26. As another district court held when upholding a statute prohibiting the use and possession of computerized milling machines to manufacture firearms,

What is at issue here is a ban on self-manufacture of firearms and a prohibition on the sale of the tools and parts necessary to complete the self-manufacturing process. . . . [Y]ou will not find a discussion of these concerns (or any such 'right(s)') in the 'plain text' of the Second Amendment.

*Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (quotations omitted).

### 2. Plaintiffs' out-of-circuit authority does not justify discarding the plain language of the Second Amendment.

Plaintiffs rely on several cases from other circuits, but these cases involve challenges to inapposite regulations and fail to establish that Colorado's serialization requirement infringes upon Plaintiffs' right to keep and bear arms. Plaintiffs rely particularly upon *Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022), which preliminarily enjoined a Delaware statute prohibiting the possession of unfinished frames and receivers as well as untraceable firearms. But the Delaware law challenged in *Rigby* differs significantly from Colorado's. According to the *Rigby* court, the Delaware statute implicated the right to keep and bear arms because it "criminalize[d] the possession of unserialized finished firearm frames and untraceable firearms *without providing any way for Plaintiffs to keep firearms they lawfully manufactured.*" *Id.* at 613 (emphasis added). *Rigby* favorably commented on California's ghost gun regulation, which permitted individuals to serialize their PMFs: "unlike California, Delaware is criminalizing the possession of once-lawfully possessed firearms without giving Plaintiffs any opportunity to maintain possession of their firearms by applying for a

serial number." *Id.* at 613 n. 12. Colorado's statute is similar to the
California statute approved of in *Rigby*, not the Delaware statute held
to be unconstitutional. Colorado's statute allows a federal firearms
licensee to serialize any frame or receiver (finished or unfinished) or
firearm, providing Coloradans an opportunity to possess privately
manufactured firearms. *See* Colo. Rev. Stat. § 18-12-111.5(7).

Other courts have reached the opposite conclusion as *Rigby* and
held that the Second Amendment's plain text does not cover private
manufacture or assembly. *See New York v. Arm or Ally, LLC*, No. 22-
CV-6124 (JMF), 2024 WL 756474, *14 (S.D.N.Y. Feb. 23, 2024)
(rejecting a challenge to New York state's ghost gun regulations because
"none of the local, state, or federal laws at issue prohibit people legally
entitled to bear arms from purchasing a firearm"); *Def. Distributed*,
2022 WL 15524977, at *4 n.8 (finding *Rigby* "not persuasive").

The other cases relied upon by Plaintiffs fare no better. *United
States v. Alston* involved a challenge to 18 U.S.C. § 922(n), which
categorically prohibits individuals under indictment from receiving a
firearm. 2023 WL 4758734 (E.D.N.C. Jul. 28., 2023). There, the court
found that the "receipt of a firearm" was logically connected to the

plaintiff's ability to keep and bear arms. *Id.* at *8. The same cannot be said for the right to privately assemble a firearm without a serial number, and the statute's serialization requirement imposes no burden on Plaintiffs' right to keep and bear arms.

Plaintiffs also attempt to cast *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) as fully establishing an implied right to acquire firearms. Opening Br., 46. But *Ezell*, an out-of-circuit, pre-*Bruen* case, does not sweep nearly that far. There, the court struck down Chicago's prohibition on indoor firing ranges within city limits based on the finding that the regulation implicated "the core Second Amendment right to possess firearms for self-defense" because Chicago required range training to lawfully possess a firearm. *Ezell,* 651 F.3d at 711. Here, however, Colorado's regulation imposes no burden on the "core right" of possessing firearms for self-defense.

Finally, Plaintiffs rely on *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017), but that case supports the Governor's position. There, the court rejected a gun seller's challenge to a county ordinance limiting where gun stores could locate, concluding that "the Second Amendment does not independently protect a proprietor's right to sell

firearms" because "nothing in the text of the amendment . . . suggests that the Second Amendment confers an independent right to sell or trade weapons." *Id.* at 683. While this pre-*Bruen* case acknowledged some right to acquire weapons implied by the Second Amendment, it declined to "define the precise scope of any such acquisition right" and concluded that "[w]hatever the scope of that right," the plaintiff's claim failed because gun buyers' access to firearms was not "meaningfully constrained." *Id.* at 679-80.

### 3. The district court correctly found the Act is a presumptively lawful commercial regulation.

The district court's finding that the statute "imposes a condition on the commercial sale of a firearm" further supports the conclusion that Plaintiffs' conduct is not protected by the plain text of the Second Amendment. Because "individual self-defense is 'the central component' of the Second Amendment right," *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599) (emphasis omitted), the Supreme Court has stressed that *Heller*'s holding should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and

qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786. Such laws are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26.

Plaintiffs dispute that any regulations are presumptively lawful following *Bruen*. Opening Br. 61. But remarkably, Plaintiffs ignore the Supreme Court's most recent Second Amendment case, *Rahimi*, altogether. The eight-justice majority in *Rahimi* acknowledged that, as in *Heller*, "many [] prohibitions" on firearm possession, including those categories listed in *Heller*, are "'presumptively lawful,'" *Rahimi*, 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627, n. 26.). Justice Kavanaugh expressly observed that "'laws imposing conditions and qualifications on the commercial sale of arms' are presumptively constitutional.'" *Rahimi*, 144 S. Ct. at 1923 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-627); *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (same); *id.* at 72 (Alito, J., concurring) (noting that *Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns") (citation omitted). In short, "the Supreme Court has stated repeatedly over sixteen years,

from *Heller to Rahimi*," that certain categories of regulations "are presumptively lawful." *United States v. Langston*, No. 23-1337, 2024 WL 3633233 at *7 (1st Cir. Aug. 2, 2024).

Here, the district court correctly held that the Act "imposes a condition on the commercial sale of a firearm" and is therefore "presumptively constitutional." Special App. I at 23. The purposes of the statute are to ensure that individuals cannot purchase firearms kits without completing a background check, as is required for all other firearms sales, and that any frames or receivers (finished or unfinished) will only be sold with a serial number. *See House Committee Hearing* at 7:56:55 (statement of Rep. Boesenecker) (explaining that the bill addresses "gaps in the law" that enable individuals to acquire firearms without a background check, allowing "prohibited purchasers of firearms to evade state and federal laws while gaining access to firearms that cannot be traced by law enforcement"). While not every subsection of the statute directly addresses sales, reading the statute as a whole demonstrates this overall purpose of ensuring people do not acquire firearms or unfinished frames or receivers that can be readily assembled into firearms without undergoing a background check and

obtaining a serialization on those firearms. These are conditions sellers must satisfy before completing a firearm transfer. Therefore, the Act is a presumptively lawful commercial regulation.

**B.    The Court does not need to reach the question of whether SB 23-279 is consistent with the Nation's history and tradition of firearm regulation, but ample evidence shows that it is.**

The Court need not address whether the government carried its burden on the second step of *Bruen* because Plaintiffs did not carry their burden to show the Act is covered by the Second Amendment's plain language. Furthermore, because the district court found that the statute was presumptively lawful and did not fall within the Second Amendment's plain text, it did not address whether the serialization requirement "is in accord with the Nation's history and tradition of regulating firearms." Special App. I at 24 n.21. If this Court disagrees with the district court's analysis, it should remand the case to the district court to consider *Bruen*'s history-and-tradition step in the first instance. *See, e.g.*, *Forth v. Laramie Cnty. Sch. Dist. No. 1,* 85 F.4th 1044, 1070 (10th Cir. 2023) ("Where an issue has not been ruled on by the court below, we generally favor remand for the district court to examine the issue.") (quotations omitted).

45

However, if the Court does proceed to the second step of *Bruen*, Plaintiffs are not likely to succeed on the merits because Colorado's statute "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To meet his burden at the second step, the Governor does not need to identify a historical law that is a "dead ringer." *Id.* at 30. Instead, the Governor must demonstrate only that § 18-12-111.5 has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* As the Supreme Court recently held in *Rahimi*, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," and the analysis required under *Bruen* was "not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897-98. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. Given these shifting regulatory challenges, courts must determine "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. The Act is.

1.  **New "societal concerns" and "dramatic technological changes" have created different regulatory challenges Section 18-12-111.5 is intended to address.**

This case presents a clear example of "unprecedented societal concerns" and "dramatic technological changes" that have altered the "regulatory challenges" from what "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27.

The Governor's witness, Professor Brian DeLay, testified as an expert in the history of firearms and in the international arms trade of the eighteenth and nineteenth centuries. App. Vol. 3 at 585:14-17. Professor DeLay explained that domestic manufacture of firearms was limited in the Founding Era. Instead, "the vast majority of those firearms [in the thirteen colonies] would have been made in Northern Europe, particularly Britain." *Id.* at 586:15-587:2.

Given that "firearms in the 18th century were the most complicated objects that individuals ever encountered except maybe for clocks," it is unsurprising that manufacture of firearms was limited in Founding Era America. *Id.* at 589:19-21. Even among the small number of gunsmiths with the requisite tools and skills, making firearms from self-fashioned components was "a very uncommon practice." *Id.* at

590:15, 590:23-25. The more common practice was to manufacture firearms using imported locks and barrels manufactured in Europe. *Id.* at 591:13-16. However, even individuals utilizing this method of construction "needed to have been trained as a gunsmith and have a wide range of gunsmith tools in order to make a functioning and reliable firearm . . . ." *Id.* at 599:22-24. Unlike gunsmithing today, eighteenth century gunsmithing had "nothing like interchangeable parts," *Id.* at 599:7-10, and the process of constructing a firearm with imported parts "to make it actually function in concert safely was not amateur work." *Id.* at 599:19-20. And "there were certainly nothing like gun kits in early America" that could provide amateurs "everything one would need in order to make a gun." *Id.* at 600:4-8. Based on his extensive academic research, Professor DeLay opined that there was no tradition of amateurs assembling functioning firearms from parts in early America. *Id.* at 601:11-16.

Today, however, dramatic technological changes and unprecedented social concerns present lawmakers with new regulatory challenges. Now, ghost gun kits "are explicitly designed for and marketed to amateurs" and "enable consumers with no skill, experience,

48

or special tools to quickly assemble high-quality firearms." App. Vol. 1 at 83, 118. Furthermore, because PMFs and kits do not require pre-sale background checks and are untraceable because they lack serial numbers, they provide "unique benefits to traffickers and persons engaged in crime." App. Vol. 2 at 373. As a result, PMF recoveries at crime scenes have increased tenfold in in just four years. *Id.* at 368.

The legislative history of § 18-12-111.5 demonstrates that Colorado already struggles with the challenges presented by unserialized PMFs. For example, Chief Brent Newbanks, representing the Colorado Association of Police Chiefs, testified to the legislature that "[g]host guns are seen frequently by police investigating crimes around the state of Colorado" and that these weapons "present unique challenges to law enforcement when it comes to tracking weapons previously used in crime." *Senate Committee Hearing* at 3:21:50 (testimony of Chief Brent Newbanks). These "dramatic technological changes" have enabled the proliferation of easily assembled privately manufactured firearms and created the sort of "unprecedented social concerns" that *Bruen* recognized could require a different regulatory approach than existed at the Founding. *Bruen*, 597 U.S. at 27-28.

Plaintiffs counter that this recent uptick in the production of unserialized privately made firearms is not an unprecedented social concern, but rather part of a longstanding tradition. They assert that the declaration of Joseph Greenlee was "undisputed" and demonstrates the existence of a history and tradition of Americans privately making firearms. Opening Br. 48-49. In fact, it was heavily disputed. Mr. Greenlee, the Director of the National Rifle Association Institute for Legislative Action's Office of Litigation Counsel, is not trained as a historian and does not produce peer-reviewed historical scholarship.[8] *See* App. Vol. 2 at 476.

And Professor DeLay extensively disputed and rebutted many of Mr. Greenlee's claims. First, Professor DeLay noted that Mr. Greenlee's definition of privately made firearms—any firearm not made by the government—would encompass essentially every firearm in the thirteen colonies. App. Vol. 3 at 606:24-607:5. And the "very obvious" fact that professional gunsmiths were "building firearms in colonial America . . .

---

[8] Because the district court did not reach the second step of *Bruen*, it made no findings as to any of the experts' credentials and credibility, further underscoring the need for a remand if this Court decides it needs to reach the history-and-tradition step of *Bruen*. *See* Special App. I at 24 n.21.

is not enough to establish a . . . tradition of privately made arms"
among nonexperts. *Id.* at 607:6-10.

Next, Professor DeLay disputed Mr. Greenlee's claim that four
thousand gunsmiths and armorers operated in colonial America,
observing that that figure appears to include not only actual gunsmiths
but anybody producing material connected to the military, including
items like flags, belts, and knapsacks. *Id.* at 608:6-609:5. To the
contrary, Professor DeLay explained that "the evidence is clearly closer"
to academic historians' estimates that only several hundred gunsmiths
were active in the colonies. *Id.* at 609:17-610:1. Finally, Professor
DeLay opined that "there's no evidence that domestic production was
significant in sustaining the Continental Army in the early phases of
the Revolution" as Mr. Greenlee claims. *Id.* at 610:2-9.

Plaintiffs argue that Professor DeLay's testimony shows that
Colorado's statute is contrary to the nation's history and tradition of
firearms regulation. But Professor DeLay's testimony does not support
their arguments. In what Plaintiffs describe as "stunning" testimony,
Opening Br. 49, Professor DeLay merely agreed that like today, at the
time of the founding most firearms were manufactured by firms, not

individuals. App. Vol. 3 at 616:1-4. Similarly, Professor DeLay agreed that Founding Era gunsmithing was the same as modern gunsmithing "in [the] very limited respect" that constructing a firearm using some component parts was more efficient and commonplace than constructing one entirely from scratch. *Id.* at 626:3-9.

As Professor Delay made clear, a small group of artisans constructing firearms as their profession in the 1790s is not comparable to modern hobbyists assembling firearms from kits. Plaintiffs argue that Professor DeLay agreed that Founding Era amateur gunsmithing was "functionally equivalent to the private manufacturing" engaged in by Plaintiffs, but this is simply not so. Opening Br. 56. When directly asked by Plaintiffs' counsel whether "the situation today [regarding amateur firearm making] is not only partially but 100 percent overlap with what was happening in the Founding Era," Professor DeLay "disagree[d] with that statement." *Id.* at 617:22-25. There simply was no tradition of amateurs assembling firearms from kits in Founding Era America. *Id.* at 601:11-602:5.

**2.     The nation has a long history and tradition of regulating firearm manufacturing and firearm components.**

Given the vastly changed societal and technological circumstances in firearms production, it is hardly surprising that there is no Founding Era "dead ringer" for a law requiring serialization of privately manufactured firearms. In the founding generation, with the extreme differences in firearm production technology, the small number of individuals with the requisite skills and tools to produce firearms, and the lack of a need for serialization in a largely preindustrial society, such laws would have served little practical purpose.

However, the "principle" underlying Colorado's legislation—that the government may regulate the private production of firearms—is found early on in our republic. *Rahimi*, 144 S. Ct. at 1898. As early as 1805, Massachusetts imposed penalties for the manufacture, sale, or delivery of muskets or pistols "without having the barrels proved and stamped as aforesaid," to "prevent" firearms from being "introduced in use which are unsafe, and thereby the lives of the citizens could be exposed." *See* Statutory Addendum. Massachusetts was not alone in requiring that firearms be marked and stamped, including privately

53

made firearms. *See id.* (1821 Maine law imposing fines for selling "any new, or unused musket, rifle, or pistol barrel, without having the same first proved, marked, and certified according to the provisions of this act"). Thus, early American governments understood that requiring firearms to be marked and stamped furthered an important public safety interest without infringing on the right to keep and bear arms.

Similarly, like Colorado's regulation of frames and receivers, Founding Era governments "widely and extensively" regulated another essential component of a functional firearm: gunpowder. App. Vol. 1 at 156. At least six colonies in the 1600s and eight colonies in the 1700s enacted laws regulating this necessary firearm component. *Id.* at 158. Some regulations required a license to possess certain amounts of gunpowder. *Id.* at 161. Others prohibited the importation or sale of gunpowder that was not "marked" as required by statute. *See* Statutory Addendum (1795 Pennsylvania law requiring inspecting and marking of "all gunpowder" stored in public magazines and prohibiting sale of unmarked gunpowder); *see also id.* (1809 Massachusetts law requiring gunpowder manufactured in the state be marked "Massachusetts Inspected Proof"). These regulations of gunpowder were thus sometimes

54

similar to, and sometimes broader than, Colorado's requirement to serialize frames, receivers, and firearms.

Finally, many colonies and states in the Founding Era also regulated self-made firearms called trap guns, which could fire without a human operator by use of a tripwire. App. Vol. 1 at 148-52. The earliest of these laws was enacted in 1771, with fifteen more enacted in the 1700s-1800s. *Id.* American governments thus not only regulated the manufacture of firearms (even those produced by private citizens), but in some cases outright prohibited certain self-made arms to address pressing public safety concerns.

Plaintiffs' argument ultimately amounts to the claim that they should prevail because the founders did not enact "a regulation identical to the Colorado statute." Opening Br. 56. But a challenged regulation need not be "a 'dead ringer' or a 'historical twin'"; it must only "comport with the principles underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898. (Plaintiffs again do not even cite to *Rahimi* in their history-and-tradition argument.) And just as historic surety laws and going armed laws were sufficiently analogous to a modern law preventing individuals from possessing firearms when a court order had

found that the individual posed a threat to his intimate partner or

child, *see id.* at 1894, historic laws regulating firearms manufacture are

sufficiently analogous to Colorado's ghost guns legislation to survive

Second Amendment scrutiny.

Contrary to Plaintiffs' claims, then, Founding Era governments

did not leave the private production of firearms and firearms

components completely unregulated. Instead, history shows a long

tradition of regulating such conduct. And these early regulations,

including requiring stamping and marking firearms and firearm

components, and the outright prohibition of certain types of self-

produced firearms, demonstrate that § 18-12-111.5 is consistent with a

"principle[]" that "underpin[s] the nation's regulatory tradition"—that

governments may regulate private firearms manufacturing to protect

public safety. *Rahimi*, 144 S. Ct. at 1898.

## V. The remaining preliminary injunction factors, to the extent they are addressed at all, favor affirmance.

A court must deny a preliminary injunction if the plaintiffs fail to

meet any of the preliminary injunction factors. Because, as shown

above, Plaintiffs here failed to show a likelihood of success on the merits

of their claims, this Court should affirm the district court's decision

without reaching the remaining factors. Alternatively, if the Court does not affirm, it should remand the matter to the district court for consideration of these factors in the first instance. *See Forth*, 85 F.4th at 1070. But if the Court reaches the remaining preliminary injunction factors, it can still affirm because Plaintiffs have failed to demonstrate irreparable harm or that the public interest favors the injunction.

### A.      Plaintiffs have not established irreparable injury.

Plaintiffs have not shown how requiring serial numbers to be printed on frames or receivers causes them irreparable harm. For example, Plaintiff Schlosser testified that firearm sellers now sell kits that contain serial numbers, so he could continue his hobby of assembling firearms from currently available parts kits. App. Vol. 3 at 526:17-527:1. He also recognized that there were places in Colorado where he could get parts serialized. *Id.* at 528:13-15. (Plaintiff Howard testified that he has in fact taken completed firearms to be serialized. *Id.* at 551:25-552:2.) Plaintiff Schlosser testified that he currently owns firearms he can use to defend his home, and that those firearms contain serial numbers. *Id.* at 528:1-9. And he testified that firearms with serial numbers operate just as well as firearms without serial numbers. *Id.* at

529:1-7. In other words, the Act is not preventing Plaintiffs from defending themselves, which is the central component of the Second Amendment. Nor is it preventing Plaintiffs from engaging in the hobby of assembling firearms. Nor is it requiring Plaintiffs to forfeit any weapons or weapons parts they currently possess. It therefore is not creating a "certain, great, actual and not theoretical" injury of the kind needed to justify a preliminary injunction entered at the outset of a case. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotations omitted).

Plaintiffs do not argue that any facts show irreparable injury here. Rather, Plaintiffs argue that establishing a likelihood of success on the merits of a Second Amendment violation automatically establishes irreparable harm. *See* Opening Br. 69. They principally rely on caselaw establishing that presumption for First Amendment cases. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). But the Tenth Circuit has not adopted this rule in Second Amendment cases.  And at least one other circuit has expressly held that Second Amendment cases are not entitled to such a

presumption and that courts "must apply their equitable discretion to the facts of each case, guided by 'traditional principles of equity.'" *Del. State Sportsmen's Ass'n, Inc. v. Del. Dept. of Safety & Homeland Security*, 108 F.4th 194, 203 (3d Cir. 2024) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006)); *see also id.* ("Except in First Amendment cases, we do not presume constitutional harms irreparable" because "[p]resuming irreparable harm is the exception, not the rule."). Even the Seventh Circuit, on which Plaintiffs chiefly rely, has deferred making that determination. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023) ("[W]e have no need to decide whether an alleged Second Amendment violation gives rise to a presumption of irreparable harm, and if so, whether any such presumption is rebuttable or ironclad.").

Plaintiffs are not entitled to a presumption of irreparable harm and have not even attempted to show that they have suffered any such harm. The preliminary injunction can be denied on this basis alone.

**B.    The public interest favors denying the preliminary injunction.**

The last two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken*,

556 U.S. at 435. These factors strongly weigh in Colorado's favor. First,
Colorado's elected officials "are in a better position than this Court to
determine the public interest." *Fish*, 840 F.3d at 755. Second, as
multiple public safety officers testified during the legislative hearings,
banning ghost guns from Colorado closes a background check loophole
and makes it harder for criminals to obtain firearms.

- "Without a serial number, it's easier for guns to end up in
  the wrong hands." *Senate Committee Hearing* at 3:01:00
  (statement of Denver Dist. Att'y Beth McCann).

- Ghost guns are "designed from the very start so that it's off
  the radar of law enforcement, and off the radar for any
  criminal investigation and prosecution of violent offenses."
  *Id.* at 2:59:20 (statement of Boulder Cnty. Dist. Att'y Michael
  Dougherty).

- "Ghost guns are seen frequently by police investigating
  crimes around the state of Colorado. Ghost guns present
  unique challenges to law enforcement when it comes to
  tracking weapons previously used in crimes, owned by

offenders, or transferred illegally." *Id.* at 3:21:50 (statement of Chief Brent Newbanks).

The benefits to public safety in keeping ghost guns off the streets of Colorado therefore requires the Court to deny a preliminary injunction at this early stage of the proceedings.

## CONCLUSION

The Court should affirm the district court's order denying a preliminary injunction.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because this appeal involves a constitutional challenge to a state statute.

Dated: September 6, 2024

Respectfully Submitted,

PHILIP J. WEISER
Attorney General

*s/Michael T. Kotlarczyk*
*Michael T. Kotlarczyk,* Assistant Solicitor
General*
*Pat Sayas,* Senior Assistant Attorney General*
*Kit Spalding*, Senior Assistant Attorney
General*
*Sam Wolter*, Assistant Attorney General*
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: (720) 508-6187
Email: mike.kotlarczyk@coag.gov;
pat.sayas@coag.gov; kit.spalding@coag.gov;
samuel.wolter@coag.gov
*Attorneys for Governor Jared Polis*
*Counsel of Record

62

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(A) [30 pages] or (B) [no more than 13,000 words].

☒     This document contains 11,865 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6):

☒     This document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.

This document has been submitted in compliance with the court's ECF requirements.

s/ Michael T. Kotlarczyk

## Fed. R. App. P. 28(f) Addendum of Statutory Provisions

| Jurisdiction & Year | Citation | Relevant Language |
|---|---|---|
| **Massachusetts 1805** | Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, at 259-60 (1807),<br><br>*original available at* https://tinyurl.com/mrxuc3vd | appointing "provers of fire arms" whose "duty it shall be to prove all musket barrels and pistol barrels" and imposing fine for manufacturing, selling or delivering muskets or pistols "without having the barrels proved and stamped as aforesaid," to "prevent" firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." |
| **Maine 1821** | Laws of the State of Maine 546 (1830),<br><br>*original available at* https://tinyurl.com/2p8dke6 | appointing "provers of the barrels of all new, or unused firearms" to "prove and try the strength of" firearm barrels and imposing fine for selling "any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified according to the provisions of this Act" |

| Massachusetts 1809 | 2 General Laws of Massachusetts from the Adoption of the Constitution to Feb. 1822, at 199 (1823),<br><br>*original available at* https://tinyurl.com/4w99snt3 | requiring that inspectors "inspect, examine and prove all gunpowder" manufactured in-state or stored in a public magazine and that each cask be marked "Massachusetts Inspected Proof" or "Condemned" |
|---|---|---|
| Pennsylvania 1795 | An Abridgement of the Laws of Pennsylvania from 1700 to Apr. 2, 1811, at 548 (1811),<br><br>*original available at* https://tinyurl.com/5x4w2hak | appointing inspectors to inspect, prove and mark "all gunpowder" stored in public magazine and prohibiting "importing" or "sell[ing]" gunpowder that was not "inspected and marked as aforesaid" |